# Exhibit 6

E1fWdroH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DROPLETS, INC.,

4              Plaintiff,

5         v.                          12 CV 2326 (CM)

6

    E*TRADE FINANCIAL CORPORATION,
7   et al.,

8              Defendants.

9   ------------------------------x
                                     New York, N.Y.
10                                   January 15, 2014
                                     10:00 a.m.
11

12  Before:

                    HON. COLLEEN McMAHON,
13
                                         District Judge
14

15                      APPEARANCES

16  MCKOOL SMITH P.C.
         Attorneys for Plaintiff
17  BY:  COURTLAND REICHMAN
         JOSHUA W. BUDWIN
18       JAMES E. QUIGLEY
         LAUREN L. FORNAROTTO
19

20  WILSON SONSINI GOODRICH & ROSATI, P.C.
         Attorneys for E*Trade, Charles Schwab,
         Scottrade, and TD Ameritrade Defendants
21  BY:  LARRY L. SHATZER
         JESSICA L. MARGOLIS
22       MICHAEL B. LEVIN
         BRIAN D. RANGE
23

24

25

1          (Case called)

2          MR. REICHMAN:  Good morning, your Honor.  Courtland

3     Reichman here, on behalf of Droplets.  With me is Josh Budwin,

4     to my right, and James Quigley.  And behind me is Lauren

5     Fornarotto.  We also have representatives of our clients, Ingo

6     Theuerkauf and David Berkerian.

7          THE COURT:  We aren't set up so one side is at the

8     front table?

9          MR. BUDWIN:  The way the media was set up, we're going

10    to have to share across the table.

11         THE COURT:  Everything is totally backwards.  First of

12    all, the plaintiff is always to my left.  The plaintiff should

13    be at the front table.  We have the plaintiff at the right and

14    only half of the front table.  Don't blame me if I get you all

15    screwed up because I've been doing this for 18 years the same

16    way.  Plaintiffs are on the left and in the front.

17         Defendants.

18         MS. MARGOLIS:  Good morning, your Honor.  On behalf of

19    defendants E*Trade, TD Ameritrade, Scottrade, and Charles

20    Schwab, I'm Jessica Margolis from Wilson Sonsini Goodrich &

21    Rosati.  I'm joined by, at the front table, my colleague Brian

22    Range and, at the back table, joined by Larry Shatzer and

23    Michael Levin.  We also have our expert Dr. Michael Shamos at

24    the back table in the center.  Finally, we've got

25    representatives from two of our clients here today, Mr. David

E1fWdroH

1    Hale from TD Ameritrade and John Bersin from E*Trade.  And,

2    your Honor, Mr. Shatzer, at the back table, will be primarily

3    addressing the Court today on behalf of defendants.

4          THE COURT:  .  We're here because we have this one

5    little, but critical, part of the claim construction to finish,

6    and in that regard, you have submitted affidavits from

7    Dr. Martin on behalf of Droplets and Dr. Shamos on behalf of

8    the defendants.

9          We start with my disclaimer, which you've heard

10   before.  I am a Luddite.  I am not a computer person.  This is

11   a glorified typewriter and post office, as far as I'm

12   concerned.  And I'm not shy about that, but I'm not really as

13   unsophisticated as I appear.  So I need things explained very

14   clearly.

15         In that regard, I understand everything in

16   Dr. Shamos's affidavit.  I do not understand a lot of things in

17   Dr. Martin's affidavit.  So we start with the defendants

18   already out in front because I understand what their expert is

19   telling me, and I do not understand what the plaintiff's expert

20   is telling me.  It does not appear to be addressing what I

21   asked to have addressed, but that's probably because I don't

22   understand it.  I just wanted to get that out there right at

23   the beginning because I don't want anybody to be disadvantaged.

24   You need to teach me.  Okay?

25         You need to teach me, so it may be necessary, as a

1    result, for there to be a little more direct of Dr. Martin than

2    I would otherwise have anticipated.  I'm kind of confused.

3    Dr. Shamos's affidavit is very straightforward.  It's very

4    understandable.  It answers exactly the questions that I asked.

5    Maybe Dr. Martin's does, too, but if it does, he does it in a

6    way that I'm not getting.

7             That said, Mr. Reichman, the floor is yours.

8             MR. REICHMAN:  Your Honor, if it would be helpful, I

9    could make a few opening comments about where we're going.

10            THE COURT:  That's fine.

11            MR. REICHMAN:  It seems to me that, pursuant to your

12   Honor's direction, there are two issues to talk about today.

13   The first one is the one that you've already mentioned, going

14   through the witness examinations so we can figure out what was

15   allegedly disclaimed or what technologies that were disclaimed.

16            THE COURT:  What was disclaimed?  What was disclaimed

17   in 2000, what was disclaimed in 2008 because you have a

18   reexamination --

19            MR. REICHMAN:  That's correct.

20            THE COURT:  -- which, by the way, as far as I can

21   tell, is not addressed in Dr. Martin's affidavit.  Maybe I

22   missed it.  It's clearly addressed in Dr. Shamos's affidavit.

23            MR. REICHMAN:  In addition, pursuant to your Honor's

24   direction, we'll talk about the law regarding the scope of the

25   disclaimer.

1          The focus of the hearing, as I understand it, is the

2     proposed negative disclaimer or negative limitation about what

3     an interactive link cannot be.  It cannot be a list of

4     different technologies.

5          THE COURT:  Right.

6          MR. REICHMAN:  I come at this from a point of view,

7     your Honor, as you do, not being a technical person by training

8     but coming to it as a lawyer, and I'm hopeful that today you're

9     going to see Dr. Martin's testimony.  We've got some graphics

10    and it will explain it in a way that will be more interactive

11    and a little more understandable.

12         THE COURT:  If they're cartoons, I love cartoons.

13         MR. REICHMAN:  We've got a couple cartoons.

14         THE COURT:  Good.  Very important.

15         MR. REICHMAN:  He's going to focus on what was the

16    state of the art in 1999, so focus on what this technology was

17    capable of at the time at the time that this patent relates

18    back to the provisional application to which the '745 patent

19    relates, as filed in 1999.  What he's going to explain, if you

20    want to boil it down to its essence, is he's going to show why

21    the technologies in question in 1999 did not have the

22    facilities for restoring previous operating states, what I call

23    the facilities clause, that's part of the Court's construction.

24         In this regard, the question today, I don't think, is

25    what were these different technologies, URLs and the like,

1   what's the definition of them; I think the question is what was

2   their functionality in 1999.  In that regard, that's where I

3   see the opposing declarations of the experts in this case

4   missing each other or passing in the night in the sense that I

5   think that Mr. Shamos's declaration is more focused on

6   definitions, and you'll see the testimony today from Dr. Martin

7   is more focused on what was the functionality of these

8   technologies back in 1999.

9           You're going to hear the testimony that it didn't make

10  any sense in '99 for URLs and the like, these technologies, to

11  have facilities for restoring an operating state because you

12  didn't have client side applications running from within

13  browsers.  It wouldn't have been necessary, it wouldn't have

14  been appropriate, to have the facilities, facilities clause

15  that we're talking about.  URLs and the other technologies at

16  issue did not, in 1999, facilitate the storage of operating

17  states.  The Web pages were static.  There was no need to be

18  facilitating the storage of these operating states.

19          But today, it's very different, and you'll hear

20  testimony about that, your Honor.  Today it's different.  Today

21  the technologies in question, URLs and the like, are part of

22  the package that is facilitating the storage of operating

23  states.  And why is that?  Because today, unlike in 1999,

24  applications are running on the client side from within the

25  browser, and we're going to show you examples of what we mean

E1fWdroH

by that.  It's not going to be just words; it's going to be a

graphic so you can see what we mean when we say applications

are running from the browser.  Because you're running these

applications on the client side, now, today, it is necessary to

facilitate the storage of the operating states.  Today URLs and

the like can be involved.  They may not do the whole job, but

they can involved in facilitating storage on these operating

states.

          Again, this is where, I think, there is a disconnect

between the experts.  It's not a question, I don't think, and I

think you'll hear Dr. Martin testify, it's not a question of

definitions.  I don't know that the definition of URLs and the

like has changed since 1999.  But what they do, what the

technologies in question do, has certainly changed since 1999

when the Internet itself was being invented.  And I don't

review Professor Shamos's declaration as saying that URLs,

bookmarks, or the other technologies had facilities for

restoring previous operating states in 1999, and if that ends

up being the position, that's something that we dealt with at

the invalidity stage of the case, which really brings me to the

second point of my introductory comments, and that is the law

relating to disclaimers.

          I'm going to assume, absent other direction from the

Court, that you don't want extensive argument at this point on

the law, that we'll deal with that when we wrap up today, but

E1fWdroH

1   maybe I'll give you a two-minute preview of what we intend to

2   argue.

3           I think our legal point, Droplets's legal point, boils

4   down to the proposition that there isn't going to be a need,

5   under the case law, for your Honor to adopt the proposed

6   negative limitation.  We think it's contrary to precedent, and

7   that's precedent that does not favor negative limitations in

8   the first place, and it's also contrary to the law regarding

9   disclaimers.  For there to be a disclaimer, the thing had to be

10  claimed in the first place, and in this case, the URLs, as they

11  existed in 1999, standing alone, there was never an allegation

12  that those were in the four corners of the patent.  Why not?

13  Because they never facilitated the storage of previous

14  operating states.  They never had the facilities clause.  So

15  there was never within the claim, it was not disclaimed.  It

16  was merely distinguished.

17          The point of this is that there is no opportunity,

18  there is no risk of recapture.  It seems to me, in reading the

19  Court's Markman rulings, there's a concern and a concern

20  expressed in the defendants' briefing of what I call anyway

21  recapture; that is, something that was distinguished as part of

22  the prior art is not now being claimed as infringing.  I think

23  that the Court's construction and the bedrock principles of

24  patent law protect against recapture.  There is no realistic

25  possibility of that happening in this case.  And why?  Because

 1   the Court adopted the facilities clause, for starters,

 2   facilities for restoring the previous operating state.  That's

 3   how the prior art was distinguished.  If defendants come

 4   forward at the invalidity stage with prior art that it has the

 5   facilities for restoring the previous operating states and

 6   meets the limitations, then these patents are invalid, so it's

 7   game over at that point.  But we don't think that we're going

 8   to see any testimony when it comes to the invalidity stage that

 9   these facilities were present in the prior art.  That's how it

10   was distinguished in the first place.

11        So then is there an opportunity for recapture on

12   infringement?  No, because if what Droplets is accusing does

13   not have the facilities for restoring the previous operating

14   state, then there's no infringement, and, if it does, there is

15   infringement.  This is all dealt with in terms of bedrock

16   principles of invalidity and infringement.

17        THE COURT:  Can I tell you something?  You're right.

18   You're cute, because we all know what the game is here.  I've

19   done this a hundred times now.  The game is to get the claims

20   defined in such a way that the issue of the infringement,

21   particularly infringement, secondarily validity, is disposed

22   of.  I mean that's round one, to get the terms and the claims

23   defined so that you can say, Hah, we have that, we don't have

24   that, game over.  We're out.

25        You're trying to do it, too.

1    MR. REICHMAN:  Certainly the parties craft their

2    positions with an eye towards invalidity and infringement.

3          THE COURT:  Right.

4          MR. REICHMAN:  But the case law is clear also though

5    that the district court does not need to be looking at the

6    claim construction with an eye towards those things.

7          THE COURT:  I'm always trying to figure out what the

8    heck you guys are trying to do, how you're trying to bamboozle

9    me into deciding the case when I don't know that I'm deciding

10   the case.  I'm not so unsophisticated as not to know that the

11   game at this stage is to get me to decide the case without even

12   knowing that I'm deciding the case.  Okay?  That's what claim

13   construction is all about.  That naive I'm not.

14         MR. REICHMAN:  That's part of the point that I'm

15   trying to make about invalidity and infringement, to give the

16   Court a view toward how this plays out in terms of invalidity

17   and infringement.

18         THE COURT:  You just told me I should not have an eye

19   to that, that the case law forbids me from doing that, so let's

20   not talk about that.  I want to define the term.  I want to

21   define the term, and the law tells me that when I define the

22   term, I'm supposed to look at the prosecution history and I'm

23   not supposed to define a term in a way that recaptures -- that

24   is the correct word -- something that wasn't disclaimed in the

25   prosecution history.  That's all this is about.

E1fWdroH

1          That's all this is about.  We're not going to discuss

2     explicitly how whatever definition I adopt will advance it, one

3     side or another, in the merits litigation.  But I'm not a dope

4     and I know perfectly well that one side or the other will be

5     advantaged in the merits litigation, depending on how I come

6     out.  Okay?  So fine, but I have to define the term.

7          MR. REICHMAN:  That's right.

8          THE COURT:  I have to define the disputed term.  I

9     don't have any choice.  I do not choose to defer it because, as

10    far as I'm concerned, we've got to get the definitions on the

11    table so you know what you're litigating over.

12         MR. REICHMAN:  I think that's right, your Honor, and

13    the law that we'll talk about at the end in terms of what is

14    the scope of a disclaimer, I submit, Droplets submits, that

15    this is not within the law in terms of the scope of the

16    disclaimer.

17         THE COURT:  Great.  That's your position.  Now let's

18    get to what we want to talk about today, which is this

19    evidence.

20         MR. REICHMAN:  At most, then, what you'll see in the

21    evidence, the most that could be disclaimed, just as a matter

22    of logic, is what existed in 1999: the technologies that were

23    later created could not have been disclaimed.

24         Thank you, your Honor.

25         THE COURT:  Let's get started.  It's your nickel.

E1fWdroH

1          MR. BUDWIN:  Your Honor, absent any guidance to the

2     contrary, we would call Dr. David Martin.

3          THE COURT:  I think that would be the best possible

4     idea.

5          MR. BUDWIN:  Come forward, please, Dr. Martin.

6      DAVID W. MARTIN,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9          THE COURT:  First of all, I want to apologize to you

10     for not understanding everything you have in there, but you'll

11     explain it to me.

12          THE WITNESS:  I can't see how that's your fault, your

13     Honor.

14     DIRECT EXAMINATION

15     BY MR. BUDWIN:

16     Q.  Good morning, Dr. Martin.  It should be no surprise that

17     you're here with plaintiff, Droplets, in this case, is that

18     correct?

19     A.  That's correct.  Good morning.

20     Q.  Dr. Martin, why are you here, as you understand it?

21     A.  I'm here to testify about the term "interactive link" and

22     the proposed disclaimer.

23     Q.  Are you also prepared to give the Court a background and

24     introduction into the technology?

25     A.  Yes, I am.

1  Q.  In your opinion, should the defendants' proposed disclaimer

2  be read in as a technological matter?

3  A.  No.

4  Q.  Before getting into the details of your opinion and the

5  background of the technology, can you summarize at a high level

6  why you've come to that opinion?

7  A.  Yes.  At a high level, the technologies that were

8  distinguished in the prosecution history did not meet the

9  construction of interactive link, specifically, the part about

10  restoring operating states.

11  Q.  When you refer to the construction of interactive link, you

12  mean the core definition that the Court has already provided

13  us?

14  A.  That is correct.

15          MR. BUDWIN:  Can we see slide two.

16  Q.  We won't belabor this point, but can you just very quickly

17  hit your expert qualifications?

18  A.  Yes.  I have almost 35 years' professional experience in

19  software.  I have a Ph.D. in computer science, and I've taught

20  in computer science departments.

21          MR. BUDWIN:  Can we advance the slide three, please.

22  Q.  What is the core construction of the interactive link term

23  that the Court has already provided us, what we see here.  We

24  don't have to read it.

25  A.  Yes, sir.  It's shown on the slide.

1   Q.  We see the first part of the definition retrieves and

2   presents applications and/or information stored at remote

3   locations across the network.  Do you see that?

4   A.  Yes.

5   Q.  Dr. Martin, is that a characteristic of all links,

6   bookmarks, shortcuts, hyperlinks, and URLs, as those have

7   existed throughout time?

8   A.  I would say so, yes, for links that concern remote

9   computers.  Yes.

10  Q.  Then the second part of this definition, this is what we've

11  referred to as the facilities clause, provides, "Includes

12  facilities for restoring previous operating states of the

13  application," and that's the point, the application, "as the

14  application is being re-presented at the user's computer.

15  Would you agree or disagree that the second part of this core

16  definition is a characteristic of all links, bookmarks,

17  hyperlinks, URLs, shortcuts?

18  A.  I would disagree.  The second part is not a characteristic

19  of all links.

20  Q.  And why is that?

21  A.  Simply because links, in the early days of the Web, could

22  be used to retrieve and present information that had nothing to

23  do with an application running in the Web browser, and so there

24  was no operating state to consider.

25          THE COURT:  Guess what?  I don't understand what you

1   just said.  I know you're at a higher level, but since I don't
2   want to be confused, I need to understand what you just said.
3           MR. BUDWIN:  Your Honor, I promise that we're going to
4   dive right into that in one second.
5           THE COURT:  Please.
6           MR. BUDWIN:  I was trying to give you an overview.
7           THE COURT:  The overview is too over.
8           MR. BUDWIN:  Let's advance forward.  Let's take a look
9   at some of the background of the Web and then we'll come back
10  and summarize some of this.
11  Q.  Dr. Martin, you prepared some slides to help explain the
12  evolution of technology on the Web and help answer the specific
13  question that the Court's directed to us?
14  A.  Yes, I have.
15          MR. BUDWIN:  Can we advance to slide eight, please,
16  Mr. Quigley.
17  Q.  What are you showing us here, Dr. Martin?
18  A.  I'm showing the cover page from a book called Ajax, the
19  definitive guide by O'Reilly press.
20  Q.  Is this one of the books cited in the briefing by the
21  parties?
22  A.  Yes.
23  Q.  Does this book provide a high-level example of how the Web
24  has evolved from 2000 until more recently and how that change
25  in operating state is key in something that came in 2005 and

1    later.

2    A.  Yes, it does.

3    Q.  Are you prepared to walk us through the examples in this

4    book?

5    A.  Yes, I am.

6            MR. BUDWIN:  Let's go to slide nine.

7    Q.  What are we seeing here, Dr. Martin?

8    A.  What we're seeing here is a screen shot of the MapQuest Web

9    site as it existed in 2000.  MapQuest was a Web site that

10   allowed people to, say, enter an address and it would compute a

11   map and show the map within a Web browser.

12   Q.  Something people familiarly and frequently use on the Web

13   then and now?

14   A.  That's correct.

15           THE COURT:  You've picked one that I use.

16   BY MR. BUDWIN:

17   Q.  Did the MapQuest, in 2000, have links, hyperlinks, and

18   URLs?

19   A.  Yes.  You can see some on the screen.  The big buttons, for

20   instance, are hyperlinks.

21   Q.  Could you save a bookmark or create a shortcut?

22           THE COURT:  What do you mean the big buttons?

23           THE WITNESS:  For instance, in the right lower

24   left-hand column of the screen shot -- yes, thank you.

