# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

DROPLETS, INC.,

       Plaintiff,

   -against-                               12 Civ. 2326 (CM)

E*TRADE FINANCIAL CORPORATION,
ET AL.,

       Defendants.

----------------------------------------------------------x

## SECOND MARKMAN DECISION CONSTRUING "INTERACTIVE LINK" FOLLOWING CONSIDERATION OF EXTRINSIC EVIDENCE

McMahon, J.:

      The extrinsic evidence hearing contemplated by the Court's decision of October 21, 2013 took place on January 15, 2014. At that hearing, each side presented the testimony of an expert witness, and the Court, as well as counsel, had the opportunity to ask questions of two highly qualified individuals: Dr. David Martin for Droplets and Dr. Michael Shamos for Defendants. Counsel also prepared a number of helpful exhibits and presented both oral argument and very detailed and extensive (perhaps unnecessarily extensive) findings of fact and conclusions of law. I am grateful for their efforts.

      The narrow purpose for which the hearing was called was to determine whether the phrase, "An interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL)" should be added to what I had already concluded (based on intrinsic evidence) was the "core definition" of the disputed claim term "interactive link." As outlined in the October 21 *Markman* decision, in the original (intrinsic evidence only) *Markman* proceeding, the defendants argued that this phrase should be added to the definition of "interactive link" because Droplets had specifically stated, in communications to the PTO when the patent was being reexamined, that URLs and Internet shortcuts "cannot perform the functions of interactive links as claimed," while manual URL address inputs, bookmarks or special browser icons were not "an interactive link as claimed." Droplets countered that the statement had no place in the definition of "interactive link" because the cited references did no more than distinguish certain identified features of the earlier patents on which the Examiner had (erroneously, in Droplets' view) relied, while a person skilled in the art's "understanding" of the terms URL address, hyperlink, bookmark and the like had changed in the years since 1999, when the provisional application for what became the '745 patent was filed.

1

At the hearing and in written presentations reviewed by the Court prior to the hearing, the parties joined issue on that particular dispute: would a person skilled in the art in 1999 have understood the terms URL address, hyperlink, bookmark and cookie differently than those terms are understood today? After considering the testimony and exhibits, I find that question easy to answer: the credible evidence indicates that the meaning and understanding of those terms has not changed since 1999, when the provisional application was filed. In this regard, I credit the testimony of Dr. Shamos. His testimony is supported by every dictionary definition of any of those terms that has been called to my attention, whether the dictionary was published in the 1990s or years later (*see* Defendants' Proposed Findings of Fact a, b, c and d, as well as the dictionary often consulted by the Court in such situations, McGraw-Hill Dictionary of Scientific and Technical Terms 267, 485, 1036, 2225 (6th ed. 2003)). It is also supported by the undeniable fact (to which Dr. Shamos testified, credibly) that these rather ubiquitous computer facilities are so fundamental to the operation of the Internet that it would be impossible for their meaning to change absent wholesale agreement among web users, which agreement has not been sought or obtained (as by altering the Internet Engineering Task Force standards) in the fifteen years since the provisional application was filed. To the extent that Dr. Martin testified to the contrary, I find his testimony unpersuasive and I decline to credit it.

Actually, all Dr. Martin said was that since 1999, clever people have figured out, and continue to figure out, new and creative ways in which to use URLs, hyperlinks and bookmarks. With that proposition Dr. Shamos readily agreed. That is, these facilities can now do things that they could not do in 1999, because no one—including, by the way, Droplets—had thought of such uses.[1]

But that does not mean that the definition or function of these facilities has changed over the intervening years. They have not.

A URL (Uniform Resource Locator) was in 1999 and is today a Internet address assigned to a web document or resource by which it can be accessed by any browser; its function is to serve as a unique identifier for a particular web page or web-based application.

A hyperlink was and is a highlighted word, phrase, or image that, when chosen, connects the user to another part of the same document or to a different URL; its function is to allow a user to navigate from one web page to another without typing in a new URL/web address.

A bookmark was and is a URL that is saved by a user for quick reference; its function is to allow for quick access to a previously-saved URL.

A cookie was and is a data file written to an internet user's hard drive containing information; its function is to allow a web site to track information about a user, such as passwords, login information, preferences, shopping cart contents, etc.

There may have been changes in the way these facilities are employed, or in their capabilities, but the meaning, nature and purpose of these functionalities has not changed. If I

---

[1] To take one example that was the subject of testimony, Droplets did not patent a system for using the query string portion of a URL to generate custom stock charts.

2

may use an analogy invoked during oral argument: there have been many changes to automobiles over the course of the last century, some of them patentable—for example, the invention of an electrically-powered engine, and the addition of computerized GPS navigation systems. But a car is still understood, by persons skilled in the art and by everyone, to be what it always was: a four-wheeled vehicle, propelled by an engine rather than by human power, the function of which is to convey people from one destination to another, generally over roads that are built on or above the ground. You can talk on a telephone or watch a movie in a car today, or get directions to your local pizzeria; Henry Ford could do none of those things in his Model T. But those developments did not alter either the definition or the function of a car. Put another way, they did not add to or detract from the vehicle's "car-ness."