25           Can you see the cursor moving?

1                THE COURT:  Under special interests?

2                THE WITNESS:  Yes.  Those would be the hyperlinks.

3    Other material on the page, pretty much every independent text

4    block on the page, is probably a hyperlink.

5                THE COURT:  Thank you.

6    BY MR. BUDWIN:

7    Q.  Could you save a bookmark or create a shortcut to a

8    MapQuest page in 2000?

9    A.  Yes.  Web browsers at that time allowed users to save

10   bookmarks.

11   Q.  Does the MapQuest as it exists today work in the same way

12   as it did in 2000?

13   A.  Actually, no, it doesn't.

14   Q.  Is that change relevant to the issue that you've been asked

15   to address today?

16   A.  I think so, yes.

17   Q.  I want to take one step back and I want to look at one of

18   the claims at issue in this case --

19                MR. BUDWIN:  And, Mr. Quigley, if we could see slide

20   five.

21   Q.  -- what are you showing us here, Dr. Martin?

22   A.  We're looking at claim one in the upper left-hand corner

23   and we see the highlighting beginning with client computer and

24   further on having computer code embedded therein.

25   Q.  Do we also see claim 41?

A.  Yes, and 41 in the lower right-hand corner, which also

concerns the client computer, the application presented on the

client computer, and how that information is delivered there.

Q.  These are some of the claims that are being asserted in

this case?

A.  Yes, sir.

Q.  Why are you showing us these claims?  Why is it relevant to

the discussion that we're getting ready to have about the

MapQuest application and how it changed from 2000 to 2005?

A.  These claims talk about the application being presented on

the client computer.  So I think what we need to visualize here

is that there is some active program that runs on the client

computer that's doing work for the user, as opposed to the 1999

state of the art in which a Web browser just showed views of

information that was stored strictly at a Web server.

            THE COURT:  Wait.  This is from the patent, right, the

original?  So this is like a 1999 document, is it not?

            MR. BUDWIN:  This is the asserted claims.

            THE COURT:  The asserted claim.

            MR. BUDWIN:  In the '745 patent.

            THE COURT:  The patent was allowed in, what, 2000?

            MR. BUDWIN:  I don't have the exact date.

            THE COURT:  This document dates from around 1999, does

it not?

            MR. BUDWIN:  The provisional filing was 1999.

1    THE COURT:  Provisional filing was in 1999.  Okay.

2    MR. BUDWIN:  Correct.

3    THE COURT:  This language was created in 1999, so I

4    don't understand why you're asking him to distinguish what was

5    available in 1999 from this language, which is 1999 language,

6    as I understand it.

7    MR. BUDWIN:  Your Honor, what we're going to endeavor

8    to show you is that the Web, in 1999 and 2000, worked in a

9    paradigm where the Web browser on the user's computer, all that

10   Web browser was capable of is displaying a page.

11   THE COURT:  Right.

12   MR. BUDWIN:  Display, that was it.  That was all it

13   did.  In 2005 and later, there was a fundamental shift in

14   technology on the Web where now what you actually have

15   delivered to your client computer is an application, so the Web

16   server, instead of merely sending pages that your browser

17   blindly displays the content of, what you're going to see is a

18   shift where the Web server is now delivering to your client

19   computer an application, and that application is going to run

20   in part on your client computer and in part on the server, and

21   the reason we're showing the claim language here is this is

22   what the invention claims.

23   The invention is claiming what would be called a

24   distributed application, an application that's running in part

25   on the client computer and in part on the server computer, and

1    that's why in particular we've emphasized the language from

2    claim 41 here.  Claim 41, which is one of the asserted claims,

3    talks about updating the display on the client using what's

4    called net change information.  So instead of merely refreshing

5    the page, there's a small, think about MapQuest and this is

6    what we're going to walk through.  You move the map one iota

7    over, what would happen in 2000, the whole page would be

8    redrawn and delivered from the server.

9            What happens today is only that small part of the page

10   is updated because you have this dynamic interactive real time

11   update, and the reason that's important is because when you

12   have a distributed application, like this patent claims and

13   like what became common on the Web after 2005, now you have to

14   preserve operating state information on both the client and the

15   server.  You've always preserved operating state on the server.

16           THE COURT:  Okay.

17           MR. BUDWIN:  We'll get to that.

18           THE COURT:  All right.

19           MR. BUDWIN:  We're going to walk through this.

20           THE COURT:  Okay.

21           MR. BUDWIN:  Mr. Quigley, could we go back to slide

22   nine.  What we're seeing here is just the MapQuest as it looked

23   in 2000; it's got links, hyperlinks, you could create bookmarks

24   and shortcuts.

25   Q.  Dr. Martin, this page that we're seeing here in 2000, how

1   did this work?  Did this work like the invention that's being

2   claimed in the patent, or did it work differently?

3   A.  This worked differently, as I explained.  This is a simple

4   view of a document that's generated at the server and sent back

5   to the Web browser.

6   Q.  Do we have to take your word for it, or does this book

7   actually make the exact point that we're going to endeavor to

8   make here?

9   A.  The text of the book describes the details of the old site

10  and the new technologies as well and how we improved it.

11              MR. BUDWIN:  Could we have the next slide, please,

12  Mr. Quigley.

13  Q.  There's a lot of text here.  There's a lot of highlighting.

14  I'm going to read just a little bit of it, and then maybe you

15  can help us describe a little bit.  It says here that, in 2000,

16  MapQuest worked the same as all other Internet sites at the

17  time.  You click on a link or a search button and you're taken

18  to a new page that had to be completely redrawn.  Is that

19  consistent with the description I just provided to the Court

20  about the application not running on the client?

21  A.  Yes, it is.  And that is how the site worked at the time.

22  Q.  And it says here you change the zoom factor, you move that

23  any direction, you get this round trip to the server that upon

24  return caused the whole page to refresh.  That's what we're

25  describing?

1    A.  That's correct.

2    Q.  Then if we look a little bit further down the page, I

3    believe it's on this page --

4          MR. BUDWIN:  Mr. Quigley, you may have to check; it

5    may break to the next page, the next slide.

6    Q.  -- it says what you really need to know about MapQuest and

7    all Web sites in general at the time, this is 2000, is that for

8    every user request for data, the client would need to make a

9    round trip to the server to get information, a completely new

10   page had to be loaded into the browser.  This was extremely

11   frustrating, but this is how everything was done on the

12   Internet back then.  As the text says, it was the only way to

13   do things.

14         MR. BUDWIN:  Could we see the next slide, please,

15   Mr. Quigley.

16   Q.  Dr. Martin, can you explain what this is showing us, this

17   graphic is showing us, from the textbook?

18   A.  Yes.  This illustration is attempting to show the click,

19   wait, and refresh style of the old Web.  And what we see on the

20   left column, we see the Web browser, the client computer, over

21   time, and it's trying to show that in the first upper left-hand

22   corner view, a Web page is visible when a user does anything

23   like move the map slightly to one direction, that requires a

24   request being sent to the server.  That's the top arrow going

25   to the right.

1   Q.  Can you speak slowly, too?

2   A.  Sorry.  Thank you.

3       So the request is sent to the server that's labeled page

4   request one and sent to the right.  The server then computes

5   the page, the new map, and sends it in response to the client.

6   And then if the client clicks again, then the same process has

7   to happen, and it's shown here three different times.

8   Q.  What is it that the user is clicking on or interacting

9   with, links, hyperlinks, URLs, things of that nature?

10  A.  Yes.  The user can click on a hyperlink or click on an

11  arrow to move the map slightly, for instance.

12          THE COURT:  That's a link.

13          THE WITNESS:  That is a link, yes.

14  BY MR. BUDWIN:

15  Q.  As this is describing, when a user is clicking an arrow or

16  link to move the map a little bit, we have this process where

17  the whole page is being redrawn?

18  A.  That's correct.

19  Q.  In this example, would you characterize the browser as

20  running a portion of the MapQuest application?

21  A.  No, I wouldn't.  I would say that the browser is a viewing

22  portal for maps that are generated on the server in the right

23  column, and it actually shows that there is no client

24  application with operating state running on the Web browser

25  computer.

1    Q.  Now, you've told us before, that MapQuest doesn't work like

2    this today?

3    A.  Correct.

4        MR. BUDWIN:  And we can advance to the next slide.

5    Q.  What is this telling us?  When did the evolution and the

6    way that these sites worked from being what I would call server

7    centric to being distributed across a client and server?  When

8    did that generally take place, as you understand it?

9    A.  That took place in the mid-2000s, and I agree with the text

10   here, that Google Maps, which was a competitor to MapQuest, was

11   the first big deployment of this technology.

12       MR. BUDWIN:  Can we advance to the next slide,

13   Mr. Quigley.

14   Q.  What is this showing us, Dr. Martin?

15   A.  Well, this is a modern version of the MapQuest Web page

16   using the new technology, and if you look at it now, it really

17   doesn't look any different than the old, but it behaves

18   differently underneath.

19   Q.  How does it behave differently?  Do you have some slides

20   that explain that?

21   A.  I do.

22       MR. BUDWIN:  Can we advance again.

23   Q.  What are you showing us here, Dr. Martin?  What is the

24   textbook, and what can you tell us about how a MapQuest has

25   changed between 2000 and 2005?

1    A.  What's attempting to be illustrated here is that the user

2    is still clicking in order to change the map, say, to scroll it

3    to the right or to the left.  But rather than having the map

4    newly regenerated each time, what we see are these embedded

5    arrows.  They're labeled XHR request 1, 2, and so on.  Those

6    are smaller requests that are sent by the client application

7    running on the Web browser computer.  Those are smaller

8    requests that just say, Hey, I need another block of

9    information in this map.  You don't have to redraw the whole

10   thing, just give me the new material.  And so one of those XHR

11   requests is sent to the right, the server computes just the new

12   material, and sends only the new material back to the client

13   application.  That's the MapQuest.

14          THE COURT:  But that happens on the server, not on the

15   client.  The client computer is still essentially a display

16   mechanism; it just now has the ability to ask not for a whole

17   redraw of the page but, Could you please redraw the upper

18   left-hand corner of the page?

19          THE WITNESS:  Generally, yes.  In this scenario,

20   that's what the client application is doing.  It's just asking

21   for a small update to the information on the page.

22          THE COURT:  But how is that fundamentally different?

23   It's still asking the server at the remote location to do that,

24   to do the redrawing.  It just says redraw less.  How is that

25   fundamentally different?

1          THE WITNESS:  I think the difference is that you

2     actually have part of the application running on the client

3     now, and the term that we're discussing has to do with whether

4     it's possible to restore operating states of an application.

5     Now we have an application that's actually running on the

6     client, and it makes sense to talk about its operating state.

7          Now, this example, I agree, is just improving the

8     efficiency of the previous map.

9          THE COURT:  That's what it sounds like all it's doing.

10    It's going to take less time for the server at the remote

11    location to get back to the screen what you want to see because

12    you're only asking it to redraw a little bit of the map, not

13    the entire thing.  Maybe I'm not understanding what it is

14    that's happening at the client computer.

15         MR. BUDWIN:  Your Honor, we have another example that

16    we can show of a live Web page that may help illustrate this,

17    but the key, the key point, is now, instead of the browser

18    merely displaying a document that's generated by the server, on

19    the client computer, part of the application is actually

20    running.  It's not just displaying a page that's drawn by the

21    server.  The client computer actually has logic and is doing

22    processing.

23         THE COURT:  You can't tell that from this example.

24         MR. BUDWIN:  So let's talk about one of the examples

25    that Dr. Shamos used in his declaration, which is the Yahoo!

1   stock chart example.  Why don't we jump forward to that and

2   let's walk through that.  Mr. Quigley, can we jump forward to

3   slide 25.

4   Q.  Dr. Martin, what are you showing us here on slide 25?  And

5   before we get into this, what is operating?  We're talking

6   about operating state, saying it's important now the

7   application's distributed.  What is the operating state, and

8   maybe use your MapQuest example to explain that?

9   A.  Sure.  Look, an application can do many different things,

10  and the operating state is what determines what the application

11  is doing at one instant rather than the full spectrum of things

12  that it can do.  So for the MapQuest example, an operating

13  state might be the particular neighborhood that it's generating

14  a map of.  This is something you might want to write down so

15  that later you can return to the same map segment.

16  Q.  And in the old way of doing the map where the map is being

17  entirely drawn by the server, do you need to preserve operating

18  state with links and URLs and shortcuts that are on the client?

19  A.  You might want to be able to regenerate those graphs later

20  from the server, but in the absence of a client application

21  running, it doesn't make sense to talk about storing the

22  client's application state.

23  Q.  Let's step forward to Dr. Shamos's Yahoo! example.  What

24  are you showing us here on this slide?

25  A.  This is going to be, I think, a three-, or four-slide

1    sequence.  It's a little technical here, but basically, I want,

2    I'm trying to illustrate the old way that things worked, the

3    flow from the client to the server, and what the server does as

4    a result, and it also defines a couple of terms that have come

5    up so far; namely, the query string and the URL.

6    Q.  We see at the top of the page something labeled URL.

7    A.  Yes.

8    Q.  That's a uniform research locator.  It's a link, could be a

9    shortcut.  It's an address of something on the Internet?

10   A.  Yes, and this could be the result of someone clicking on

11   something leads to this URL being used to generate a display.

12   So what happens then when the client's Web browser wants to

13   display this URL is the entire URL is analyzed and broken up

14   into pieces.  The part I've colored red that follows the

15   question mark and labeled query string is simply part of the

16   URL that communicates information to the Web server, and in

17   this example, the query string is saying please generate a

18   graph of the NASDAQ index over time.

19   Q.  That's what the IXIC is, that's the ticker for NASDAQ?

20   A.  That's right.  That refers to NASDAQ.  And then there's

21   also a time frame specified here, T equals 3M, that's within

22   the query string and that says I want a range of a three-month

23   graph.

24   Q.  This is an example of Yahoo! as it worked in '97, as

25   Dr. Shamos says in his declaration, '99, and they even still

1   have pages that work like this today?

2   A.  That's correct.  In fact, this is a URL that still works

3   today using the old technology.  Yahoo! just happens to provide

4   the old technology Web site even today.

5   Q.  So when a user enters this URL or clicks a link that has

6   this address, what happens?

7           MR. BUDWIN:  Could we advance to the next slide.

8   A.  So the URL, most of the URL is sent to the Yahoo! Web

9   server on the right here, and I'm showing on this slide simply

10  that the Web server has received the URL and it needs to create

11  a graph of NASDAQ over time, so it creates that graph and sends

12  it back to the Web browser --

13          MR. BUDWIN:  Next slide, please.

14  A.  -- as a completed Web page with the graph and with all the

15  other buttons and hyperlinks that belong on the Web page.

16  Q.  You actually made a video that illustrates how this process

17  works?

18  A.  Yes, I have.

19  Q.  Can you show that to us and walk us through it?

20  A.  Let's give it a try.

21  Q.  We may have to pause the view a couple times to make sure

22  we keep up.

23  A.  Here we go.  I'm launching the Web browser now, and I

24  have --

25          MR. BUDWIN:  Can you pause it.

1    Q.  What do we see?

2    A.  What we see is the Web browser simply having been launched,

3    and I'm about to click on a bookmark.  It's hard to read, but

4    this is just a bookmark that goes to the Web site I was just

5    discussing, the finance Yahoo! Web site.

6    Q.  So you've created a bookmark that has the URL that you

7    showed in the prior example, the three-month NASDAQ graph?

8    A.  That's correct.

9    Q.  You're going to click on that URL and now we're going to

10   see what happens?

11   A.  Right.

12         MR. BUDWIN:  Please advance the video.

13   A.  So the graph is constructed by the Web server and then

14   delivered to the Web browser.

15   Q.  Correct.

16   A.  Yes.

17   Q.  In its entirety?

18   A.  In its entirety.

19         MR. BUDWIN:  If we advance the video further --

20   A.  I guess we rewound the video a bit so there's a little bit

21   of a repeat here.  So now I'm just moving the mouse pointer,

22   showing the contour of the line.  It kind of doesn't do

23   anything.  It's not a very live chart, but here I'm clicking on

24   a different range.  I'm saying --

25         MR. BUDWIN:  Please pause that, Mr. Quigley.

E1fWdroH                    Martin - direct

1    A.  I just clicked on, I know it's hard to read here, but --

2              THE COURT:  Six months.

3              THE WITNESS:  Six months, right.

4    A.  And let's do another one.  You may have seen when I clicked

5    on six months, the entire screen was erased and then redrawn

6    with the new graph.  I'll do this again here if we just go --

7              MR. BUDWIN:  Slide back a little bit and then play it

8    again.

9    Q.  Go ahead.  See that white flash?  Is that indicative of a

10   page being redrawn, that white flash, Dr. Martin?

11   A.  That is what I was discussing.  Yes.

12             THE COURT:  So long, that must have taken at least

13   like a tenth of a second.

14   Q.  So what we're seeing here is using the older technology,

15   the browser's just displaying the chart on the page as that

16   whole page and that whole chart is being generated by the

17   server?

18   A.  That's correct.

19             MR. BUDWIN:  Let's advance the video further.

20   A.  The next thing that I did was try to show how the Web

21   browser is just a portal on to the Web server, showing what the

22   Web server creates, and it has no independent application

23   ability itself.

24             MR. BUDWIN:  Pause it.

25   Q.  Why is it important whether the application as it's running

1    on the client, or why is it important if there is an

2    application running on the client or not?

3    A.   Again, we're talking about the ability to restore operating

4    states of an application that runs on a client.

5    Q.   In this example, is there an application running on the

6    client?

7    A.   No.  This is the old technology.

8    Q.   You're going to show even further illustration of why

9    that's the case.

10                MR. BUDWIN:  Go ahead.  Push forward.

11   A.   That's correct.  So what I've done now is I have unplugged

12   the network connection and now I'm going to click on one of

13   these hyperlinks.

14                THE COURT:  What do you mean you've unplugged the

15   network connection?

16                THE WITNESS:  I mean it's actually taking the network

17   link and turning it off so the computer that I'm making a video

18   of here is not able to talk to any other computers now,

19   including the Web server.

20   BY MR. BUDWIN:

21   Q.   You've broken the connection between the client and the

22   server?

23   A.   That's correct.

24                MR. BUDWIN:  This is going to be a test, your Honor,

25   so we can see whether or not there is an application running on

1    the client side or not.

2          Advance it and let's see what happens.  I need a new

3    graphics guy.

4          THE COURT:  Basically, what you're going to do is

5    you're going to click like 12 months, or something, and

6    nothing's going to happen because you're not connected to the

7    Internet.

8          MR. BUDWIN:  Correct.  And you don't have any portion

9    of the application that's running on the client, so there's no

10   need to preserve session state because there is no application

11   running on the client.

12   Q.  Now, do you have another example, just like MapQuest, as to

13   how this same technology works using this distributed

14   application claim type claimed by the claims where you have

15   this need to preserve session state, operating state?