The question then becomes whether Droplets, in order to obtain (or in this case, avoid the imminent cancellation of) its patent, disavowed, unequivocally and unambiguously, that URLs, shortcuts, bookmarks, cookies and hyperlinks—all of which admittedly predate the 1999 application (see '745 Patent, 3:36-65 and 2:37-56)—could be the "interactive link" claimed in the invention.

In the October 21 *Markman* decision, I accepted Defendants' argument that these items had been disclaimed. Defendants are correct that Droplets did not timely move for reconsideration of that determination. Indeed, I have gone back over the original *Markman* submissions and I do not find in them the precise argument that Droplets now makes: that the references cited by the Court in support of that conclusion (all of which were found in the reexamination file) would have been understood by a person of ordinary skill in the art "as disclaiming nothing more than the static, location-based 'bookmarks,' 'shortcuts,' 'hyperlinks,' and 'URLs' as they existed" in 1999. Pl.'s Proposed Findings of Fact and Conclusions of Law at 24. In other words, Droplets argues, whether or not the *definitions* of those terms are different today than they were in 1999 (and they are not, as explained above), the statements that Droplets made to the Examiner about those terms could only have disclaimed their *capabilities* as they existed in 1999. This is so, Droplets contends, because "it would have been impossible for Droplets to disclaim 'bookmarks,' 'shortcuts,' 'hyperlinks,' and 'URLs' including state information related to the applications . . . since no such capability existed at the time of invention." *Id.* at 25.

Defendants have every right to urge that I ignore this argument as belatedly raised, but a district court is always free to change interlocutory rulings prior to the entry of final judgment. *See United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991). Frankly, I would rather consider the argument now than learn later that it would have made a difference to the outcome of this case.

The parties have not provided the Court with the file wrapper from the original patent examination—why I do not know. Therefore, I do not know what was or was not said to the PTO during the initial examination or whether the patentee had any difficulty obtaining its patent. However, in the original patent itself—in particular, in the discussion of the Background of the Invention in the '745 patent—Droplets went to great lengths to explain that existing systems and methods for locating sites of interest or linking to pages on the internet were static rather than interactive, which was identified as a disadvantage over the newly-claimed invention. Droplets

3

then quite specifically went out of its way to identify exactly what those disadvantageous facilities were:

> Facilities presently exist for storing an address (URL) of a web site currently being displayed. One such facility is referred to as a "bookmark." Once created, bookmarks offer a means of retrieving the URL of a particular web site and directing the user's browser to display the page residing at the URL. Bookmarks eliminate the need for the user to manually enter the URL of a site of interest or to retrace (re-navigate) a path through the Internet to arrive at the web site through a known link. However, bookmarks are limited in two respects. Firstly, a web page must be displayed before the URL corresponding to the web page can be stored as a bookmark. Secondly, bookmarks do not maintain information pertaining to a previous operating state of the web site. For example, a bookmark may return a user to a previously displayed web page, such as a form for completing a commercial transaction, but information that may have been completed on the form is generally not saved. That is, the completed information is generally not stored unless the information is made available through another tracking facility referred to as a "cookie." Cookies maintain tracking information on the user's computer that may be referenced once the browser reloads the desired web page and invoked the application included therein. Once the application is invoked, information that was previously entered and stored in the cookie may be restored in the application. Cookies, however, are generally time-sensitive and may expire before a user attempts to re-navigate to the site of interest. Also, cookies are only store on the computer where the original transaction occurred. If the user accesses the site from another computer, the tracking information is not available.
>
> Therefore, there is a need for storing an interactive link on a user's computer which, when selected, retrieves and presents applications and/or information stored at remote locations across the network. There is also a need for the interactive link to include facilities for restoring previous operating states of the application as the application is re-presented at a user's computer.

('745 Patent, 3:36-4:5). This passage can only be read as indicating that URLs (which are specifically identified as web addresses), cookies and bookmarks—all of which "presently exist"—could not do what the newly-invented "droplet" could do, and so were not the "interactive link" being claimed. Were it otherwise, there would have been no need for the invention, the critical feature of which (as both experts testified) was its ability to restore previous operating states of the application.[2]

I accept (because both experts agree) Droplets' representation that URLs and cookies and bookmarks could not do certain things in 1999 that they can do today. But that does not enhance Droplets' position on this issue. Last year, in *Biogen Idec Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090 (Fed. Cir. 2013), the Federal Circuit rejected an argument virtually indistinguishable from the one propounded by Droplets in this case. In *Biogen*, the patentee (Biogen) limited the term "anti-CD20 antibody" during prosecution by stating that the claimed antibody would have

---

[2] Both experts so testified, though Dr. Shamos was quite clear that other facilities existed in 1999 that were capable of performing precisely that function.