16   A.  Yes, I do.

17         MR. BUDWIN:  Now, can we advance to the next slide.

18   Q.  Dr. Martin, what are we seeing here?

19   A.  This is the three-, or four-slide explanation of the video

20   that we'll see afterwards, and it shows the new technology.

21   Q.  Let me stop you.  I see at the top a URL similar to the one

22   that we saw before.

23   A.  Yes, it's not exactly the same, but it's similar.

24   Q.  It's a URL?

25   A.  Yes.

1          THE COURT:  It's definitely a URL.

2    BY MR. BUDWIN:

3    Q.  And you could have a link or a shortcut or a bookmark to

4    this URL?

5    A.  Yes, you could.

6    Q.  And then looking here, I see you've labeled a box query

7    string.

8    A.  Yes.

9    Q.  And within that query string, I see the EIXIC, that's the

10   same NASDAQ index?

11   A.  Yes, it is.

12   Q.  Except now I see plus interactive?

13   A.  Yes.

14   Q.  And so is this going to be a different example than what we

15   saw before?

16   A.  Yes, it is.

17   Q.  And at the very far end of this, you labeled something as a

18   fragment identifier.  What is the portion of the fragment

19   identifier?

20   A.  The fragment identifier starts with the green sharp symbol

21   and it includes all the text including symbol equals and range

22   equals.

23          THE COURT:  What does that mean?

24          THE WITNESS:  The fragment identifier is going to be

25   used by the application that now actually is running on the

1  client to figure out how much of the NASDAQ graph to actually

2  display to the user.

3  BY MR. BUDWIN:

4  Q.  I see you have this computer on the left and the Yahoo!

5  server on the right, and I see there's a get in the middle.

6  What does that illustrate?

7  A.  This is showing the client again sending a request to the

8  Web server, but it's requesting an application now, not merely

9  a Web page.  It's requesting an application.

10 Q.  And then I see you show below the client computer, you say

11 this portion of fragment identifier, see that, is not sent?

12 Why is that important?

13 A.  It's important because what is going to be delivered back

14 to the client is an application that is going to look at this

15 green fragment identifier, and the application will decide what

16 range is appropriate to display to the user based on the user's

17 initial request.  In fact, the Web server in this scenario

18 never even knows what date range is being shown to the user.

19 Q.  Is it possible or would it be fair to characterize at least

20 some query strings of the type that you've shown here as being

21 operating state information for the application as it exists on

22 the server?

23 A.  Yes.

24 Q.  But, is it important in this example in contrast to the

25 prior example and in a context of the distributed application

1   claimed in the patents at issue here that a portion of the

2   fragment identifier that's maintained on the client, why is

3   that important?

4   A.  It's important because the fragment identifier is a good

5   place to store operating state information about the client

6   application simply because it is always maintained on the

7   client.  It's never even sent to the server.

8           MR. BUDWIN:  Can we advance to the next slide.

9   Q.  That's what you're endeavoring to show here: now, in this

10  example, the application, as it runs in the client, it's

11  remembering part of the information in that URL or that

12  shortcut?

13  A.  That's correct.

14  Q.  And that's operating state information for part of the

15  application running on the client?

16  A.  That's right.

17  Q.  But if we look at what's happening on the server, what is

18  the server doing now, Dr. Martin?

19  A.  The server now constructs this interactive application that

20  it's going to deliver.

21  Q.  Let me stop you there.

22          MR. BUDWIN:  Why don't we go ahead and advance to the

23  next slide.

24  Q.  You're saying it's constructing an application.  How is

25  constructing an application different from what we saw in the

1    prior example where the server's constructing a page with a
2    static GIF or JPEG image that shows the stock quote?
3    A.   The difference is in the prior version, the Web page that's
4    generated really just has images and text and layout
5    information in it.
6    Q.   I see, if I look at the page that you're showing being sent
7    back here, there's actually no stock ticker or graph being
8    displayed.  That's different from the prior example.
9    A.   That's correct.  In the modern example, the graph isn't
10   generated at the server.  Rather, the server sends a program, a
11   client application, that is capable of constructing the graph
12   on the client computer.
13   Q.   Is that what you're showing here on the next slide?
14   A.   That's correct.
15   Q.   What is happening now once this application, once that's
16   received by the client, what's the client doing with that
17   application?
18   A.   When received by the client, the client runs this
19   application and looks at this green fragment identifier, sees
20   the one-day date range, and it knows that it needs to construct
21   the graph.  And so it constructs this graph and it puts it on
22   the Web browser making it visible, and then it continues
23   running, watching what the user is doing, to see if the user
24   wants to change anything on the graph.
25   Q.   So now, do we actually have logic running on the client in

1    addition to logic running on the server that's going to

2    process, interpret, and update the display for the user without

3    having to make any queries to the server at all?

4    A.   That's correct.

5    Q.   Is that important?

6    A.   Yes, that is important.

7    Q.   Why?

8    A.   Because, again, this means that much of the computing

9    burden of generating these graphs is now borne by the

10   individual users.  Okay?  This is, makes it much easier to run

11   the Yahoo! servers because they don't have to construct the

12   graphs; they just have to send graphing applications to users.

13   So that's a benefit to Yahoo!.

14   Q.   Why is that important in the context of the specific

15   question that you're being asked to address today, which is

16   whether or not the capabilities and functionalities -- links

17   and URLs and hyperlinks and shortcuts -- have evolved from 1999

18   until today?

19   A.   Again, back to the client application running, since the

20   application is running here, it makes sense to want to record

21   its operating state; namely, what is being graphed and what the

22   range of that graph should be.  Okay?  And so that operating

23   state is visible in the URL as part of the fragment identifier

24   and can be bookmarked.

25   Q.   Do you have another video that shows this example or kind

1   of contrasts it somewhat to the prior one?

2   A.  Yes, I do.

3   Q.  Again, let's just walk through this slowly.  What are we

4   seeing, Dr. Martin?

5   A.  This will look initially very similar to the previous

6   example, but this uses the modern technology.  So I clicked on

7   the new link, and we will see a brief pause and a graph

8   appears.  It's been constructed by the client application, and

9   now if we continue, I'm going to move my mouse pointer around

10  on the graph.  You can see there's a small dot that follows the

11  mouse pointer and there's a number that tracks the dot in the

12  upper left.  It's a little small.  So that's showing the client

13  application doing something.  And now I'm going to, as before,

14  disconnect from the network.  It's no longer able to talk --

15  Q.  Sorry.  Why are you disconnecting from the Internet, and

16  what is that going to prove?

17          THE COURT:  Because you asked him to.

18          I know what it's going to prove.  It's going to prove

19  that there's going to be a change that is going to be made on

20  this graph, even though he's no longer connected to the

21  network, that something's happening on the client computer.

22          MR. BUDWIN:  Right.  Part of the application is

23  running on the client.

24          THE COURT:  That I got.

25          MR. BUDWIN:  Advance.

 1          THE COURT:  So disconnect, press the button, and
 2     update the graph.
 3          THE WITNESS:  Exactly.  That's exactly what we'll see
 4     here.  We're disconnected, as shown in the lower right-hand
 5     corner.  You can still click and change the date range.  Again,
 6     just shows that a client application is now running.  So that's
 7     the essential difference between the old and the new.
 8     BY MR. BUDWIN:
 9     Q.  And now because this client application is running on the
10     client in part, what does that mean about operating state?
11     A.  That means that it's relevant to store the operating state
12     of the client application because we have a client application.
13     Q.  Now, we can all agree or disagree about how evolutionary
14     this change in the Web was.  I mean, I think if you look at the
15     relevant commentators --
16          MR. BUDWIN:  And, Mr. Quigley, can hold up the Ajax
17     book in front of him.
18     Q.  -- it's all about this.  This is a thick book.  This is a
19     big change that fundamentally happens in the mid-2000s, and
20     that change is fundamental to the conventions that are claimed
21     here.
22          MR. BUDWIN:  If we can go to slide 14, back to the
23     claim language, this is where -- sorry.  Slide 15.  Back to the
24     claim language.  This is where we have to look to see what the
25     invention is that's being claimed.

1   Q.  Dr. Martin, in light of the example that you gave us of

2   MapQuest and Yahoo! and looking at the language, the first part

3   of the language of claim one, can you explain how those

4   examples are relevant to the claim language and whether the old

5   systems -- did old systems read on claim one?

6   A.  No, they don't, because the old systems don't have computer

7   program code embedded that arise at the client.  That's

8   referring to the client side of the application.

9   Q.  If we look at claim 41, this is the claim that talks about

10  using the net change information.  Did the old Yahoo! and

11  MapQuest read on claim 41?

12  A.  No, for the same reasons.

13  Q.  Again, would a modern Web application where part of the

14  processing is borne, part of the application is on the client,

15  is that germane?  Does that fall within the type of

16  architecture invention set forth in claim one and claim 41?

17  A.  Yes.  It's relevant and it potentially would satisfy these

18  highlighted limitations.

19  Q.  So that's why this change is relevant in the state of the

20  art because now we have these client server applications as

21  opposed server-centric applications?

22  A.  That's correct.

23  Q.  Dr. Martin, with that background, I'd like to advance and

24  ask you some questions about the specific prior art that was in

25  prosecution because the patentees are distinguishing specific

1    pieces of art, and it's what the patentees had to say about the
2    capabilities of those specific pieces of prior art.  That's
3    what's relevant to the scope of the alleged disclaimer and
4    whether or not there's recapture.  That's my statement; you
5    don't have to agree with that.
6         MR. BUDWIN:  Let's take a look at slide 16.
7    Q.  This is the Gish patent.  This is one of the pieces of
8    prior art that was being discussed in prosecution?
9    A.  That's correct.
10   Q.  And we can see a date at the top, June 16, 1998, filing
11   date of '96.  Before we get into the meat of the issue, there's
12   another reference called ICE-T that's been talked about?
13        MR. BUDWIN:  Next slide.
14   Q.  High-level overview, ICE-T user guide '96.  Is there a
15   relationship between the Gish patent in slide 16 and the ICE-T
16   system that we see in slide 17?
17   A.  Yes.  They both describe the same invention.  Gish is the
18   patent and ICE-T is simply a user's guide.
19   Q.  Let's advance a little bit.  We're going to talk about Gish
20   and ICE-T together, if that's okay with you, Dr. Martin, since
21   they're similar or the same.
22   A.  Yes.
23        MR. BUDWIN:  Slide 18, please, Mr. Quigley.
24   Q.  What is, at the highest level, the Gish patent and the Gish
25   system?  What is it about?

1   A.  The Gish invention provides a way to create client server

2   applications that run over the Internet.

3   Q.  So at a high level, how is the system described in Gish and

4   ICE-T different from the inventions claimed in the '745 patent

5   and in particular some of the claims, one and 41, that we've

6   shown the Court?

7   A.  One relevant difference is that Gish does not describe any

8   mechanism for restoring previous operating states of an

9   application.

10  Q.  That's the second part of the Court's core definition of

11  the interactive link term?

12  A.  That's right.

13  Q.  Do Gish and ICE-T discuss links as that technology existed

14  in 1998?

15  A.  Yes, they do.  We can see a reference to a link on the

16  slide 18.

17  Q.  No surprise that links were in the prior art in 1998?

18  A.  No.

19  Q.  Not disputing that the Gish patent and ICE-T reference

20  discuss links as they existed?

21  A.  No.

22          MR. BUDWIN:  If we could see slide three, Mr. Quigley.

23  Q.  This is back to the Court's core definition, rooted in the

24  claims and the parts of the construction that we've already

25  received.  Did the links discuss in Gish and ICE-T meet the

1   first part of the Court's core definition of interactive link?

2   A.  Yes, they would.

3   Q.  Why is that?

4   A.  Because the hyperlinks discussed in Gish are able to

5   retrieve and present information stored at remote locations

6   across the network when selected.

7   Q.  Now, would the links in Gish and ICE-T meet the facilities

8   clause, the second part of the Court's core construction of the

9   interactive link term?

10  A.  No, it wouldn't.  Because, as I said, there is no

11  application operating state to restore described in Gish.

12  Q.  And so the fact that Gish and ICE-T failed to meet the

13  second part of the Court's construction of interactive link

14  shows that no additional disclaimer, at least as to those

15  references, is warranted.  That's my statement; you don't have

16  to accept that.  It's a legal statement.

17          MR. BUDWIN:  Let's advance to the Dickman reference,

18  which is another of the pieces of prior art that's being

19  discussed, and this is slide 19.

20  Q.  What's the date on the Dickman patent?

21  A.  March 2, 1999.

22  Q.  Can you tell us a bit about the system being claimed by

23  Dickman?

24  A.  Yes.  The invention of Dickman was to describe simply a new

25  place to store a bookmark.  Previously, bookmarks were stored

 1    strictly within the Web browser and Dickman says, Hey, you can

 2    actually take the bookmark and store it outside of the Web

 3    browser as well.

 4    Q.  If we look at the abstract here, there's a reference to URL

 5    and there's a reference to an Internet shortcut?

 6    A.  Yes.

 7    Q.  So, again, no surprise that those technologies existed or

 8    were discussed in the prior art?

 9    A.  Right.

10    Q.  So at a high level, how is it that the invention in Dickman

11    is different from what's being claimed by the patents at issue

12    in this case?

13    A.  Again, the difference is that Dickman does not describe

14    applications running on the client.  It simply describes links

15    and where the links are going to be stored.  So without

16    describing applications, there's no need to be concerned with

17    storing the application operating state.

18    Q.  If we go back to the Court's core definition of the

19    interactive link term in slide three, would the URLs and the

20    shortcuts that are discussed in Dickman meet the first part of

21    the Court's core definition?

22    A.  Yes, they would.

23    Q.  Why is that?

24    A.  Because, as hyperlinks, they're able to retrieve and

25    present information stored at remote locations.

1    Q.  Would the URLs and the shortcuts that are being talked
2    about in the Dickman reference meet the second part of the
3    Court's core construction of the interactive link term?
4    A.  No, they wouldn't, because there is no description of
5    applications, and at that time there were no client side
6    applications that could be invoked using links.
7                MR. BUDWIN:  Again, I would just make a statement --
8                THE COURT:  You don't have to make a statement.
9                MR. BUDWIN:  Let's talk about the next slide.
10               THE COURT:  Let's not.  Do me a favor.  I have a
11   criminal matter that is going to take about eight minutes, but
12   I have a whole bunch of people sitting in the back and I'd like
13   to get them out of here, as the billable hours are starting to
14   run.  Why don't we take a ten-minute break and let me deal with
15   this criminal matter.
16               (Recess)
17               (In open court)
18               THE COURT:  You're still under oath.
19               MR. BUDWIN:  We need to go back.  I realized I started
20   addressing one of the Court's earlier questions and didn't
21   preface that I was actually doing that.  So let's take a step
22   back to slide 16, please.
23               Before the break, we talked about the Gish and ICE-T
24   references.  Those were references that were being asserted in
25   the re-exam, and so the basis on which those references were

1  distinguished, and we'll look at the alleged disclaimers about

2  these references in a minute, but I just wanted to point that

3  out, that those were reexamination references.

4          THE COURT:  They were, correct.

5          MR. BUDWIN:  The same is true with respect to the

6  Dickman reference, slide 19, which is where we were at the time

7  we took the break.

8          THE COURT:  Yes, because I think I sent out an e-mail

9  that said, Guys, where is stuff in the record from the original

10  prosecution, and I was told that everything was from

11  reexamination.

12          MR. BUDWIN:  Correct, yes.  It was a filing of that

13  nature.

14          Let's pick back up where we were.  This is the Dickman

15  reference, slide 19.  It's a re-exam reference, filed in '95.

16  The date of patent is '99, and talks about URLs and Internet

17  shortcuts.  Could we go to slide three.

18  Q.  Would the URLs and the shortcuts in Dickman meet the first

19  part of the Court's core construction of the interactive link

20  term?

21  A.  Yes, they would, because they can be used to retrieve and

22  present information stored at remote locations.

23  Q.  Would the URLs and the shortcuts in Dickman meet the second

24  part of the Court's core construction of interactive link?

25  A.  No, they wouldn't, because they don't describe the

1    operating state of an application or even an application.

2              MR. BUDWIN:  Let's take a look at slide 21.  This is a

3    part of Dickman that we'll actually see being discussed in the

4    sites that the defendants point to for the alleged disclaimer,

5    and the very last sentence -- I'll read it, this is describing,

6    this is quoting, this is actually out of the Dickman patent --

7    says, "The Internet shortcuts encapsulate URLs or other

8    location information and other information.  The Internet

9    shortcuts are implemented as objects that are visible within

10   shell name space."

11   Q.  Is that consistent with how you described the Dickman

12   reference, Mr. Martin?

13   A.  Yes, it is.

14   Q.  Let's take a look at one more reference that is being

15   discussed in the prosecution which is LeMole, slide 22.  What

16   do we see as the date of the LeMole patent?

17   A.  December 28, 1999.

18   Q.  And, again, if we look a little bit below in the abstract,

19   there is a reference here to specific URL addresses?

20   A.  Yes.

21   Q.  What is the LeMole patent claiming or describing, at a high

22   level?

23   A.  LeMole describes a facility for delivering appropriate

24   advertisements to Web browser users.

25   Q.  And if we look at the next slide, this is the summary of

1  the LeMole invention, straight out of the LeMole patent?

2          THE COURT:  Do me a favor.  Say that again, what

3  LeMole was.

4          THE WITNESS:  Sure.  LeMole describes a technique for

5  selecting advertisements to display to the user of a Web

6  browser.

7  BY MR. BUDWIN:

8  Q.  In fact, is that what we see being described here with the

9  summary of the invention, "In accordance with the present

10  invention, a customized advertising repository server is

11  connected on the World Wide Web"?

12  A.  That's correct.

13  Q.  Then if we look a little further, it says, "and it can be

14  accessed by a registered user through his or her browser,

15  either by clicking on an icon or inputting a specific URL

16  address of the particular server which stores the user's

17  advertising repository."

18  A.  Correct.

19  Q.  So, if we look back to the Court's core construction of the

20  interactive link term in slide three -- actually, before we get

21  there, at a high level, how does the advertising system in

22  LeMole differ from the inventions claimed in the patent?

23  A.  LeMole delivers advertisements, generally images, to a Web

24  browser user, and it does not discuss applications that do work

25  on behalf of the user at all.

E1fWdroH                          Martin - direct

1   Q.  So, again, if we look at the Court's core definition in

2   slide three, the interactive link term, would the URL that's

3   being described in LeMole meet the first part of the Court's

4   construction?

5   A.  Yes, it would.

6   Q.  Why is that?  Why is that?

7   A.  Because such URLs were used to retrieve and present

8   information; namely, advertisements.

9   Q.  Would the URLs being discussed in LeMole meet the second

10  part of the Court's core construction of the interactive link

11  term?

12  A.  No, because the advertising delivered can't be considered

13  applications.