4

"similar affinity and specificity as does RITUXAN®," an antibody that could attach to the large loop, or "epitope," of the CD20 anitigen's protein chain. At the time Biogen made this statement to the PTO, no one knew that there was also a small loop of the CD 20 protein; in its suit against GlaxoSmithKline, Biogen argued that its statement should not bar its claims from covering antibodies that were capable of attaching to the small loop, because the small loop was discovered only after Biogen's disclaimer—and so could not have been disclaimed, even though RITUXAN® could not attach to the small loop, only to the large loop. A district court and the Federal Circuit rejected this argument, holding that Biogen's disavowal during prosecution of antibodies that did not work as RITUXAN® worked meant that its claims did not cover antibodies that could attach to the small loop. Technological developments subsequent to a broad disclaimer were discounted and the statement to the Examiner was read literally to cover exactly what the patentee said—antibodies that did not work the way RITUXAN® did.

When the patent was reexamined in 2007, at Adobe's instigation, the Examiner was plainly prepared to invalidate the patent until Droplets indicated that the "interactive link" it was claiming was not a URL, a bookmark or a cookie. I find it impossible to conclude otherwise. Droplets' statements to the Examiner during reexamination included broad disclaimers, such as:

- "Internet shortcuts encapsulate URLs or other location information (Dickman, column 4, line 23-26) and cannot perform the functions of interactive links as claimed. Internet shortcuts contain only URLs. An Internet shortcut is used by the operating system to launch a browser to retrieve resources that reside on the Internet at the location of the shortcut." (Docket No. 208, Ex. KK, at 27).

- "URLs and other location information are merely location data and do not, e.g., connect one part of a program to another program. URLs and other information are elements that inform the browser program to locate certain items. Internet shortcuts are not graphical representations of interactive links but are instead representations of instructions to perform on an internet browser." (*Id.* at 27-28).

- "[M]anual URL address inputs, bookmarks, or special browser icons are not the same as an interactive link as claimed. A bookmark is a stored web page location or URL on a browser while a browser icon is a picture that launches a browser application. Manual URL address input, bookmarks and special browser icons are all browser elements that inform the browser program to locate certain items. The browser elements are not interactive and do not perform the functions of the interactive link as claimed." (*Id.* at 55).

- "Manual URL address input, bookmarks and special browser icons are not interactive links because they are simply browser elements that merely inform the browser program to locate a certain item." (*Id.*).

- "Browsers or Internet shortcuts are not representative of interactive links because they are representative of an Internet browser and contain only URLs. URLs, as described above, are elements that inform the browser program to locate a certain item." (*Id.* at 61-62).

5

It is absolutely true that Droplets made these arguments to counter the Examiner's tentative conclusion that the claimed invention had been anticipated by earlier patents, including specifically LeMole, Dickman and Gish. But contrary to the assertion now being made, Droplets' sweeping statements about why URLs, bookmarks, and special browser icons were not the claimed "interactive link" were not limited in any way—not by anything in the patents being distinguished, not by any capability of those facilities of which a person skilled in the art would have been aware in 1999. Like the Federal Circuit in *Biogen*, I cannot narrow Droplets' broad disclaiming language simply because later technological developments led to new ways of using URLs, bookmarks or special browser icons. Everyone appears to agree that since 1999, technological developments have rendered cookies, bookmarks, shortcuts, hyperlinks, and URLs much more useful than they were then, but even if there was no way Droplets could have foreseen how the utility of these facilities would improve, it nevertheless chose to state to the PTO, clearly and unambiguously, that none of those things was its "interactive link."

Droplets argues that it could not have disclaimed bookmarks, shortcuts, hyperlinks, and URLs "as they exist today" because "no such capabilit[ies] existed at the time of invention." Pl.'s Proposed Findings of Fact and Conclusions of Law at 25. But that is exactly the argument the Federal Circuit rejected last year in *Biogen*. In that case, no one knew about the small loop in the CD20 antigen's protein chain (to which certain antibodies could bind, but not Rituxan®); the only known CD20 epitope at the time the patent issued was the one to which Rituxan® could bind. The court nevertheless held Biogen to its "clear and unmistakable" disclaimer of "antibodies that do not have a similar affinity and specificity for the *specific epitope* to which Rituxan® binds." 713 F.3d at 1098 (emphasis added). I can see no way to distinguish this case from that one.

Droplets correctly notes that it did not disclaim (or distinguish) cookies in the reexamination. However, any concept that a cookie could be the interactive link claimed in the '745 patent was swept away by the language of the original patent itself, in which cookies were expressly distinguished from the claimed invention.

For this reason, I will adopt the claim construction urged by Defendants.

Dated: January 28, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

6