14  Q.  So in light of that background, now that we've talked a

15  little bit about the technology and the reference, I think it

16  would be helpful to look at the specific disclaimers that the

17  defendants are pointing to, and I also think it's important to

18  keep the disclaimer in mind not only in the context of the

19  technology as it existed in 1999 in general, but I think it's

20  fundamentally important to keep in mind the specific technology

21  and discussion that are in the references that are actually

22  being distinguished.

23          MR. BUDWIN:  Let's take a look at slide 39, please.

24  Q.  What we see on slide 39 is one of the disclaimers

25  defendants have pointed to.  Have you reviewed these,

1   Dr. Martin?

2   A.  Yes, I have.

3   Q.  Here, there is the discussion of Dickman, which is one of

4   the references we talked about earlier?

5   A.  Yes.

6   Q.  And it says, "Internet shortcuts encapsulate URLs or other

7   location information and cannot perform the functions of

8   interactive links as claimed."  Do you see that?

9   A.  Yes.

10  Q.  In light of what the Court has already given us, two-part

11  interactive link construction, what do you understand this

12  disclaimer to be talking about?

13  A.  This disclaimer is talking about the way in which URLs were

14  used at the time.

15  Q.  And specifically in the Dickman reference?

16  A.  Specifically in the Dickman reference, and regarding URLs

17  as communicating location information.

18  Q.  And you see, looking at the portions that we've highlighted

19  here, "The Internet shortcut is used by the operating system to

20  launch a buffer application and to retrieve resources that

21  reside in the Internet."  URLs and other location information

22  are merely location data, correct?

23  A.  Correct.

24  Q.  URLs and other information are elements that inform the

25  browser to locate certain items, right?  That's what the

1  applicants are saying?

2  A.  That's correct.

3  Q.  And if we go back to the Court's core construction in slide

4  three, we see that what the applicants are saying is the URLs

5  that are in Dickman, they talk about location and how to

6  retrieve information over a network, right?

7  A.  They do.

8  Q.  That's the first part of the Court's definition?

9  A.  Yes.

10  Q.  I don't see any reference in this disclaimer to the second

11  part of the Court's core definition, which is about operating

12  state of applications, so if we go back to slide 39, do you see

13  any such reference or discussion in the disclaimer?

14  A.  No, I don't.

15  Q.  Is it fair to say the discussion that's being provided here

16  is consistent with the Dickman reference and the way that you

17  described it to the Court?

18  A.  Yes, I would say that.

19  Q.  Now, the defendants like to focus on the section heading,

20  "Internet shortcuts do not represent an interactive link."

21  That's what they point to.  But do you think it's important to

22  actually look into the substance of the argument the applicant

23  is making in addition to merely looking at section headings?

24  A.  Yes, I do.  It's important to understand the full

25  explanation.

1  Q.  And this is talking about a specific reference, the Dickman

2  reference?

3  A.  That's my understanding.

4  Q.  Now, in addition to what you've told us about the Dickman

5  reference not including operating statement information, have

6  you seen any indication from the defendants or from Dr. Shamos

7  in his declaration that the Dickman reference included

8  operating state information so that the defendants or the

9  applicants would have to broaden their disclaimer to get around

10  it?  Have you seen that allegation?

11  A.  No, I haven't.

12  Q.  Let's take a look at the second disclaimer the defendants

13  point to, and this is the same basic text of what we saw in the

14  last one.  It's the same heading and it's the same subject

15  matter.  Again, the applicants are pointing out that the

16  Internet shortcuts in the Dickman reference being discussed

17  here are location based?

18         THE COURT:  You know, I just have to say one thing.

19  I'm so happy today, this is so much more fun than what I did

20  the last two days.  You guys are such great lawyers, but you're

21  doing legal argument.  I don't need him to be on the stand

22  while you're doing legal argument.  I need him to give

23  testimony about that which he is an expert.  Okay?

24         MR. BUDWIN:  That's a fair point.

25         THE COURT:  I'm not going to listen to a word he says

1   about legal argument.

2          MR. BUDWIN:  That's a fair point.  I'll wrap it up.

3          THE COURT:  And you're paying for him.

4          MR. BUDWIN:  I'll wrap it up briefly.

5   Q.  So the discussion here is about location?

6   A.  Yes.

7   Q.  And in your expert opinion and in your review of the

8   Dickman reference, you would agree the Dickman reference is

9   talking about location?

10  A.  Location represented in the URL, that's right.

11  Q.  Not operating state?

12  A.  That's right.  Not operating state.

13         MR. BUDWIN:  Let's take a look at another of the

14  alleged disclaimers, slide 42.

15  Q.  This is the discussion of the LeMole reference, one of the

16  ones we talked about earlier, advertising, is that right?

17  A.  That's correct.  LeMole and advertising.

18  Q.  And again, it says, "The bookmark is stored on the Web page

19  location or a URL on a browser, while a browser icon is a

20  picture that launches a picture application.  All browser

21  elements that inform the browser program to locate certain

22  elements."  Do you see that?

23  A.  Yes, I do.

24  Q.  Again, they're talking about location?

25         THE COURT:  I'm sorry.  Icons aren't interactive?

1     When I click on an icon, something doesn't happen?  That's

2     funny.  When I click on icons, things happen on my computer.

3     Is my computer unique?

4                THE WITNESS:  No.  Icons can be links.

5                THE COURT:  They can be links, they can be

6     interactive, can they not?

7                THE WITNESS:  Absolutely, yes.

8                THE COURT:  That's what I thought.

9                MR. BUDWIN:  But, your Honor, I don't think --

10               THE COURT:  No, no.  Now you're having a conversation

11    with me.  If you choose to ask him questions, then I get to ask

12    him follow-up questions.  If you want to make legal arguments,

13    you make them later.  Okay?

14    BY MR. BUDWIN:

15    Q.  Dr. Martin, do you see the text where it says "special

16    browser icons are not the same as an interactive link as

17    claimed"?

18    A.  Yes.  Right above the highlighted block, it says, "special

19    browser icons are not the same as an interactive link as

20    claimed."

21    Q.  Do you understand that statement to be saying --

22               THE COURT:  No, I don't want to hear what you say it

23    says.  Have you guys ever heard of a leading question, you

24    people on this side of the room?  Are you familiar with that

25    concept?

 1           MR. BUDWIN:  Yes, your Honor.

 2           THE COURT:  Good.  Because I've let this go on for

 3   like two hours.  I want to hear him.  So far, I've heard your

 4   testimony with which he agrees.  Okay?  I'm not going to give

 5   that a lot of weight, let me tell you that right now.  As far

 6   as I'm concerned, he hasn't testified.  So if I were you, I'd

 7   quit now and I'd let this man, who has credentials that you and

 8   I do not, testify.

 9           MR. BUDWIN:  Yes, your Honor.  Let me just wrap it up

10   then.

11           THE COURT:  Don't wrap it up with a leading question.

12   And you, on your feet, as my partner Arthur Liman used to say,

13   hitting us on the back, "On your feet."

14           MR. SHATZER:  Yes, your Honor.

15           THE COURT:  Object.

16           You haven't done anything wrong.

17           THE WITNESS:  Thank you, your Honor.

18           MR. BUDWIN:  Dr. Martin, I appreciate your time and I

19   think we've hit the issues that we need to hit, your Honor, and

20   I'll pass the witness for cross-examination.

21           THE COURT:  Okay.

22   CROSS-EXAMINATION

23   BY MR. SHATZER:

24   Q.  Good morning, Dr. Martin.

25   A.  Good morning.

```
1    Q.  We're going to have binders up there for the witness.
2    We're going to ask you about some documents, I want to make
3    sure you have them handy.
4        Dr. Martin, I'd like to start by looking at paragraph 28 of
5    your declaration.  Do you see a binder there with your
6    declaration in it?
7    A.  I see it.
8    Q.  Could we go to paragraph 28?
9    A.  Yes.
10   Q.  In that paragraph, you discuss something called JavaScript,
11   correct?
12   A.  Yes, I do.
13   Q.  What is JavaScript?
14   A.  JavaScript is a programming language that is available for
15   use in a Web browser.
16   Q.  And you indicate in paragraph 28 that JavaScript can be
17   used for special effects and form validation in 1999, correct?
18   A.  That's correct.
19              THE COURT:  What does that mean?
20              THE WITNESS:  So, what I went on to describe in the
21   declaration was an example of a special effect is, for
22   instance, when you use your mouse to drive the pointer over an
23   icon that you can click on but don't click on yet, the icon
24   might change color, indicating that it's clickable.
25              THE COURT:  Okay.
```

E1fWdroH                          Martin - cross

 1  BY MR. SHATZER:
 2  Q.  At the end of paragraph 28, you talk about a JavaScript
 3  application, right?
 4  A.  Yes.
 5  Q.  What's a JavaScript application?
 6  A.  A JavaScript application would be an application that
 7  executes task for an end user.
 8  Q.  I'm sorry.  Go ahead.
 9  A.  And is written in JavaScript.
10  Q.  And JavaScript applications are run within a Web browser,
11  correct?
12  A.  That's what I was describing here, yes.
13  Q.  And JavaScripts ran within Web browsers in 1999, correct?
14  A.  It depends on what you consider an application to be.
15  Q.  We don't have to worry about that.  The Court's told us
16  with respect to this patent what an application is, haven't
17  they?  Didn't the Court, in its claim construction order, give
18  us a definition?  Are you familiar with that?
19  A.  Yes, I am.
20  Q.  And the definition is a software program that executes
21  specific tasks for an end user, correct?
22  A.  That's correct.
23  Q.  So a JavaScript application meets that definition, does it
24  not?
25  A.  Yes.

E1fWdroH                    Martin - cross

1   Q.  And JavaScript applications ran on browsers in 1999,

2   correct?

3   A.  I think such applications did exist, yes.

4   Q.  You talked a little bit in your direct about what you

5   called old Yahoo!, and we had a little video.  Do you know what

6   I'm talking about when I say old Yahoo!?  Can I use that

7   shorthand?

8   A.  Sure.

9   Q.  I believe you said, please correct me if I am wrong about

10  this, but I believe you said old Yahoo! was not an application,

11  is that right?

12  A.  I don't recall if I used that exact phrasing.

13          THE COURT:  I don't recall that you did either.

14          MR. SHATZER:  Let me ask then.

15  Q.  Was old Yahoo! an application?

16  A.  I can see how it would be considered a server side

17  application, but not a client side application or a mixed

18  client/server application.

19          THE COURT:  You mean it was an application under my

20  definition, but it's an application that ran on the server and

21  not on the client side?

22          THE WITNESS:  That's exactly it, yes.

23          THE COURT:  Okay.  So it's an application, but it's

24  over there, not over here.

25          THE WITNESS:  That's right.

E1fWdroH                    Martin - cross

1           THE COURT:  Okay.

2    BY MR. SHATZER:

3    Q.  Would a browser in 1999 meet the Court's definition of an

4    application?

5    A.  Yes.  I would say that a browser in isolation could, yes,

6    would meet the Court's definition of application, in 1999.

7    Q.  During your testimony today, you used the word

8    "application" quite a bit.  You talked about things that were

9    applications, things that weren't applications.  When you were

10   giving that testimony, were you applying the Court's definition

11   of application in each instance?

12   A.  I believe I was, yes.

13   Q.  You talked about Web sites and what they could do in 1999.

14   Isn't it true that not all Web sites in 1999 required complete

15   page refresh before providing new information?

16   A.  That's true.  Some other information could be shown without

17   a complete page refresh, such as scrolling the page up and

18   down, for instance.

19          THE COURT:  You mean it wouldn't all appear on the

20   screen, but I could make more of it appear on the screen by

21   scrolling up and down?

22          THE WITNESS:  Exactly.

23          THE COURT:  Okay.

24   BY MR. SHATZER:

25   Q.  Let's turn to paragraph ten of your declaration.  The first

1    sentence reads:  "In the years following 1999, Web browsers and

2    available computers became more powerful and their ability to

3    run applications within the Web browser became more practical."

4    But as we discussed before, it's true that even in 1999,

5    computers could run applications within the Web browser,

6    correct?

7    A.  Correct.

8    Q.  In fact, we just talked about JavaScript as an example of

9    that, correct?

10   A.  A JavaScript application could be run in 1999, yes.

11   Q.  The next sentence, paragraph ten, you refer to these new

12   applications, and I'm going to talk about them.  You're talking

13   about these new applications; you're not talking about

14   JavaScript applications, right?

15   A.  No.  I am talking about these new applications that were

16   now more practical because of the improving technology.

17   Q.  So you could do different things with JavaScript

18   applications, but they already existed, right?

19   A.  As I said, yes, JavaScript applications existed in 1999.

20   Q.  I'd like to talk now about what you referred to, I think,

21   as new Yahoo!.  If I use that term, do you know what I'm

22   talking about, your second video?

23   A.  I do, or modern Yahoo!, yes.

24   Q.  Modern Yahoo!.  Obviously it was your video, so if you need

25   your counsel to call it up for you, I have some questions for

1    you.  Perhaps there's something in your declaration you could

2    point me to, but my question is in the new Yahoo!, where is the

3    interactive link, in the modern Yahoo!?

4    A.  Well, I did not set out to identify the interactive link

5    when I created that video, but in response to your question, I

6    would tentatively point to the URL, including the fragment

7    identifier that was shown in that video, as a candidate for the

8    interactive link.

9    Q.  How does that URL with the fragment identifier facilitate

10   operating state?

11   A.  If the operating state in question is the range of dates

12   over which the index graph is to be generated, then that

13   operating state information is encoded or appears to be encoded

14   in the fragment identifier portion of the URL.

15   Q.  Just so I'm clear, when you use the term "operating state,"

16   what do you understand that to be?

17   A.  As I described earlier, operating state determines what an

18   application is doing at a particular moment, as opposed to all

19   the things the application is possible of doing.

20              THE COURT:  Okay.

21              THE WITNESS:  Capable of doing.

22              THE COURT:  Got it.

23              I may be oversimplifying.  As you testified on direct,

24   and it did clear up some things.  I now understand your

25   affidavit much better.  Thank you.  I got the impression that

1    by operating state, you were using that term synonymously with

2    a previous screen, going back to a screen that you had been on

3    before, and that's what you meant by restoring the operating

4    state.  Is that what you meant by restoring operating state,

5    going back to a screen that had already appeared and that I'd

6    navigated away from?

7              THE WITNESS:  That could be one way to look at it.

8    Yeah, that would count as restoring operating state.  If, by

9    restoring that screen, you've taken the application back to a

10   state that you've desired to put it in, yeah.

11             THE COURT:  Let me be crude about this.  I'm checking

12   my Gmail.  I navigate away from that to, because something

13   appears on the side about a weight loss product, an issue in

14   which I take great interest, and I click on that, and I read

15   about the weight loss product, and I want to go back to my

16   Gmail, and I click back on Gmail and, lo and behold, I'm back

17   with my e-mail.  Have I restored an operating state, as you're

18   defining that term?

19             THE WITNESS:  Potentially, yes.  And I can add a

20   little more detail to make this, I think, easier to understand.

21             THE COURT:  Thank you.

22             THE WITNESS:  When you're looking at your Gmail

23   folder, you have different folders, your inbox and your junk

24   mail and maybe your other folders.  So what I would point to as

25   operating state in that case is which folder you're currently

1    looking at within the Gmail application.

2            THE COURT:  If I go from inbox to trash to try to find

3    something that I've thrown in the trash but that's alluded to

4    in an e-mail.  I'm navigating away from operating state A,

5    going into operating state B, and if I go back to my inbox,

6    I've restored the operating state?

7            THE WITNESS:  That's correct.

8            THE COURT:  Okay.  Thank you.

9            THE WITNESS:  You're welcome.

10           THE COURT:  That's very helpful.

11   BY MR. SHATZER:

12   Q.  How does modern Yahoo!'s URL allow restoring an operating

13   state, but the old Yahoo! does not?  Is it just because one's

14   an application and the other's not?

15   A.  It's because whether the application is running on the

16   client or not that provides the Yahoo! example.  That's the

17   difference.

18           THE COURT:  So the real difference here, and this, I

19   think, I asked you about when you were on direct, the real

20   difference here is where the application is.  In 1999, it

21   wouldn't run on my computer; it would only run on the Yahoo!

22   server.  But now there's a way to get an application to run on

23   this machine?

24           THE WITNESS:  That's correct, yes.

25           THE COURT:  And the Web browser I'm using.  I'm using

1    AOL as my Web browser.  Yahoo! doesn't like that, but Yahoo!

2    doesn't care because it can send an application, and I can run

3    the application on this.

4              THE WITNESS:  Yes.

5    BY MR. SHATZER:

6    Q.  Just to follow up on the judge's questions, some

7    applications could be run -- so it's true though, following up

8    on the judge's question, that some applications could run in

9    the Web browser, even in 1999, like a JavaScript application,

10   right?

11   A.  JavaScript applications could run in a Web browser in 1999,

12   for instance, a calculator application.

13   Q.  And a person of ordinary skill in the art would have known

14   that in 1999?

15             THE COURT:  What he said was a person of ordinary

16   skill would have known that.

17             There's no way she could have taken that down.  It

18   came out as blah, blah, blah.

19             MR. SHATZER:  It's one of our terms of art.

20             THE COURT:  It's a term of art for you.  Every day,

21   she has new terms of art.

22   Q.  Dr. Martin, are you familiar with the term "session

23   identifier"?

24   A.  Yes, sir, I am.

25   Q.  What's a session identifier?

1   A.  A session identifier generally is a number or some other

2   string that is used to look up data in a database about a

3   particular session.

4   Q.  And you would agree that prior to 1999, URLs could store

5   session data using session identifiers?

6   A.  Generally speaking, yes.  Session identifiers could be used

7   for shopping cart memory, for instance.

8   Q.  And are you familiar, let's look at, actually, the errata

9   that Dr. Shamos filed to his declaration yesterday that refers

10  to the CDNow site.  Are you familiar with that?

11          THE COURT:  A site I never heard of.

12  BY MR. SHATZER:

13  Q.  It should be in the very back of the larger binder you

14  have, the second-to-the-last tab.

15  A.  I see it, yes.

16  Q.  Do you see on the page where his signature is there's a

17  screen shot?  Do you see that?

18  A.  Yes, I do.

19  Q.  And do you see that the text mode button on the bottom

20  right-hand corner of the page, there's a cursor over query?

21  A.  I see it.

22  Q.  Do you see that the URL for the hyperlink there contains an

23  SID number?

24  A.  I see that, yes.

25  Q.  And that's a session identifier, correct?

E1fWdroH                    Martin - cross

1    A.  It could be a session identifier.

2    Q.  Do you see that it contains the characters DM equals T?

3    A.  I see the URL contains those characters.

4    Q.  And if I represented to you that this display mode equals

5    text, do you have any reason to disagree with that?

6    A.  Well, I guess I don't know what it stands for, but I'm

7    willing to let you represent that.  Sure.

8            THE COURT:  If he doesn't know what it stands for, I'm

9    sure Dr. Shamos is going to have something to say about it.

10   BY MR. SHATZER:

11   Q.  Do you understand, in December of 1996, that the CDNow

12   site, if I went on there and let's say I were going to search

13   for Beatles albums, would give my session a session identifier

14   so if I bookmarked that and I clicked on it, it would take me

15   back to the main CDNow page, it would take me back to my search

16   results for Beatles albums?

17           THE COURT:  Do you have any familiarity with this

18   particular site?

19           THE WITNESS:  Yes, I do.  And I guess I don't remember

20   specifically what the 1997 Web site did, but that sounds

21   possible to me.

22   BY MR. SHATZER:

23   Q.  Let me frame it another way.  Pre-1999, a Web site could

24   use session identifiers in a way, and URLs, where, if I

25   bookmarked them, I could go back to a page I had visited

1   before, like search results?

2   A.  Yes.  Whatever could be put in a bookmark, in a URL before

3   1999 could be stored in a bookmark, including a URL that

4   contained an SID number.

5         THE COURT:  Anything that could be put in a URL in

6   1999 could get bookmarked, is that what you said?

7         THE WITNESS:  Yes.

8   BY MR. SHATZER:

9   Q.  Would you consider that session identifier taking me back

10  to my search results to be restoring operating state, previous

11  operating state?

12  A.  Possibly, yes.  It could be considered to restore a

13  previous operating state of the server side shopping cart

14  facility.

15  Q.  Let's go to paragraph 19 of your declaration.

16  A.  Paragraph 19, I have it.

17  Q.  19 and 20 are excerpts from what appear to be what I would

18  characterize as a chat discussion from the Internet, is that

19  fair?

20  A.  I wouldn't call it a chat discussion, no.

21  Q.  What would you call it?

22  A.  I would call it a technical article post, possibly a blog

23  post, with comments.

24  Q.  The author of the blog post is Mike Stenhouse, is that

25  right?

E1fWdroH                          Martin - cross

1    A.   That's right.

2    Q.   Do you know Mike Stenhouse?

3    A.   Not personally, no.

4    Q.   Do you know if he was a person of ordinary skill in the art

5    in 1999, in the art we're talking about?

6    A.   I hadn't thought of that before.  I suspect that he is, but

7    I'm not sure one way or another, as I sit here.

8    Q.   You cannot tell me anything, can you, sir, about

9    Mr. Stenhouse's qualifications as a person of ordinary skill in

10   the art, correct?

11   A.   On the contrary.  I can.

12   Q.   Mr. Stenhouse, in paragraph 19, in this post, is talking

13   about discovering a solution to restoring a session state, is

14   that right?

15   A.   Generally speaking, yes.  He describes it, I believe, as

16   browser state.

17           THE COURT:  That says I'm trying to restore the

18   session state.

19           THE WITNESS:  Yes.

20           THE COURT:  Part of my problem was with paragraphs 19

21   and 20.  I didn't really understand.  There was some different

22   terminology used.

23           THE WITNESS:  You're right.  I was looking at the

24   following page.  Sessions there, yes.

25   BY MR. SHATZER:

1    Q.  And this blog post and discussion is dated 2005, correct?

2    A.  That's correct.

3    Q.  You don't know whether or not Mr. Stenhouse discovered this

4    solution in 2005 though, do you?

5    A.  I'm not sure exactly when he discovered the solution.  I

6    understood it to be in proximity to his writing this article

7    about it.

8    Q.  Let's go to paragraph 20.  You say, "The comments below

9    Mr. Stenhouse's explanation indicate that other Web developers

10   were generally unaware of this technique and that this use of

11   URLs and bookmarks was not generally known."  By "this use of

12   URLs and bookmarks," what are you referring to specifically?

13   A.  I'm referring to the use of the fragment identifier field

14   in the URL in order to store operating state of a JavaScript

15   application.

16   Q.  And then you quote these comments.  Who is Ignacio?

17   A.  Ignacio is one of the commenters.

18   Q.  And was Ignacio a person of ordinary skill in the pertinent

19   art of the '745 patent as of 1999?

20   A.  It appears that Ignacio was capable of understanding the

21   technical explanation on this page.  Whether that makes him a

22   person of ordinary skill in the art, I would lean towards that

23   direction, but I wouldn't definitively say that he is given to

24   own this.

25   Q.  Isn't it true that all this tells us is that somebody we

1   don't know named Ignacio, in 2005, learned about this solution

2   for the first time?  It doesn't tell us what anyone of the

3   ordinary skill in the art knew about the solution in 1999, does

4   it?

5   A.  I think it does contribute to that understanding because

6   what we have is a reader of this highly technical discussion

7   who seems to appreciate it.

8   Q.  We don't know anything about this person other than his

9   first name, isn't that true?

10  A.  Or possibly last name.  I don't know.

11  Q.  And then the comment on page nine, bridging over to page

12  ten, is from someone named Jim.  Was Jim a person of ordinary

13  skill in the pertinent art of the '745 patent as of 1999?

14  A.  Again, I would lean in that direction, but not knowing Jim,

15  I'd hesitate to say definitively.

16  Q.  So this 2005 online exchange between semi-anonymous

17  commentators doesn't really tell us anything about the

18  question --

19          THE COURT:  That's a perfect example of an

20  argumentative question.

21          MR. SHATZER:  All right, your Honor.  I'll withdraw

22  it.

23          THE COURT:  Thank you.

24          MR. SHATZER:  You're welcome.

25          Your Honor, may I have a moment to confer with my

E1fWdroH                          Martin - cross

1    colleagues.

2              THE COURT:  Sure.

3    BY MR. SHATZER:

4    Q.  One last question.  When you were comparing modern Yahoo!

5    with old Yahoo!, and you concluded that one was and one was not

6    an application that restored operating state, did you look at

7    the JavaScript code of the two to compare them?

8    A.  No.  I used an alternate technique.

9    Q.  What was that?

10   A.  In the old example, I disabled JavaScript altogether and

11   generated the graph that showed that the JavaScript application

12   did not exist or was not instrumentally involved in causing the

13   graph to appear in the old example.

14             MR. SHATZER:  I have nothing further.  Thank you.

15             THE WITNESS:  You're welcome.

16   REDIRECT EXAMINATION

17   BY MR. BUDWIN:

18   Q.  Just a few brief questions for you, Dr. Martin.  We had a

19   couple of questions about JavaScript applications in 1999 and

20   you gave the example of a calculator, do you recall that?

21   A.  Yes, I do.

22   Q.  You got claim language shared from the patent, would that

23   example meet the claim language that's being shown?

24             THE COURT:  You mean does a calculator fall within the

25   claim language?

1          MR. BUDWIN:  Your Honor, the purpose of my question is
2    I want to understand whether or not this calculator that
3    Dr. Martin was describing was or wasn't a distributed
4    application.  In this instance, what you're going to see is --
5          THE COURT:  What I'm going to see is whatever he tells
6    me the answer is.  I'd like to hear it from him before I hear
7    it from you.
8    BY MR. BUDWIN:
9    Q.  Dr. Martin, do you recall being asked about JavaScript
10   applications in 1999?
11   A.  Yes.
12   Q.  And in particular, the calculator?
13   A.  Yes.
14   Q.  Is the calculator a JavaScript application or similar
15   applications that existed in 1999 relevant to the claims at
16   issue in this case?
17   A.  The problem with those applications and applying them to
18   the claims is that -- well, there are many steps to the claims,
19   and I don't see the back and forth of information flow that
20   needs to happen to satisfy the claim as a whole.
21   Q.  Then I have one other area of inquiry for you.
22          THE COURT:  You mean the back and forth of information
23   from the server to this machine connected to my Web browser?
24          THE WITNESS:  Yes, but more than that.  In claim one,
25   for example, there is first information, second information,

1  third information.  It's not just a simple, single back and

2  forth.  There have to be multiple exchanges of data that are

3  recited in the claim.

4  BY MR. BUDWIN:

5  Q.  Dr. Martin, you were asked some questions about session

6  identifiers.  Do you recall that?

7  A.  Yes, I do.

8  Q.  What's the purpose of a session identifier?

9  A.  The session identifier, as we were discussing earlier, is

10  used in order to remind a server side application of where it

11  was the last time this Web browser user did something with the

12  server, clicked on a link, or something like that.

13  Q.  Is the fact that session identifiers existed and were used

14  by a server relevant to the question that you're endeavoring to

15  answer today?

16          THE COURT:  Which is the definition of interactive

17  link, in case you've forgotten the question that he asked that

18  we have on the table today.

19  A.  It's relevant, but it describes the strictly server side

20  part of the equation, as I understand it.

21  Q.  Counsel asked you some questions about a CDNow Web site

22  from '96 and '97.  Do you recall that?

23  A.  Yes, I do.

24  Q.  Is that discussed in the prosecution history?

25  A.  That example is not discussed, no.

E1fWdroH                    Martin - redirect

1   Q.  Do you recall any arguments or disclaimers made by the
2   applicants about the CDNow Web page in 1996 or '97?
3   A.  No, I don't.
4   Q.  And even though you just got the updated declaration from
5   Dr. Shamos yesterday, have you reviewed that?
6   A.  Yes, I have.
7   Q.  And how would you describe CDNow in 1996 or 1997?  How did
8   it work?  How did it work?
9   A.  So, the way CDNow worked was, as I described before, the
10  Web browser was used as essentially a viewing portal into the
11  Web server presentation of the CDNow Web site.  So, yes, users
12  could browse music and buy albums.  The session identifier was
13  most likely used in order to keep track of what is in a user's
14  shopping cart, for instance.
15  Q.  Is that similar to the old Yahoo! example that we talked
16  about earlier?
17  A.  Yeah, I find it similar in the sense that the information
18  in the session ID is really only of concern to the Web server
19  and not a client side application.
20          MR. BUDWIN:  Thank you, Dr. Martin.
21          THE COURT:  Anybody else have anything for Dr. Martin?
22          MR. SHATZER:  Nothing.
23          MR. BUDWIN:  No, your Honor.
24          MR. SHATZER:  Nothing further, your Honor.
25          THE COURT:  Thank you.

1            THE WITNESS:  You're welcome.

2            (Witness excused)

3            THE COURT:  It's 25 of one.  I realize I interrupted

4    you all for half an hour, but I don't know if it makes sense to

5    start with Mr. Shamos or take an early hour for lunch and come

6    back in an hour.

7            MR. SHATZER:  I think we'd prefer to break now, your

8    Honor, if we could.

9            THE COURT:  I'll see you at quarter of two and I'll be

10   ready to go.  Okay?

11           (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E1fWdroH                          Martin - redirect

                        AFTERNOON SESSION

 1

 2

 3          THE COURT:  Here we are again.  Have a seat.  Am I

 4     going to hear from Dr. Shamos now?

 5          MR. SHATZER:  Your Honor, defendants call Dr. Shamos.

 6      MICHAEL IAN SHAMOS,

 7          called as a witness by the Defendants,

 8          having been duly sworn, testified as follows:

 9     DIRECT EXAMINATION

10     BY MR. SHATZER:

11     Q.  Could you please state your name.

12          THE COURT:  He already did that.

13     BY MR. SHATZER:

14     Q.  Dr. Shamos, could you very briefly tell us about your

15     relevant background and expertise?

16     A.  Yes.  I've been involved with computers and computer

17     programming for a little bit over 50 years.  To condense a long

18     story, making it very short, I think the relevant experience is

19     that since 1998, I have been director or codirector of the

20     graduate programs at Carnegie Mellon University in electronic

21     commerce and e-business, all of which is very heavily Web

22     oriented.

23     Q.  Dr. Shamos, if you could, turn in your binder, I think it's

24     the very last thing in the big binder, to the Court's claim

25     construction decision.

1   A.  Yes.

2   Q.  And if you could, go to page 11, please.

3   A.  I'm there.

4   Q.  At the bottom, that's where the Court gave its core

5   definition of interactive link, which is "computer code that,

6   one, retrieves and presents applications and/or information,

7   stored at remote locations across the network when selected by

8   an end user; and, two, includes facilities for restoring

9   previous operating states of the application as the application

10  is re-presented at a user's computer."  Do you see that?

11  A.  Yes.

12  Q.  If you could look at page 13, about the middle of the page,

13  is it your understanding the question before the Court today is

14  whether or not the Court should add to that construction the

15  following:  "an interactive link cannot be a bookmark, cookie,

16  shortcut, hyperlink, or Internet address (URL)"?

17  A.  Yes.

18  Q.  Has the meaning of the terms "bookmark," "cookie,"

19  "shortcut," "hyperlink," or "URL" changed to one of ordinary

20  skill in the art since 1999?

21  A.  No.

22  Q.  Keeping in mind the Court's construction of interactive

23  link, would one of ordinary skill in the art understand the

24  capabilities of bookmarks, cookies, shortcut, hyperlinks, or

25  URLs to have materially changed since 1999?

1    A.  No.

2    Q.  Can you explain why that's the case?

3    A.  Yes.  So many of these things are the subject of Internet

4    standards.  And those standards have been incorporated into

5    numerous pieces of software, including server software and

6    browser software.  And so it is not a trivial matter to change

7    the way these things behave because it would cause a huge

8    amount of critical Internet software to be obsoleted.  That

9    said, people can dream up new uses for these things, but that

10   doesn't change what those things are.

11   Q.  In his opening, Mr. Reichman said that distributed

12   applications could not run on Web browsers in 1999.  Is that

13   your understanding?

14   A.  No, it's not, and maybe I ought to explain my understanding

15   of distributed application first.  In a distributed

16   application, there's code that runs on at least two different

17   computers, and some of the processing is done on one computer

18   and some of the processing is done on another computer.  In a

19   client/server environment, distributed application would mean

20   that the server is doing some of the work and the client is

21   doing some of the work.  And as long as there is code, for

22   example, running on the browser, that is executing based on

23   information that's being received from the server, then some of

24   the processing is done on the server and some is done on the

25   client.  And this is only with respect to Web browsers.  I

E1fWdroH                          Shamos - direct

1    mean, there were plenty of distributed applications not

2    involving browsers that ran over the Internet in 1999.

3    Q.  Can you give some examples of Web browsers in 1999 that ran

4    distributed applications?

5    A.  Yeah.  I'm thinking that you probably didn't mean Web

6    browsers; you mean can I give you examples of applications that

7    were distributed that happen to run in a Web browser.

8    Q.  Yes, when you put it that way.

9    A.  Yes, there were many.  So I used to teach, when I was

10   teaching a foundational course in electronic commerce.  It was

11   called E-commerce Technologies, and I had lectures on various

12   technologies that one might bring to bear on, for e-commerce

13   Web sites, in order to sell things over the Internet.  And one

14   of my favorite examples was one from a clothing retailer that

15   allowed you to shape in general a model of yourself on your own

16   browser.  So it wouldn't capture your face, but it would

17   capture your overall proportions, and then when you picked an

18   article of clothing, it would choose the right size and it

19   would show you what that clothing would look like on a model

20   having your proportions.

21       Now, some of that processing is being done on the server

22   and some of the processing was being done on the client.  So

23   there's a perfect example of a distributed application.

24   Q.  Would JavaScript be another example of a distributed

25   application that would run on a Web browser in 1999?

1   A.   In general.  I think there were some dumbed-down ways of

2   using JavaScript which might not actually qualify as a

3   distributed application.  For example, if everything that

4   JavaScript is doing is purely local to the browser and is not

5   communicating with the server, I'm not sure you'd call that a

6   distributed application.  For example, if all you're doing is

7   mouse-overs, which the server never learns about, and all

8   you're doing is seeing that on your browser screen, but if the

9   server has relegated to the browser the responsibility for

10  doing substantive processing of the data, then it would be a

11  distributed application.

12  Q.   And in 1999, JavaScript could do that?

13  A.   Oh, yes, indeed.  Not only could, it did, because there

14  were numerous Web sites that used that capability.

15  Q.   To put it another way, is it true that in 1999, all a

16  browser could do was display a page?

17  A.   Not at all.

18  Q.   There was some testimony from Dr. Martin he had attached to

19  his declaration, an Ajax book.  Is all the information from the

20  Ajax book that Dr. Martin cited in his direct testimony today

21  accurate, in your view?

22  A.   No, and I sort of thought that we were being asked to

23  simply accept at face value what was going on in that book, and

24  I think the book makes a number of very sweeping statements

25  that, just by virtue of their sweepingness, are incorrect.

1    They talk about all Web sites did this and no Web site did
2    that, etc., without any evidence or any credible argument that
3    the author of the book was able to examine all Web sites.  So
4    there were lots of statements of that kind that I simply don't
5    think should be accepted.
6    Q.   There was some testimony earlier about MapQuest when
7    Dr. Martin testified.  Do you recall that?
8    A.   Yes.
9    Q.   What, in your view, is the relevance of the fact -- let me
10   withdraw that.
11       What is the relevance to the question before the Court
12   today of the fact that MapQuest could be presented more
13   efficiently in 2005 than in 1999?
14   A.   I don't see any.
15   Q.   Why not?
16   A.   Because it doesn't relate to any new use of any of the
17   constructs that are, that defendants seek to have added to the
18   disclaimer.
19            THE COURT:  I'm not sure I understand that answer.
20            THE WITNESS:  Okay.  So there's a list of constructs.
21   URLs, bookmarks, cookies and shortcut, etc.  And there is no
22   difference in any of those in the old MapQuest versus the new
23   MapQuest.  All the constructs are exactly the same and they're
24   used for the same purpose.  The shortcut is to get you back to
25   a particular page you were looking at.  A URL is to both

1    request information from a server and also, for example, in a

2    query string, pass information from a client to a server.  None

3    of those has changed going from the old MapQuest to new

4    MapQuest.

5    Q.  To the extent it operates more efficiently, it doesn't have

6    anything to do with the URLs or the shortcuts or bookmarks?

7    A.  I don't think so.  No one is suggesting that the Web hasn't

8    improved and that computers haven't gotten faster and that we

9    don't have a lot more memory cheaply available now than we used

10   to.  So that's given rise to people believing things are now

11   feasible simply because of the processing power that might not

12   have been feasible in older days when things were smaller.  But

13   that has not changed the nature of or the usage of these

14   constructs that we're talking about.

15   Q.  Is a browser an application under this Court's definition

16   of that term?

17   A.  Yes.

18   Q.  When a bookmark is selected on a browser, is any state of

19   the browser restored?

20   A.  So --

21           THE COURT:  Read the question again.

22   BY MR. SHATZER:

23   Q.  When a bookmark is selected on a browser, is any state of

24   the browser restored?

25   A.  So, state is an elusive concept.  State refers to something

1   historical.  If the aspect of history you're concerned about is

2   what page was being viewed, then when you save a bookmark that

3   marks that page and you later select that bookmark, you are

4   again looking at the page that you were previously viewing.  So

5   there's some portion of state that is being saved and being

6   restored.

7   Q.  Was that true in 1999?

8   A.  Oh, yes.

9   Q.  Let's talk a little bit about modern Yahoo! and old Yahoo!.

10  In the modern Yahoo! -- well, let me just be clear.  When I say

11  modern Yahoo!, would you understand what I'm referring to from

12  Dr. Martin's testimony?

13  A.  Yes, I think we're talking about the finance part of the

14  Yahoo! site that displays stock charts.

15  Q.  Correct.

16  A.  Yes.

17  Q.  In the modern Yahoo! application, does the fragment

18  identifier that Dr. Martin identified store operating state?

19  A.  I don't think anybody's pointed to a fragment identifier

20  that stores operating state anywhere in any of the examples

21  that were given.

22  Q.  Based on your understanding of how the modern Yahoo!

23  application works, could it have been implemented in 1999?

24  A.  Yes.  Similar functionality could have been implemented.

25  It might not have been implemented in exactly the same way.

1  Q.  Let's talk about old Yahoo! now.  Did old Yahoo! allow

2  saving a date range for a stock chart?

3  A.  Yes.

4  Q.  Could a bookmark in 1999 show a page in a browser that had

5  previously been displayed?

6  A.  Yes.

7  Q.  In his direct testimony, Dr. Martin tried to draw the

8  distinction that he, let me say, tried to draw a distinction

9  between old Yahoo! and modern Yahoo!.  Do you believe that

10  extensions that he was drawing are relevant to the question of

11  the meaning of interactive link to a person of ordinary skill

12  in 1999?

13  A.  No.

14  Q.  Why not?

15  A.  The only difference between old Yahoo! and new Yahoo!, and

16  I want to make the point that both made extensive use of

17  JavaScript and, in fact, the amount of JavaScript in the old

18  and the new is just about the same in terms of number of bytes

19  of JavaScript, the -- in the interim, a more efficient way was

20  found of allowing one to navigate around the stock chart

21  without having to send, essentially to reload the page or to

22  send additional chart information.  But from the point of view

23  of the processing that was going on in the browser with respect

24  to old Yahoo! and new Yahoo! and the saving of state, I don't

25  see substantive differences.

1  Q.  Dr. Martin referred to the relevance of restoring operating

2  state.  Do you recall him showing any examples of restoring an

3  operating state?

4  A.  Well, so, there were certainly examples of restoring the

5  state.  A state is an overall generic term of which operating

6  state is obviously a subset.  Now, there hasn't been a

7  construction yet of operating state, and so I believe what was

8  shown is certainly saving pieces, components of operating

9  state, possibly not saving the entire operating state.

10  Q.  Did Web pages in 1999 have embedded code that would be

11  executed by a browser?

12  A.  Yes.  JavaScript is an example of that.

13  Q.  There was some testimony earlier about the Gish patent.

14  Are you familiar with that patent?

15  A.  Only a little bit.

16  Q.  But does the client application running in the Gish patent

17  have an operating state?

18  A.  Yes.  All applications have operating states.

19  Q.  Could a URL or bookmark in 1999 be used in restoring

20  operating state?

21  A.  This is a complicated question.  And it depends on exactly

22  what's meant by operating state and whether operating state

23  means saving every conceivable relevant portion of the state.

24  Certainly portions of operating state would be easily restored,

25  easily stored, and would be restorable.  Let me give an example

E1fWdroH                         Shamos - direct

of that.

    When I interact with, there are numerous Web sites that are
oriented toward international use so that people who speak
different languages can effectively still interact with the
site, and once you tell the site what language you would like
to talk to the site in, every time you visit that site again,
you will be presented with pages in your own language.  So to a
certain extent, just the knowledge of what language you want to
interact with the site in is a form of state.  That doesn't
mean that you can go back to exactly the same page and view it
in exactly the same way, or that if there were JavaScript
running in your browser, that all the variables in the
JavaScript would have exactly the same values when you came
back.  So language is just a piece of state.

    If you take the totality of all pieces of state that enable
you to go back and have what's running in the browser exactly
the same as what was running when you left off, then you've
reached, you've stored the entire operating state.  Anything
less than that isn't the entire operating state.  It's pieces
of it.
Q.  As an expert and based on your review of Dr. Martin's
declaration and his testimony here today, what is your opinion
of the overall significance of Dr. Martin's testimony on the
issue of meaning of the term "interactive link" to a person of
ordinary skill in the art in 1999?

A.   I don't think there is any.  And the reason for that is

that we're talking about the meaning and capabilities of these

what I refer to as the constructs, which are the ones in the

putative disclaimer.  Those haven't changed.  So, I don't think

the plaintiff is happy with that, and so they have to show that

something, somewhere has changed in the interim.  And there

have been changes.  I mean, there are new technologies.  There

are new uses that have been made of URLs in the meantime, but

that just doesn't change the fundamental nature of what

interactive link is.

          MR. SHATZER:  No further questions.  I pass the

witness.

          THE COURT:  Can you talk to me a little bit -- this

was in your affidavit as well -- about these standards that you

say these constructs, or at least some of them, are subject to

certain standards, some body promulgates standards that would

make it difficult to change what it is that they mean or what

it is that they do?  I'd like to hear more about that.

          THE WITNESS:  Certainly.  So I think a very good

example is URL because URL is so universal.  All browsers have

to understand URLs.  Web servers have to understand URLs

because they're going to be getting them hundreds of thousands

or millions of times second.  We already know from, I think,

both of our declarations that there's something in URL called a

query string, and it begins with a question mark character.

1   And what follows the question mark character is the query

2   string that is passed in a uniform way to the Web server.

3           Now let's suppose I would like to change the format of

4   URLs and I'd like to add a new, special character with a

5   special substring in there, so I decide I want to add an

6   exclamation point as a delimiter that would indicate a

7   particular part of a URL.  Well, I could do that and I could

8   implement it on my Web server and I could write a browser that

9   understood that exclamation point character, so my browser and

10  my Web server could talk to one another, but your Internet

11  Explorer browser or your Chrome browser would have no idea what

12  that exclamation point meant, and no other Web server in the

13  world would understand that.  So I can't as a practical matter

14  do that the way I want to.

15          If I wanted to add, for example, such an exclamation

16  point character, I would create a request for comment.  The

17  request for comment would be distributed to the Internet gurus

18  and then maybe after a time the World Wide Web consortium would

19  adopt that as a standard for URLs.  Then I could actually

20  change what a URL was.  But, in general, it's extremely

21  difficult to do that because it requires everybody who has a

22  browser or a server around the world to go and change their

23  code.  That's what I mean by a standard and the difficulty of

24  changing a literal worldwide standard.  I mean, it's used

25  everywhere.

1        THE COURT:  Okay.  Understood.  URLs.  It's the World
2   Wide Web consortium that sets these standards?
3        THE WITNESS:  Sort of.  Unfortunately, the
4   organization of the Internet is unlike any other.
5        THE COURT:  A lot of cowboys out there, I understand.
6        THE WITNESS:  So what happens is that standards
7   basically develop by acclamation.  That is, somebody publishes
8   a request for comment, and people comment on it and they say,
9   well, this is a terrible idea for the following reasons, and if
10  the naysayer carries the day, then the request for comment
11  never gets adopted by everybody.  But after a period of time,
12  if there's endorsement of the idea, then eventually, the people
13  who produce Web browsers, Web servers, and other Internet
14  software will essentially adopt the recommendations in the RFC.
15  And there have been many thousands of RFCs.  Some of them have
16  gone nowhere and some of them are critically important.
17       THE COURT:  Kind of like Wikipedia.
18       THE WITNESS:  In a certain sense, I understand that,
19  because anybody can generate an RFC, if you'd like to, and
20  anybody could make a Wikipedia entry, if they would like to.
21       THE COURT:  In reading your affidavit, it looked to me
22  like, at least with respect to URLs and one other, one of the
23  other terms --
24       THE WITNESS:  There are bookmarks --
25       THE COURT:  It looked to me like you were saying that

1    there was some standard, let me see if I can find this.

2              THE WITNESS:  Well, hyperlink is the same.

3              THE COURT:  Hyperlink.  That was it.

4              THE WITNESS:  Yes.  Essentially, a hyperlink is an

5    embedded URL.

6              THE COURT:  "In 1994, the network working group of the

7    Internet engineering task force adopted certain standards for

8    the URL."  That's paragraph 36 of your affidavit.  What's the

9    network working group of Internet engineering task force?

10             THE WITNESS:  Well, as I said, there's a distributed

11   control, or let's say distributed noncontrol, over the Internet

12   and there are a number of organizations that have interest in

13   what goes on in the Internet, and one of them is the W3C

14   consortium, World Wide Web consortium.  Another is a group of

15   known specialists in Internet technology comprising the

16   Internet engineering task force.  And, fundamentally, they give

17   their blessing to the standards that have been proposed in

18   RFCs.

19             THE COURT:  Okay.  So they've given a blessing to a

20   concept that is URL.

21             THE WITNESS:  Well, I think it's more than a concept.

22   It's rules about what can be and what can't be in the URL, how

23   long URLs are, how URLs are used.

24             THE COURT:  As you say, "the standards of this

25   document prescribe the syntax and semantics for a compact

1   screen representation for a resource available called the

2   uniform resource locater."  And did that same group do

3   something with respect to hyperlinks?

4              THE WITNESS:  It's the same group that blesses the

5   other RFCs.

6              THE COURT:  Same.  Okay.  And so, are you saying to me

7   that between 1999 and 2008, the group that gives its'

8   imprimatur to these concepts did not give an imprimatur to any

9   kind of fundamental change in URL or hyperlink or cookie, or

10  any of those terms that we're talking about?

11             THE WITNESS:  That's correct.

12             THE COURT:  Okay.  That cleared that up for me.

13             MR. SHATZER:  Could I ask a couple of follow-ups.

14             THE COURT:  It's your witness.

15  BY MR. SHATZER:

16  Q.  Just to follow up on the judge's questions, most

17  particularly Dr. Martin is relying on the use of a fragment

18  identifier for the changes he's talking about.  Were fragment

19  identifiers a recognized part of URL strings in 1999?

20  A.  Yes.

21  Q.  Has there been any change since 1999 through 2008 to how

22  fragment strings were used in URLs?

23  A.  Well, when you say how they were used --

24  Q.  Sorry.  Let me withdraw that.

25      Is there any change in their functionality in the URL?

1   A.  So the function of a fragment identifier is to point a

2   browser to a particular content to display.  As Dr. Martin

3   points out in his declaration, people have figured out ways of

4   sticking things into the fragment identifier field in a URL

5   purely within the browser so that information can be

6   essentially stored.  It's like a storage location.  You can

7   fiddle with that fragment without causing a page reload.  So

8   there are certain efficiencies that are achieved by doing that.

9   But the fundamental nature of what a fragment identifier is

10  hasn't changed.  A fragment identifier points to a particular

11  part of the page that you want displayed by your browser.

12  Q.  And it did that in 1999?

13  A.  Yes, that was the original purpose of the fragment

14  identifier.

15          MR. SHATZER:  No further questions.

16  CROSS-EXAMINATION

17  BY MR. BUDWIN:

18  Q.  Good afternoon, Dr. Shamos.  My name is Josh Budwin.  We

19  haven't met before.  Nice to meet you.  I guess this is not the

20  best way to do it.

21  A.  Hello.  How are you?  I'll shake your hand later.

22  Q.  You're a lawyer, is that right?

23  A.  Yes.

24  Q.  Your license is active today?

25  A.  Yes, it is.

1   Q.  Would you agree with me that the automobile has existed for
2   more than a hundred years?
3   A.  Yes.
4   Q.  And if I were to go back to 1900 and look at the definition
5   for an automobile, it might say something like conveyance
6   powered by an engine with four wheels?
7   A.  Hypothetically, it might.
8   Q.  Same definition might apply to an automobile today?
9   A.  Hypothetically, it might.
10  Q.  Would you agree or disagree that the capability and use put
11  to automobiles has materially changed in the last hundred
12  years?
13  A.  Not necessarily.  I get in an automobile in one place and I
14  drive it to another place.  They may go much faster now.  They
15  may use more efficient fuels.  They may be electrically
16  powered, but it sounds to me like it's still an automobile.
17  Q.  Don't you think that you just made my point for me, that
18  the functioning capability of an automobile has changed even if
19  the high-level, broad definition of that concept is the same,
20  they may be more fuel efficient, they may have more power --
21           THE COURT:  The function hasn't changed in my
22  lifetime, which is 62 years.  The function of the automobile
23  has not changed.  Okay?  I'm prepared to make that finding.
24  The function of an automobile has not changed.
25           MR. BUDWIN:  All right.

1          THE COURT:  If you want to talk about the capability

2    of an automobile, that may be a different question.  But every

3    time you ask function and capability, I can understand why the

4    gentleman answers the question as he does, because the function

5    of the automobile has not changed.

6    BY MR. BUDWIN:

7    Q.  Let's move on and let's pick up exactly where the Court was

8    asking you some questions about standard-setting activities.

9    You have a copy of your declaration in front of you with the

10   exhibits, correct?

11   A.  I do.  I have it in my binder.  Is it also in the cross

12   binder?

13   Q.  Why don't you look at your binder.  In particular, the

14   Court, do you need a second to find it?

15   A.  One moment.  Yes, I have.

16   Q.  In particular, the Court was asking you about paragraph 36.

17   A.  Yes.

18   Q.  The reference to URL and then there's a cite to Exhibit L.

19   A.  Yes.

20   Q.  Exhibit L to your declaration is request for comment,

21   correct?

22   A.  Yes.

23   Q.  It's request for comment 1738?

24   A.  Yes.

25   Q.  A request for comment and standard are not the same thing,

1   you would agree with that, right?

2   A.  Yes.

3   Q.  And do you know whether the Federal Circuit has spoken in

4   previous cases to the applicability of not just requests for

5   comment at the W3C but to the applicability of this specific

6   RFC, RFC-1738, to claim construction?

7           MR. SHATZER:  Objection, to the extent that this

8   witness isn't here testifying as a lawyer.

9           THE COURT:  I'm sorry.  I'm two steps behind.  Where

10  are we in the cross binder?

11          MR. BUDWIN:  We are looking at tab 14.

12          THE COURT:  Tab 14?

13          MR. BUDWIN:  Paragraph 36.

14          THE COURT:  This is just his affidavit, right?

15          MR. BUDWIN:  Yes, your Honor, and he's got a cite in

16  paragraph 36 to Exhibit L.  And I've asked the witness --

17          THE COURT:  Are you asking him to look at Exhibit L?

18  Where is Exhibit L?

19          MR. BUDWIN:  It's going to be in the binder that has

20  Dr. Shamos's declaration.  It would be the white binder.

21          THE WITNESS:  The thick white binder.  Yes.  And I

22  think it's at tab L.

23          THE COURT:  Thanks.

24  BY MR. BUDWIN:

25  Q.  So you agree with me Exhibit L is request for comment 1738?

1  A.  Yes.

2  Q.  And you would agree with me that a request for comment at

3  the W3C is different from a standard at the W3C?

4  A.  It is not necessarily a standard.

5  Q.  My question to you is whether you know if the Federal

6  Circuit has case law that addresses the applicability of

7  request for comment and, in particular, request for comment

8  1738, to claim construction?

9         MR. SHATZER:  Objection.  The witness is a lawyer, but

10  he's not here testifying as a lawyer.  He's testifying as an

11  expert.  I think that's a legal question, your Honor.

12         THE COURT:  The objection is overruled.  I'm curious.

13  Because one of the things I picked up on in his affidavit was

14  this notion of standards, and, frankly, to me, little layperson

15  that I am, if there really are standards and they haven't

16  changed over time, I find that very salient.  So if there's a

17  way of undermining his testimony about standards, I will

18  certainly allow Droplets to try and undermine it.

19  A.  The answer is I don't know what the Federal Circuit said

20  and I don't know the context in which they said whatever they

21  said.

22  Q.  Would you agree or disagree that the purpose of a request

23  for comment like RFC-1738 is to collect commentary and to

24  select language to facilitate a common understanding from a

25  variety of competing technologies in a variety of potentially

1    competing interests?  Do you agree with that?

2    A.  Yes, with the objective of achieving a common acceptance of

3    what's in the RFC so it may become standard.

4             MR. BUDWIN:  Your Honor, we do have a case.  I can

5    provide the case cite and hand a copy of it up to your Honor

6    later.  It deals with this particular RFC in the context of

7    claim construction and says it's less helpful than treatises or

8    dictionaries.  That cite is ACTV v. Disney.

9             THE COURT:  Fine.  Treatises and dictionary aren't

10   your strongest evidence.  They're the strongest evidence for

11   the other side.

12            MR. BUDWIN:  346 F.3d.

13            THE COURT:  If all we're talking about were treatises

14   and dictionaries, you would have lost on this a long time ago.

15            MR. BUDWIN:  1082.

16            THE COURT:  Okay.

17   BY MR. BUDWIN:

18   Q.  But, at the end of the day, you would agree with me request

19   for comment is not the same as an adopted standard?

20   A.  A request for comment can become a standard.  They don't

21   all become standards.

22   Q.  And I think if the request for comment that you're citing

23   in your declaration became a standard, we could expect you to

24   cite the standard and not the request for comment?

25   A.  Not necessarily.

E1fWdroH                        Shamos - cross

 1   Q.  Did you agree with any of Dr. Martin's testimony at all?

 2   A.  He spelled his name correctly.

 3   Q.  Beyond that --

 4   A.  No.  He said many, main things.  He testified for two

 5   hours.  I'm sure he said plenty of things that were correct and

 6   that I agreed with.  I just don't remember them all.

 7   Q.  Did you agree or do you agree that MapQuest evolved in the

 8   way that Dr. Martin described and the way that it's discussed

 9   in this Ajax book?

10   A.  I agreed with that, yes.

11   Q.  And do you agree that Yahoo! evolved in the way that

12   Dr. Martin explained and showed to you and the Court?

13   A.  Well, I'm not sure what your definition of evolution is,

14   but MapQuest back then was not identical to the way MapQuest is

15   now.  So it's certainly changed.

16   Q.  I moved on.  I was asking about Yahoo!

17   A.  Yahoo!, MapQuest, all of them, I'm not sure evolved is the

18   right word.  There are differences between MapQuest today and

19   MapQuest in the older days, 1999 time frame.

20   Q.  Did you agree or disagree with Dr. Martin's testimony about

21   the way what we've called old Yahoo! and new Yahoo! worked?

22   A.  The way --

23           THE COURT:  I have to say, looking at my notes about

24   the direct, isn't it fair to say that you agree with some of

25   the things he said and not with other things that he said?

E1fWdroH                          Shamos - cross

1          THE WITNESS:  I think that's a perfect description of

2     it.  Yes.

3          THE COURT:  We already asked him.  Dr. Shamos says

4     fragment identifier doesn't store operating state, but

5     Dr. Martin said that it does.  So?

6     BY MR. BUDWIN:

7     Q.  You talked about some generic applications that you said

8     existed prior to 1999 and were distributed applications and

9     gave an example of a clothes picker.

10    A.  No.  I didn't refer to those as generic applications.  I

11    did use the word "generic" in a different context.  That was a

12    very specific application.

13    Q.  You talked about a clothes picker on your direct?

14    A.  Yes.

15    Q.  What Web site was it on?

16    A.  I don't recall.

17    Q.  Do you have the code for that?

18    A.  I may, I may have archived it.

19    Q.  Cited in your declaration, have we had a chance to review

20    it?

21    A.  No, it's not in my declaration.

22    Q.  And you also referred to 1999 JavaScript as distributed

23    applications.  Do you recall that?

24    A.  Yes.

25    Q.  Again, did you provide any of those examples in your

E1fWdroH                          Shamos - cross

1    declaration?

2    A.  No.  Dr. Martin did.  Old Yahoo! is an example of that.

3    Q.  Now, you took issue with some of the descriptions in this

4    Ajax book of the way all Web sites worked or no Web sites

5    worked, or something of that nature, didn't you?

6    A.  Yes.

7    Q.  Have you brought forth any contrary authoritative evidence

8    in the form of a book, treatise, something other than your

9    testimony, that would support that the statements in this book

10   are incorrect?

11   A.  When you say brought forth, I had no opportunity to bring

12   forth because those declarations were filed simultaneously.

13   Q.  You submitted a declaration yesterday, didn't you,

14   Dr. Shamos?

15   A.  Yes.

16            THE COURT:  This is not persuasive to me.  This is

17   exactly the kind of cross-examination that makes me sick.

18   Okay?  It doesn't persuade me of anything.  All right?

19            Here's what happened.  You guys were told by me to

20   have simultaneous expert declarations.  Nobody responded to

21   anything, and the only thing that got submitted yesterday was a

22   correction, an errata.  All right?  So as far as I'm concerned,

23   the defendants did exactly what I told them to do, and I'm

24   underwhelmed by cross-examination that says, Hey, you didn't

25   dispute this, did you.  Well, that's not what I asked.  I have

E1fWdroH                         Shamos - cross

1   them here on the stand so that you can ask real questions,

2   substantive questions.  That's the point of this hearing, is to

3   have you ask substantive questions so that people can

4   supplement testimony and their testimony can be challenged.  So

5   get rid of all questions like the ones you have just asked.

6          MR. BUDWIN:  Yes, your Honor.

7   Q.  Dr. Shamos, would you agree or disagree that prior to the

8   mid-2000s, the Web was stateless?

9   A.  No.  That's one of the statements that I definitely

10  disagree with.

11  Q.  Do you have the cross binder in front of you, Exhibit 4?

12  A.  Yes.

13  Q.  Just take a look at that.

14  A.  You mean tab four?

15  Q.  Yes, please.

16  A.  Yes.

17         MR. SHATZER:  Do you have a reference to that?  I'm

18  without a binder.

19         MR. BUDWIN:  It's going to be the Winkler blog post.

20  Q.  Do you have that exhibit, Dr. Shamos?

21  A.  Yes.

22         MR. SHATZER:  Your Honor, we don't have that exhibit.

23  We don't have a cross binder.  I'm not sure what he's referring

24  to.

25         THE COURT:  He's referring to what says "in the

1    beginning."  Very biblical, in the beginning, the Web was

2    stateless, on something called Tech Block.

3    BY MR. BUDWIN:

4    Q.  You would disagree with the statements that are being made

5    in this blog post?

6    A.  Not just disagree.  I'm extremely familiar with the issue

7    and attempts to solve the problem of statelessness, and there

8    were effective solutions to it in 1994.  So the idea that,

9    okay, when you say in the beginning, if the beginning was the

10   day after Tim Berners invented the World Wide Web, maybe it was

11   stateless that next day, but it certainly wasn't stateless in

12   1999.

13   Q.  Have you provided us, in your declaration, any evidence in

14   support --

15             THE COURT:  Like I said, I'm underwhelmed by those

16   questions.  You're not filtering correctly.

17   BY MR. BUDWIN:

18   Q.  Dr. Shamos, we can all agree that URLs, hyperlinks,

19   bookmarks, cookies, shortcuts, existed in 1999?  You agree with

20   that?

21   A.  I don't know if we can all agree.  I certainly agree.

22   Q.  You agree?

23   A.  Yes.  I don't know what the other people think.  But I

24   think that.

25   Q.  And to you in your testimony, those things have the same

1  meaning and the same function and capability today as they did

2  in 1999?

3  A.  Yes.

4  Q.  And you would disagree that the function and capability of

5  URL, hyperlinks, bookmarks, you would disagree that those have

6  changed between 1999 --

7  A.  I agree that people have found new ways of using them.  For

8  example, the query string in a URL, query string is an

9  arbitrary string that follows an Internet resource limited only

10  by length and character set.

11  Q.  So you --

12  A.  Let me finish.

13  Q.  Sorry.  I didn't mean to interrupt you.

14  A.  Once I can pass data from a client to a server, it is

15  limited only by human imagination what one might do with that

16  capability, and so certainly people are constantly dreaming up

17  new ways to use the query string.  That has not changed what a

18  URL is or what a query string is.

19  Q.  Would you agree then there are new uses or functionalities

20  that URLs and the query string portion of URLs is being put to

21  today than what they were being put to in 1999?

22  A.  I'll certainly agree with new uses.  I don't agree with

23  functionality, and the reason for that is that the function of

24  a URL is to pass the address of an Internet resource to a

25  server along with certain other fields, for example, the query

1   string.  That's its function.  That hasn't changed.

2   Q.  If we were to look at the Court's core definition of the

3   interactive link term, there's two parts.  The first part is

4   retrieving and presenting information and the second part is

5   restoring previous operating states.

6   A.  Yes, let me get that.

7   Q.  We could show it.  I think it's on slide three or two.

8   A.  Yes.

9   Q.  Now, can you, or would you, agree that URLs, bookmarks,

10  hyperlinks, shortcuts, as they have existed since 1999, would

11  meet the first part of this definition, the location part?

12  A.  Yes.

13  Q.  Would you agree with me that not all links, URLs,

14  bookmarks, hyperlinks, and shortcuts meet the second part of

15  the definition?

16  A.  I guess it depends what you mean by previous operating

17  state.  If it's simply reloading a page that was previously

18  loaded earlier, then I think all bookmarks do that.

19  Q.  How are you using the term "operating state" in this

20  definition, Dr. Shamos?

21  A.  I'm not.  This is the first that you've thrown it up on the

22  screen and asked me about it.

23  Q.  What's your understanding of the term "operating state" in

24  this definition?

25  A.  Okay.  So I said earlier the operating state has not been

E1fWdroH                    Shamos - cross

1    subject to construction.  I gave an explanation of the

2    difference between the overarching term "state" and operating

3    state and the difference between complete operating state and

4    pieces of operating state.  That's as far as I've gone.

5    Q.  What's your understanding of the term "operating state" in

6    this construction, if you have one?  How would you define it?

7    How would you use it as one of ordinary skill in the art?

8    A.  To me, as one of ordinary skill in the art, if you say I

9    want to capture the operating state of an application, then I

10   understand that an application has executable code that is

11   executed.  If you interrupt the processing of an application

12   and you want to save enough state so that you can restore the

13   application to exactly the condition it was in at the time of

14   interruption, then you have saved its operating state.  If you

15   save less than that, then you've saved pieces of operating

16   state, not the entire operating state.

17   Q.  And so in your understanding, operating state refers to

18   restoring the entirety of an application state, not just some

19   portion of it?

20   A.  Well, it, I would refer to that as complete operating the

21   state.  It may not be that the complete operating state is

22   relevant.  It may not matter.  For example, if the user does

23   not rely on the totality of the functionality of the

24   application, but only components of it, then it may be enough

25   to capture a portion of the operating state.  Here's an example

1     of that.

2          Let's suppose I bookmark a page and then later on, I select

3     that, you know, two months later, and I select that bookmark.

4     And let's say the Web page on the server hasn't changed in the

5     meantime; it's exactly the same.  It's brought back into my

6     browser, so, from my point of view, I'm looking at the same

7     page.  That has restored a portion of the operating state of my

8     browser because there's more to the state.  When I left off two

9     months earlier, I had a browsing history.  I could hit the back

10    button over and over and over again and I could get back to the

11    previous pages.

12         When I bookmark a page, I don't save my entire browsing

13    history.  So two months from now, if I reload that page, let's

14    say I open the browser, no browsing history, this is initial

15    execution of the browser, I select the bookmark, the page comes

16    up, if I hit back, it won't go anywhere.  The browsing history

17    was not saved.  So is browsing history part of the operating

18    state or not part of the operating state?

19    Q.  Dr. Shamos, using your understanding of operating state,

20    would you agree that not all links, URLs, bookmarks, and

21    hyperlinks meet the second part of the Court's definition, that

22    have the facility of restoring previous operating state?

23    A.  Yes.

24    Q.  Now, in your declaration and your testimony, you talked

25    about CDNow and the Yahoo! examples.

1    A.  Yes.

2    Q.  Those aren't examples of prior art that was being discussed

3    in the prosecution history?

4    A.  I don't think so.

5    Q.  You didn't see any disclaimers made by the applicants about

6    how CDNow page operates Yahoo! Web page operated?

7    A.  I don't recall any such.

8    Q.  Now, have you identified or are you aware of anything

9    existing in the prior art, the patent, that you would

10   characterize as an interactive link under the Court's core

11   definition of that term?

12   A.  I haven't looked.

13   Q.  Would you characterize any part of your CDNow example or

14   your Yahoo! example, the ones that existed prior to 1999, as

15   meeting the Court's definition, core definition of interactive

16   link?

17   A.  Sure.  Depends on what operating state means.  If operating

18   state is restoring a page that I was previously viewing, then

19   there were plenty of interactive links that did that.

20   Q.  Could be almost any Web page at the time, under that

21   definition?

22   A.  Yes.  If that's operating state, then, yes.

23   Q.  Now, you said you reviewed references that were discussed

24   in the prosecution, Gish, ICE-T, LeMole?

25   A.  I didn't say that.  You said that.  I reviewed LeMole.

1    Q.  Did you review Gish and ICE-T?

2    A.  No.  My only knowledge of those is what I saw today.

3    Q.  It's your understanding that in looking at a disclaimer, we

4    need to look at the prior art of the applicants

5    distinguishing --

6             MR. SHATZER:  Objection to the form.  Incorrect

7    statement of the law, your Honor.

8             THE COURT:  The objection to the form I'll sustain.

9    Just ask the man a question.

10   BY MR. BUDWIN:

11   Q.  You haven't reviewed Gish or ICE-T or LeMole or any of the

12   prior art in the prosecution history in enough detail to tell

13   us whether, in your opinion, those references have an

14   interactive link under the Court's definition?

15   A.  I wasn't asked to do that, but if this case ever moves to

16   the invalidity phase, I suppose I will be asked to do that.

17   Q.  So at this stage, you're not prepared to answer questions

18   about those specific references?

19   A.  That's right.  We don't even have a construction yet of

20   interactive link.  That's what we're here today about.

21   Q.  Now, you're aware, aren't you, that the patent office

22   allowed the patent to issue over the prior art of record in

23   part because the prior art of record didn't have interactive

24   link?

25             THE COURT:  You know --

1   A.  I suppose.

2           THE COURT:  Oh, never mind.

3   BY MR. BUDWIN:

4   Q.  Did you think it would be helpful to answer the questions

5   being presented today to study those references so that we

6   could determine whether or not --

7           THE COURT:  Another question that you should have

8   pared.

9   BY MR. BUDWIN:

10  Q.  Dr. Shamos, in your declaration submitted yesterday, you

11  talked about something called session state?

12  A.  Yes.

13  Q.  Is session state the same as or different than operating

14  state?

15  A.  I think it's different, but operating state can include

16  session state.

17          THE COURT:  Just so I know, what is session state?

18          THE WITNESS:  Okay.  So the whole notion of state

19  refers to history because we use state to go back to a

20  particular point in time.  And when you go to a Web site, for

21  example, typically you will look at the home page and you will

22  then click on hyperlink, go to some other page, click an on

23  another link, etc.  The history of the pages that you visited

24  is the session.

25          And in the old days, before people figured out how to

1   keep sessions within a sequence of HTTP requests and responses,
2   when you made the second request to the Web browser, it didn't
3   know that it was you that had made the first request.  It's
4   just responding to everybody's request, Give me this page, give
5   me this page, give me this page.  That would be useless in an
6   online shopping environment where, for example, you're putting
7   things in your shopping cart.  If you forgot what was in your
8   cart, you would never be able to buy anything.  So a mechanism
9   had to be found so that the Web server could recognize all of
10  the previous interactions that you had had with it during that
11  session.  It might forget about those after a week or a month,
12  but at least what was going on today, it ought to remember.

13          So session state doesn't directly have to do with the
14  state of an application running on a client.  It has to do with
15  the state of interaction between the client and the server.
16  And so that's what's normally meant by session state.

17          On the other hand, if the session is being completely
18  mediated by the client's software, then session state and
19  operating state are very close to one another.
20  BY MR. BUDWIN:
21  Q.  Session state is a concept that's been in the art for
22  sometime, since prior to 1999?
23  A.  Yes.
24  Q.  Did you see any discussion in your review of the file
25  history of the alleged disclaimers about session states?

E1fWdroH                          Shamos - cross

1    A.  I don't recall any.

2    Q.  Now, I want to show you some of the alleged disclaimers,

3    the same ones I was using with Dr. Martin.

4             MR. BUDWIN:  Could we see slide 39.

5    Q.  And have you reviewed, you've reviewed the applicant's

6    arguments, correct?

7    A.  Yes.

8    Q.  Do you recall the applicants in any of the arguments that

9    they were making to the patent office in light of the prior art

10   that was specifically of record arguing or suggesting that the

11   prior arts -- Gish, ICE-T, LeMole -- actually had operating

12   states?  Do you remember any argument to that effect,

13   suggestion?

14   A.  No.  But, it seems to me that if the applicants didn't

15   think that the prior art references showed that, they wouldn't

16   have needed a disclaimer, because they would have been able to

17   distinguish their invention from those prior references.

18   Q.  That's kind of the heart of my question.  Isn't that the

19   basis, would you agree that the basis on which the applicants

20   are distinguishing the prior art of record is by the fact that

21   the prior art of record lacks the ability to restore a prior

22   operating state?

23   A.  No.

24   Q.  Let's look --

25   A.  It doesn't say that.

E1fWdroH                          Shamos - cross

1    Q.  At slide 39.  This is one of the disclaimers being pointed

2    to about Dickman.  There's a discussion here that says "URLs or

3    other location information cannot perform the functions of

4    interactive links as claimed."  That's what the applicant's

5    saying, right?

6    A.  Yeah, I think the applicant's wrong, but the applicant said

7    that.

8    Q.  And this is what we need to look at in order to determine

9    what the scope of the alleged disclaimer is, so the applicant

10   is actually telling the patent office?

11   A.  I understand that that's a matter of law.

12   Q.  Now --

13   A.  As to what we ought to be looking at to determine the scope

14   of the disclaimer.

15   Q.  You would agree with me that URLs and links have location

16   information; that's a characteristic of all URLs and links?

17   A.  Yes.

18   Q.  And I believe you agreed with me earlier that not all URLs,

19   links, bookmarks, hyperlinks -- not all of them -- have

20   operating state information, isn't that right?

21   A.  Yes.

22          MR. BUDWIN:  No further questions.  Thank you.

23          MR. SHATZER:  I have nothing further, your Honor.

24          THE COURT:  I do.

25          Would you read back the last question and answer.

E1fWdroH                          Shamos - cross

1          (Record read)

2          THE COURT:  So?

3          THE WITNESS:  I wanted to say so what when he asked me

4    that, but I thought it would be impolite, your Honor.

5          THE COURT:  Okay.  I guess I'll ask him.  So?

6          MR. BUDWIN:  Your Honor, would you like me to go back

7    to the podium?

8          THE COURT:  No.

9          MR. BUDWIN:  Your Honor, the point is when we're

10   looking at a disclaimer, we need to look at what the applicant

11   actually said and what the art of record actually teaches.

12         Here, the applicant is distinguishing this prior art

13   because the applicant's saying the URLs, the links, the

14   bookmarks, the hyperlinks, the things that are actually in

15   these references, all they do is point to a location.  That's

16   it.  They lack the facility of an interactive link, as your

17   Honor has construed that term and as the applicants, consistent

18   with the specification, to restore a previous operating state.

19   That is the point.

20         The prior art is distinguished on the basis of the

21   fact that the prior art is only talking about location.  That's

22   a characteristic of all links, all URLs, all hyperlinks.  They

23   all talk about location.  But not all links, URLs, hyperlinks,

24   bookmarks -- not all of them -- have the facility for restoring

25   a previous operating state.

E1fWdroH                          Shamos - cross

1           THE COURT:  That, of course, is not what this says.

2           MR. BUDWIN:  I would beg to differ, your Honor.

3           THE COURT:  This doesn't say Internet shortcuts

4      encapsulate URLs or other locater information and not all of

5      them can perform the function of interactive links.

6           MR. BUDWIN:  It says, and cannot.

7           THE COURT:  No.  It says and cannot.  It doesn't say

8      not all of them cannot.  It certainly implies that none of them

9      can perform the functions of Internet active links, as claimed,

10     with which this particular witness disagrees.  Now, he

11     disagrees most vehemently and he gives me examples.

12          MR. BUDWIN:  Your Honor, I would beg to differ,

13     respectfully.  They're talking about a specific reference here,

14     the Dickman reference.  There is a cite to that, and what

15     they're saying is the Internet shortcuts encapsulate URLs or

16     other location information.  They're talking about and they're

17     citing the specific URLs and Internet shortcuts that are being

18     described in that specific reference, in that Dickman

19     reference.  And when we go and we look at the Dickman

20     reference, we can confirm that those links and URLs, all they

21     are is location information.  That's it.  And those specific

22     URLs cannot perform the functions of the interactive link as

23     claimed precisely because they lack the facility to restore the

24     prior operating state.  That is the argument that's being made,

25     and that's the disclaimer that's being made, and the core

1    definition of this term that your Honor has already given us is

2    sufficient to distinguish all of the prior art in the

3    prosecution history.

4         I think the fallacy of the argument is that the

5    applicants are not making broad, sweeping statements about all

6    Internet shortcuts and all links and everything that existed in

7    1999.  Each disclaimer in the file history is specific to a

8    given reference, and that's the way the disclaimer needs to be

9    analyzed, and that's the point I'm making.

10        THE COURT:  Now I understand your point.

11        By the way, thank you.  You may be excused.

12        THE WITNESS:  Thank you, your Honor.

13        (Witness excused)

14   MR. REICHMAN:  Your Honor, as a matter of

15   housekeeping, we have the proposed findings of fact and

16   conclusions of law, if you'd like us to hand those up.

17        THE COURT:  That would be great, and let's talk about

18   that.

19   MR. REICHMAN:  There's a hard copy and electronic.

20   I'm not sure how your Honor would like to proceed.  If you

21   would like to hear some argument --

22        THE COURT:  Yes.

23   MR. REICHMAN:  -- can I impose on the Court for a

24   short break?

25        THE COURT:  Sure.  I'll see you in ten minutes.

E1fWdroH

```
 1              MR. REICHMAN:  Thank you, your Honor.

 2              (Recess)

 3              THE COURT:  It seems to me that there are two issues,

 4    apparently, although I thought there was only one.  Issue No. 1

 5    is the issue that I asked you to address, which was whether I

 6    should put a limitation on the core definition of the term

 7    "interactive link" as a result of disclaimers that appear in

 8    the file wrapper relating to -- is it capabilities; is that the

 9    word that you all use -- URL, cookie, hyperlink, bookmark.  And

10    the second issue, which was introduced this morning, which was

11    a different issue, is the one that was alluded to just before

12    we broke, which is the disclaimers are not, in fact,

13    disclaimers at all, they are distinctions that are being drawn,

14    addressed entirely to specific prior art references cited by

15    the patent examiner, and that's all that these words in the

16    file wrapper should be considered as.  And I suppose what that

17    means is statements that were made to the patent examiner were

18    wrong, if, for example, the statement "which have no

19    capabilities of acting as interactive links," the last one that

20    we were looking at, turned out to be wrong and there turns out

21    to be prior art, maybe not prior cited but something else that

22    was in existence in 1999 in which a URL or a bookmark was

23    capable of being used as an interactive link, that really goes

24    to validity, and it shouldn't be definitional.  So those are

25    two separate issues.
```

E1fWdroH

1          Can we talk about the definitional issue first?

2          MR. REICHMAN:  Yes, your Honor.  The definitional one

3     is the second one or the first one?

4          THE COURT:  The first one.

5          MR. REICHMAN:  Okay.  I see these questions as coming

6     together, honestly, at some level.

7          THE COURT:  All right.

8          MR. REICHMAN:  As I see the first question, it's

9     whether the limitation should be included, the negative

10    limitation, proposed by defendants, and that question in the

11    analytical framework that the Court provided turns on whether

12    URLs have changed since 1999.

13         You heard the testimony today.  I don't need to recast

14    it for the Court.  I think there's a difference of opinion,

15    although it doesn't appear to be --

16         THE COURT:  There's a difference of opinion.

17         MR. REICHMAN:  It doesn't appear to be as deep as you

18    might think in that I think the experts agree that it may just

19    be semantics, terminology.

20         THE COURT:  I don't think it's semantics.  What I

21    heard wasn't semantic.

22         MR. REICHMAN:  And I heard some suggestion, what I

23    heard from Dr. Shamos is that the uses of these URLs and the

24    other technologies in the disclaimer may have changed.

25         THE COURT:  No.  What he said was the definition of

E1fWdroH

1    URL hasn't changed and the function of URL hasn't changed, but

2    people have found clever new ways to employ that function over

3    the course of the years.  Indeed, I would be shocked if that

4    were not true.

5         MR. REICHMAN:  And I think that's right, your Honor.

6    That's where I wonder whether that's just not a semantic issue,

7    that people have found clever new ways to use them is not

8    another way of saying that they have different capabilities

9    today, and this is where the issues come together.  If these

10   URLs and other things had interactive links, as defined by the

11   Court and met with in the patent, in 1999, then that's the

12   motion for summary judgment of invalidity.  That's not a claim

13   construction issue.  If that's what was going on back then,

14   then that's a validity question.

15        The focus here today is the specific statements that

16   were made to the patent office in connection with these four --

17   Dickman, LeMole -- references that were made.

18        THE COURT:  Right.

19        MR. REICHMAN:  And I think that Dr. Shamos said it

20   there towards the end.  I wouldn't phrase it the same way, but

21   the point, I think, is the same.  He said if the art didn't

22   have these things, you wouldn't need a disclaimer; they would

23   just be distinguishing the art.  To put it simply, that's what

24   we're trying to say.  This is not disclaimers.  This is merely

25   distinguishing the art.  And I said it a different way at the

beginning, your Honor.  I said you can't disclaim something

that you haven't claimed in the first place.  The point of a

disclaimer is you say, Okay, here's what's within the patent,

somebody comes along and says, No, no, look at this prior art.

This prior art would be within your patent, so you carve off a

piece of that limitation and say I'm going to disclaim a piece

of that limitation.

          According to the patentee, according to these very

specific disclaimers, interactive links were not in these four

prior art references.  That was the point.  It was never

claimed in the first place, so it can't be a disclaimer, and

the Federal Circuit has made that point.  There are cases to

that point, the proposition that a disclaimer is in the context

of a statement that narrows a claim.  That's what constitutes

prosecution history disclaimer.  There's no need for a

disclaimer where the court's construction already eliminates

the possibility of recapture.  And I think that is what was

animating the defendant's arguments and the Court's concerns in

these claim constructions, the fear of recapture.  You can't go

disclaim something in the prior art and say you're not that and

then turn around and claim that there is infringement of that

same thing.

          I think that there's Federal Circuit precedent,

Schindler and the other cases that we cited stand for the

proposition that there isn't a risk of recapture when the

E1fWdroH

1   Court's definition does the job.  The definition of interactive

2   link, if the facilities for restoring prior operating state

3   within the Court's definition existed in the prior art the

4   patent's invalid.  Then we move on to infringement, if those

5   facilities are not there, if all that's there is the prior art

6   that didn't have those facilities, then there's not going to be

7   any infringement on the infringement.  It's all dealt with with

8   bedrock principles of patent law.  It's double dipping to say I

9   understand that you distinguish the prior art by saying it

10  didn't have the facilities for restoring previous operating

11  state, so I'm going to put that in there, plus I'm going to

12  also say that you're not the prior art.  That's the way it was

13  distinguished in the first place.

14         In connection with this, I think that the argument

15  might be made, I think your Honor made it in one of the Court's

16  ruling, saying what's the harm of it, sort of the gist.  If you

17  were disclaiming these things what's the harm.

18         THE COURT:  Did I say that, what's the harm of it?

19         MR. REICHMAN:  You said something along those lines;

20  that's the way I took it.  I'm probably being a little

21  interpretive.  If you're not these things, then why not just

22  simply disclaim them.  In addition to the law I just cited, I

23  think the issue is jury confusion.  This is why negative

24  limitations are generally not favored by the Federal Circuit,

25  and to have the jury try and figure out it's not a URL, so

which part of URLs were around in 1999, are they citing URLs

from today, or are they citing URLs from 1999, the errata sheet

demonstrates the opportunity for confusion, even among experts,

showing the page from 2007, which really means what they wanted

from 1999, because I think I'm not going out on a limb to say

that we can't -- we can't as lawyers and the Court -- be

pointing to evidence of how URLs operate in 2014 to invalidate

this patent.  That doesn't make any sense.

          The whole structure of the invalidity argument has to

be around prior art, not 2014 art, and to have the jury looking

at it can't be a URL, which URLs can't it be, can't be a URL

today, can't be a URL back in the day, and the point was it's

not necessary because what's necessary for proving infringement

is it's got an interactive link; that is, it has facilities for

restoring a previous operating state.

          You've heard testimony from Dr. Martin, and I think

you can read it in the prosecution history just as well as

Dr. Martin, that the applicant's point of view is that these

prior references did not have interactive links, merely

distinguishing those prior references, and there's no need for

a disclaimer in that context.

          Thank you, your Honor.

          MR. SHATZER:  Your Honor, we believe you were correct

when you initially found these were clear disclaimers.  For

example, one of them is Internet shortcuts do not represent

1    interactive link.  If they were just distinguishing Dickman,

2    for example, they would have said the URL in Dickman is not

3    what's claimed in our patent.  That's what patent lawyers do

4    all the time.  These are written in the traditional language of

5    disclaimers.  They're written broadly, and maybe they're

6    broader than they need to be, but the Federal Circuit has told

7    us that that's Droplets's problem.  If you look at USHIP

8    Intellectual Props., LLC v. United States, 714 F.3d 1311, just

9    from last year's Federal Circuit, the Federal Circuit said,

10   "The fact that the applicant may have given up more than is

11   necessary does not render the disclaimer ambiguous.  The

12   analysis focuses on what the applicant said, not whether or not

13   the representation was necessary or persuasive."

14          In other words, they're stuck with what they said.

15   And why is that?  Because this Court and my clients and the

16   public shouldn't have to figure out what the disclaimer means.

17   They should be able to take it at face value.  Or, to put it

18   another way, this Court doesn't have to go through each piece

19   of prior art they distinguished and figure out just how much

20   disclaimer they needed to have to get around that art and limit

21   the disclaimer to that, which is what they're suggesting is the

22   test.

23          THE COURT:  Actually, what they're suggesting is that

24   by citing Dickman, the argument that I understand them to be

25   making is we distinguish three pieces of prior art.

1   Distinction No. 1 was Dickman.  Distinction No. 2 was, I forget
2   the name of it, and distinction No. 3 is LeMole.  And all we
3   were doing in these three segments of our presentation to the
4   PTO was addressing the patent that was cited in the parentheses
5   there.  We weren't making broad, sweeping statements, we were
6   addressing that patent.  And you don't have to go look at the
7   patent to see how narrow we would have to be in order to
8   distinguish it.  All we're doing here, when we're citing
9   Dickman and those two paragraphs, is we're distinguishing
10  Dickman and when we're citing LeMole and these three
11  paragraphs, we're distinguishing LeMole.  That's the argument
12  they're making today.

13          MR. SHATZER:  And if you look through the rest of the
14  prosecution history, when they wanted to say that, they said it
15  differently.  They said we don't have the XYZ in reference PDQ.
16  They don't make broad, sweeping statements like they make here.
17  As your Honor noted earlier, these statements are not
18  qualified.  Putting in parentheses isn't qualifying that
19  statement.  When you read these, your Honor, in your initial
20  decision, you viewed them as clear disclaimers.  That's how we
21  read them.  That's what the Federal Circuit says you ought to
22  do.  I think their point is we didn't need to disclaim that
23  much, and what the Federal Circuit said is so what, you did.

24          THE COURT:  I understand that.  I know that rule.  So
25  the issue is do I continue, in light of the arguments that are

E1fWdroH

now being made, the testimony I heard, whatever, to read them

as disclaimers or do I change my mind, and say they're trying

to distinguish these three patents here and anyway the whole

issue will come up on the inevitable summary judgment motion to

invalidate the patent on the ground that you could restore

prior operating states in 1999 through the use of interactive

links.  That's what bookmarks did.  I assume you're making that

motion.

          MR. SHATZER:  Depending on what your Honor rules, we

may very well.  Depending on the definition of interactive

link, yes, we may very well.

          THE COURT:  I don't think that my interpretation of

interactive link probably has much of anything to do with

whether you have made that motion or not.  At least it wouldn't

if I were litigating, but I'm not the litigator.

          MR. SHATZER:  In fact, your Honor, I think our motion

at this point would be for noninfringement.

          Your Honor, just to summarize, you have to take these

at face value.  It doesn't matter what the art said.  They are

clear disclaimers.  The Federal Circuit's told us that you're

stuck with what you said, even if you said too much.

          Another important case, your Honor, is the Biogen

case.  The Biogen case actually has some facts very similar to

ours.  It's a biotechnology case, but situation was this.

Somebody was prosecuting a patent for an antibody and they

E1fWdroH

1    limited their claim by saying that the antibody only attached

2    to the large loop of the antigen protein chain, and then, lo

3    and behold, somebody, Smith-Kline, made an antibody that

4    attached to the small loop and Biogen sued them, and

5    Smith-Kline said you limited your claim to the large loop.

6    Biogen's response was we didn't know about the small loop,

7    nobody knew that at the time.  The court said it doesn't

8    matter.  If you disclaimed, you disclaimed.  Same facts here.

9    Something happened later, if your disclaimer is broad enough to

10   cover what happened later, that's your problem.  That's the

11   facts of Biogen, very close to our facts, your Honor.

12          Just to summarize the testimony, and I don't think I

13   need to say too much because I think Dr. Shamos was very clear,

14   but the point is that the meaning and material capabilities of

15   URLs, bookmarks, hyperlinks, cookies, shortcuts hasn't changed.

16   The uses have changed, but they could have been put to those

17   uses earlier based on how they function.  It was just a

18   question of whether there was a need for it or somebody thought

19   of it or somebody decided to do that.  That's different.

20   That's true with everything, frankly.

21          THE COURT:  I understand, it's true with everything.

22   It's certainly true with automobiles.  But that's why I'm

23   wondering why your focus isn't on invalidity, but okay.  That's

24   why I'm not a patent lawyer.  I'm just a judge.

25          MR. SHATZER:  To be specific, the one example that

1    they focus on is this use of fragment identifiers, and those

2    fragment identifiers were available before 1999 and they didn't

3    do anything different in the example they used in 2005 than

4    they did in 1999.  Nobody used them in that particular way, but

5    the way they worked was the same exact way and they were part

6    of that standard.  Somebody had to go in and say we want to

7    have something called a fragment identifier.  You identify with

8    a panel.  Afterwards you have to put certain information in

9    there, and that was pre-1999, and people had used them for all

10   sorts of different things.  All they've done is picked one

11   later on and said it's a big change because it works better,

12   but that has nothing to do with what a URL is.  Has nothing to

13   do with what it means or its capabilities.  It was capable of

14   doing that in 2000, 1999.

15        THE COURT:  To help me clarify, let's say I agree with

16   you.  Let's say I think that this argument that there's been

17   some change in the meaning or the capability as opposed to the

18   use to which URLs, fragment identifiers, bookmarks, what have

19   you, have been put over the course of time, is that ultimately

20   a definitional issue, or is that a validity issue?

21        MR. SHATZER:  I think, because we have a disclaimer

22   here, it's a definitional issue.

23        THE COURT:  And what if I decide that it's not, that

24   there's no disclaimer, that this is simply distinguishing?  If

25   I were to decide that, does the issue drop out of the case, or

E1fWdroH

1   does it then become a validity issue?

2           MR. SHATZER:  I think with respect to this particular

3   term, even if it drops out, it remains both a noninfringement

4   and a validity issue.

5           THE COURT:  How your stuff works as opposed to how

6   their stuff works, I haven't thought about.  It's easier for me

7   to think about invalidity than it is to think about

8   infringement because I don't know how your product works except

9   that the screen shows me the picture, I press the hyperlink,

10  the screen shows me a different picture.

11          MR. SHATZER:  Understood.  But, your Honor, if you're

12  rethinking whether there was a disclaimer, I would urge you to

13  look through the rest of the document.

14          THE COURT:  I am rethinking it.

15          MR. SHATZER:  And look how they distinguish as opposed

16  to how they disclaim, because they do it very differently.

17          THE COURT:  And that would be a useful thing to have

18  pointed out to me.

19          MR. SHATZER:  And the other thing, I think, that would

20  be helpful, and the reason we think this disclaimer is

21  important is because the reason they're fighting against it is

22  we believe that they want to accuse of infringement saying that

23  we're in the prior art, and we want that to not happen because

24  it shouldn't because they disclaim that, and that's why they're

25  fighting so hard for this, your Honor.

E1fWdroH

1          THE COURT:  Everybody's fighting hard for it because

2     you want to win the case at the definitional stage.  I wasn't

3     kidding when I said that.  I've been around this track before.

4     This is not the first time I've had people come in here

5     slugging at the definitional stage to try to deliver the

6     knockout blow to end the case one way or the other.

7          MR. SHATZER:  One reason we're struggling here,

8     frankly, we don't know what they claim to be the interactive

9     link in our client's product.  They point to a bookmark, but we

10     don't know what the URL is in that bookmark.  We don't know how

11     it works.  We don't know what they're accusing.  We want this

12     claim term to be as clear as possible, based on their own

13     statements, so that we can understand what we're being accused

14     of and what this claim does and doesn't cover.  This

15     interpretation is real important to both infringement and

16     validity.

17          THE COURT:  Yes?

18          MR. REICHMAN:  Very briefly, I think the framing of

19     the issue as between validity infringement versus definitional,

20     I think, is the point that we're trying to make, so I won't

21     belabor it.  That is the point.  These are validity and

22     infringement arguments.  Droplets is not trying to hit a

23     knockout blow and trying to avoid having the definitions

24     preempt the entire infringement and validity analysis.

25          The only thing I'd point the Court to, for the sake of

1   brevity at the end of the day, is that these disclaimers we're

2   looking at, for example, if you look in the prosecution

3   history, the one we were looking at on the board, page 39 of

4   the slides, where we had Dickman in parentheses, that debate,

5   the title of that section was No. 1, what we were looking at,

6   but the title of the section issue B, rejection of claims thus

7   and so as being unpatentable over Gish in view of ICE-T.

8            THE COURT:  That's not on this screen, you see.  What

9   you're reading is not on the screen.  You're the one that came

10  up with the screen shot, and that's not what it says.  You have

11  "Internet shortcuts do not represent an interactive link."

12  That title is very broad and very general and suggests that you

13  are disclaiming, that's certainly how I read it originally,

14  that you are disclaiming the notion that Internet shortcuts,

15  like bookmarks, are the interactive link that is referenced in

16  your patent.

17           MR. REICHMAN:  You're right.

18           THE COURT:  And bookmark is an interactive shortcut.

19  That is an Internet shortcut.  That's what it is.  And I have

20  to tell you, if I had to rule this second, the definition of

21  bookmark has not changed.

22           MR. REICHMAN:  And, your Honor, because that is what

23  the slide says is why I wanted to make this one more point at

24  the end of a long day, it's in the record, it's in Exhibit KK

25  of the plaintiff's submission, I've put it up on the Elmo, the

section, and this is similar, the same as dealt with in the

other section, four different sections that are cited, it's

clear from the context, and that's what the Federal Circuit

says you have to look at, that what is being distinguished,

what is being discussed are these prior art references.  Nobody

mischaracterizes the teaching of Dickman in support of the

assertions, and it goes on to explain why Dickman is

distinguished from the patent claims.

Dickman did not have an interactive link.  That's the

point.  Gish did not have interactive link.  ICE-T did not have

an interactive link.  It's distinguishing the prior art.  So if

the prior art did have those things and the patentee was wrong,

that's a motion for summary judgment of invalidity, and if the

accused products, at the end of the day, don't have anything

more than these unadorned prior art concepts -- that is, no

interactive link -- then it's a motion for noninfringement.

This is not to be dealt with defitionally without the fullness

of seeing what's actually at issue.

Thank you, your Honor.

MR. SHATZER:  I don't have anything else, your Honor.

THE COURT:  Okay.  This was fun.  It was, actually.

You have no idea how we spent the rest of the week.  Thank you

very much.  I'll try to get something out in the next ten days.

MR. REICHMAN:  Thank you, your Honor.

oOo

E1fWdroH

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    DAVID W. MARTIN

 4    Direct By Mr. Budwin . . . . . . . . . . . . .12

 5    Cross By Mr. Shatzer . . . . . . . . . . . . .56

 6    Redirect By Mr. Budwin . . . . . . . . . . . .72

 7    MICHAEL IAN SHAMOS

 8    Direct By Mr. Shatzer  . . . . . . . . . . . .77

 9    Cross By Mr. Budwin  . . . . . . . . . . . . .93

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```