1

2

3

4            UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7   DROPLETS, INC.,                          Case No. 12-cv-03733-JST

8                    Plaintiff,
                                             **ORDER GRANTING IN PART AND**
9          v.                                **DENYING IN PART DEFENDANT**
                                             **NORDSTROM, INC.'S MOTION FOR**
10  YAHOO! INC.,                             **SUMMARY JUDGMENT**

11                   Defendant.              Re: ECF Nos. 611, 753

12

13         Before the Court is Defendant Nordstrom, Inc's motion for summary judgment of

14  noninfringement and lack of willful infringement.  ECF No. 611.  The Court will grant in part and

15  deny in part Nordstrom's motion.

16  **I.      BACKGROUND**

17         Plaintiff Droplets, Inc. accuses Nordstrom of infringing U.S. Patent No. 6,687,745 (the

18  "'745 Patent").  Droplets filed its original complaint in 2011, asserting infringement of the '745

19  Patent and the related U.S. Patent No. 7,502,838 (the "'838 Patent").[1]  Both patents have since

20  been reexamined by the Patent and Trademark Office ("PTO").  The'838 Patent claims were

21  found to be invalid in a decision affirmed by the Federal Circuit.  *See Droplets, Inc. v. Matal*, 698

22  F. App'x 612 (Fed. Cir. 2017) (mem.).  The '745 Patent claims were affirmed as not invalid on

23  that record.  The Court briefly reviews the remaining patent, the relevant claim constructions, and

24  Nordstrom's accused features.

25

26

27  _____

28  [1] The '838 Patent is a continuation of the '745 Patent, meaning that it contains additional claims
    based on the subject matter disclosed in the same application that led to the '745 Patent.  *See U.S.
    Water Servs., Inc. v. Novozumez A/S*, 843 F.3d 1345, 1348 n.1 (Fed. Cir. 2016).

*United States District Court*
*Northern District of California*

A.      **The Asserted Patent**

The '745 Patent, titled "System and Method for Delivering a Graphical User Interface of Remote Applications Over a Thin Bandwidth Connection," issued on February 3, 2004 and claims priority to a provisional application filed on September 14, 1999.  ECF No. 612-1.  The patent is directed towards "an object-oriented approach for delivering interactive links to applications and information stored in remote sources of a network."  *Id*. at 1:27-31.

As the specification explains, browsing the Internet was cumbersome in 1999.  *See id.* at 1:33-3:65.  Search engines were novel, and keeping track of "hundreds of thousands" of web sites posed a challenge.  *Id*. at 3:3-10.  Navigating to another page required leaving the existing one and following a static link.  *Id*. at 3:22-29.  If the user then wanted to find the page again, she had to navigate back to the original page and follow the same static link or write down the URL.  *Id*. at 3:29-31.  Existing methods for keeping track of webpages, such as bookmarks, lacked the ability to store state information, such as information entered into a form.  *Id*. at 3:36-55.

To solve these problems, the '745 Patent proposes the use of interactive links stored on a user's computer to retrieve applications and previous operating states without re-navigating a web page.  *Id*. at 3:66-4:5.  Figure 1 shows the proposed solution below.  First, the client computer 20 requests content, such as a web page or email, from a content provider 30.  *Id*. at 7:63-66.  The content 60 contains two elements:  a "link" and a "droplet."  *Id*. at 7:66-8:5.  The "droplet" 70 is a small application embedded in the web page content that executes to establish a connection to an application server 40.  *Id*. at 8:5-13.  The application server then remotely executes an application 41 associated with the droplet to present functionality on the client computer.  *Id*. at 8:16-21.  The application server further sends information 43 to tailor the application functionality to the client device based on information sent by the droplet.  *Id*. at 9:11-16.



*FIG. 1*

To later retrieve the same application, the user moves the link 72 from the document 60 to the local computer. *Id*. at 14:36-42. To re-execute the application, the user needs only to select the interactive link on the client computer to invoke the droplet and does not need to re-access the prior content. *Id*. at 8:21-34, 17:39-45. Moreover, the application server stores state information 48, which allows the user to reload the application in the same state even if she moves to another device. *Id*. at 24:61-25:27. And by executing the applications remotely, the invention avoids the need to locally store applications. *Id*. at 17:52-57.

Droplets asserts multiple claims of the '745 Patent, including independent claims 1, 17, and 26. ECF No. 612-18 at 2 n.1. Claim 1 recites:

> 1. In a network configured computer processing system having a plurality of client computers and a plurality of host computers, *a method for delivering interactive links for presenting applications and information from remote sources on the network*, the method comprising:
>
> > *retrieving*, in response to a request of a client computer, over a first communication connection *first information having computer program code embedded therein* and *executing the embedded computer program code* for establishing a second communication connection to a second host computer;

*sending second information relating to the operating environment* of the client computer, from the client computer to the second host computer;

*retrieving*, over the second communication connection, *third information including presentation information* for presenting an application *and fourth information*, the presentation information being based on the second information;

*presenting*, at the client computer, *the application and the fourth information* based upon the presentational information; and

*storing*, on the client computer, *an interactive link* for selectively re-establishing the second communication connection to the second host computer *for retrieving the third information and presenting the application and the fourth information*.

ECF No. 612-1 at 29:65-30:25 (emphasis added).

### B.    Claim Construction

As relevant to this Order, the Court has construed the following claim terms:

| Claim Term | Construction (ECF No. 429) |
|---|---|
| "interactive link" / "link" | computer code that (1) retrieves and presents applications and/or information stored at remote locations across the network when selected by an end user, and (2) includes facilities for restoring previous operating states of the application as the application is re-presented at a user's computer. An interactive link cannot be a bookmark, cookie, shortcut, hyperlink or Internet address (URL). |
| "presentation client" / "presentation client program code" | platform independent software, running on a client computer, that can present remotely stored applications and that can transmit user input to remotely stored applications |

### C.    The Accused Features

Droplets accuses twelve features of Nordstrom's website that "update the display of the application based on information received from a Nordstrom application server without loading a new webpage/website." *See* ECF No. 612-18.  For instance, Droplets accuses a "Search Suggest" feature that suggests search terms while a user is typing into a search bar. *See id.* at 3.  Droplets also accuses several display features, including the "filter" feature that shows a filtered view selected by the user, as well as sorting, selecting the next page, quick view, showing in-store availability, and changing parameters.  *Id.* at 10; ECF No. 612-21 at 2-23.

4

1    Droplets asserts infringement from 2009 to the present.  ECF No. 611 at 8:8-10.  In 2018,

2    Nordstrom updated its website to the "Modern Web Platform," or "MWP," which uses a different

3    front-end JavaScript framework called React.  ECF No. 731-3 at 11:9-11.  According to Droplets,

4    React enhances certain website analytic data gathering but does not otherwise affect functionality.

5    *Id.*  Droplets' infringement case thus concerns both "Legacy" features on the pre-2018 platform

6    and "MWP" features on the post-2018 platform.  *Id.*; ECF No. 611 at 8:8-10.

**II.      JURISDICTION**

8    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**III.     LEGAL STANDARD**

10    Summary judgment is proper when a "movant shows that there is no genuine dispute as to

11    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

12    A dispute is genuine only if there is sufficient evidence for a reasonable trier of fact to resolve the

13    issue in the nonmovant's favor, and a fact is material only if it might affect the outcome of the

14    case.  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014)

15    (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).  The court must draw all

16    reasonable inferences in the light most favorable to the nonmoving party.  *Johnson v. Rancho*

17    *Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).

18    Where the party moving for summary judgment would bear the burden of proof at trial,

19    that party "has the initial burden of establishing the absence of a genuine issue of fact on each

20    issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,

21    480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of

22    proof at trial, that party "must either produce evidence negating an essential element of the

23    nonmoving party's claim or defense or show that the nonmoving party does not have enough

24    evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire &*

25    *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

26    If the moving party satisfies its initial burden of production, the nonmoving party must

27    produce admissible evidence to show that a genuine issue of material fact exists.  *Id.* at 1102-03.

28    The nonmoving party must "identify with reasonable particularity the evidence that precludes

United States District Court
Northern District of California

5

summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996). "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted). If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV.   DISCUSSION

Nordstrom moves for summary judgment on four grounds. First, Nordstrom argues that Droplets cannot show infringement for Legacy features because its analysis focuses exclusively on the MWP platform features. Second, Nordstrom claims that the elements Droplets identifies for "interactive links" lack "facilities for restoring previous operating states" and are not "stor[ed]" on the client computer. Third, Nordstrom contends that prosecution disclaimer prevents Droplets' current theory for "selectively re-establishing" a communication connection. Last, Nordstrom argues that the element accused for the "presentation client" is not "platform independent." Nordstrom also moves for summary judgment of no willful infringement.

### A.   Legacy Platform Features

The first issue concerns representative products. Droplets argues that it properly analyzed the Legacy features because its expert analyzed MWP features and found that Legacy features infringed in the same way.[2] Nordstrom responds that Droplets cannot meet its burden for two reasons: (1) Droplets failed to comply with local rules in asserting "representative products" in its infringement contentions, which means that its expert report should be struck, and (2) even if not struck, the expert report is insufficient to establish representativeness.[3]

---

[2] Droplets argues that the MWP and Legacy websites are not different products, but rather the "same product hosted on a different platform." ECF No. 731-3 at 10:9-11. Because Droplets' own expert acknowledges that they are "different forms" and "versions" of the accused features, Droplets must still show that the MWP features are representative. *See* ECF No. 665-7 ¶¶ 2, 3.

[3] Nordstrom also argues that Droplets failed to identify any "interactive link" in the Legacy features. This issue is coextensive with the representative product analysis; if MWP features are representative, Droplets does not need to granularly analyze each version. The Court addressed

United States District Court
Northern District of California

1

2

### 1.      Compliance With Local Rules

3       This district's Patent Local Rules require a party asserting infringement to identify "where

4  and how each limitation of each asserted claim" is met in "each Accused Instrumentality."  Patent

5  L.R. 3-1(c).  "[T]he representative method of disclosing infringement contentions is appropriate,

6  provided the infringement contentions provide reasonable notice of the patent owner's theories of

7  infringement."  *ASUS Computer Int'l v. Round Rock Res., LLC*, No. 12-cv-02099-0JST, 2013 WL

8  5545276, at *3 (N.D. Cal. Oct. 8, 2013) (collecting cases).  The level of detail required to show

9  representativeness may vary depending on context.  For instance, in *Geovector Corp. v. Samsung

10  Elecs. Co.*, No. 16-CV-02463-WHO, 2017 WL 76950, at *5 (N.D. Cal. Jan. 9, 2017), the court

11  found insufficient conclusory allegations of representativeness where a party accused "various

12  kinds of cell phones, tablets, and phablets" that are "not even the same general type of product."

13  *Id*.  By contrast, courts have permitted more conclusory allegations of representativeness of

14  "different versions of a *single product*."  *See Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965-

15  MMC (DMR), 2015 WL 5210669, at *4 (N.D. Cal. Sept. 7, 2015) (emphasis in original).

16       Here, Droplets' Fourth Amended Infringement Contentions analyze a "specific example"

17  of source code from 2020 and state that "Droplets contends that Nordstrom has infringed in a

18  similar way since at least September 7, 2005."  *See* ECF No. 665-11 at 68.  As support, Droplets

19  cites an email from Nordstrom's counsel representing that the cited source code "reflects how [the

20  accused] features worked from about 2015 through today," as well as changelog files, Nordstrom

21  documents, and Nordstrom's interrogatory responses that fail to identify "any changes in source

22  code that affect infringement from 2005 to the present."  *Id*.  That is amply sufficient to "permit a

23  reasonable inference that all accused products infringe."  *Synopsys*, 2015 WL 5210669, at **1, 4.

24  Accordingly, the Court finds that Droplets sufficiently disclosed its representative products theory

25  in its contentions and does not strike the expert report.

### B.      Sufficiency of Evidence

26       Turning to the merits, Nordstrom argues that Droplets' expert opinion is "overly

27

28

United States District Court
Northern District of California

the sufficiency of Droplets contentions for this limitation in the motion to strike order.

1    generalized" to support a jury finding of representativeness.  ECF No. 611 at 20:15-19.  "[T]here

2    is nothing improper about an expert testifying in detail about a particular device and then stating

3    that the same analysis applies to other allegedly infringing devices that operate similarly, without

4    discussing each type of device in detail."  *TiVo, Inc. v. EchoStar Commn's Corp.*, 516 F.3d 1290,

5    1308-10 (Fed. Cir. 2008) (upholding jury verdict).  However, an expert "cannot simply 'assume'

6    that all [accused] products" are similar and "thereby shift to [the accused infringer] the burden to

7    show that is not the case."  *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006).

8    Instead, the expert must provide a "reasoned opinion" for why she believes the products operate

9    similarly for purposes of infringement.  *See Implicit Networks Inc. v. F5 Networks Inc.*, Nos. C10-

10   3365 SI, C10-4234 SI, 2013 WL 1007250, at *12 (N.D. Cal. Mar. 13, 2013).

11          Here, the Court finds that Droplets proffers sufficient evidence of representativeness to

12   withstand summary judgment.  Droplets' expert, Dr. Douglas Schmidt, specifically analyzes both

13   the current source code and the source code for Build 13030, which he contends is representative

14   of the Legacy version.  ECF No. 612-23 ¶¶ 3-4.  He also cites deposition testimony of I-Chiang

15   Chen, Nordstrom's 30(b)(6) witness, who testified that the "flow" of the infringing functionality

16   did not change between the MWP and Legacy platforms.  *Id.* ¶¶ 5; *see* ECF No. 665-5 at 129:21-

17   130:13 (Chen testifying that accused functioned in the same way), 105:8-16 (same), 112:12-20,

18   119:18-24 (same).  With respect to the interactive link, Dr. Schmidt opines on both the MWP and

19   the Legacy methods for generating interactive links.  *See* ECF No. 612-23 ¶¶ 230, 234; *see also id.*

20   ¶ 259.  Although Dr. Schmidt does not identify specific interactive links for the Legacy versions,

21   he states that "Nordstrom can, and does, change the specific names" dynamically, which makes

22   the identification of specific links exemplary only.  ECF No. 611-21 ¶ 47.

23          While Nordstrom disputes this evidence – arguing that Mr. Chen was opining on "high-

24   level information flow," rather than backend functionality, and that Dr. Schmidt fails to show that

25   the Legacy interactive link behaved in the same way– such arguments go to the weight of

26   evidence.  Because a reasonable jury could find that the MWP versions are representative of

27   Legacy versions based on Dr. Schmidt's analysis and Mr. Chen's testimony, the failure to analyze

28

United States District Court
Northern District of California

8

1    the Legacy version in detail is not fatal.  The Court thus denies summary judgment on this issue.[4]

2        **C.    Interactive Link**

3        Turning to the next issue, Nordstrom argues that the "interactive link" Droplets identifies

4    in its accused products (1) does not have "facilities for restoring previous operating states of the

5    application" and (2) is not "store[d]" on the computer.  Each of these issues implicates claim

6    construction.  Droplets argues that Nordstrom waived its arguments by failing to raise them during

7    the *Markman* stage.  For the reasons stated in the order confirming claim construction, the Court

8    disagrees and finds the arguments to be properly raised.  ECF No. 747.  The Court thus considers

9    the additional claim constructions below.  *See Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d

10   1350, 1356 (Fed. Cir. 2005) (explaining that patent infringement requires a two-step inquiry:  "First,

11   the court must construe the asserted claim," and "[s]econd, the court must determine whether the

12   accused product or process contains each limitation of the properly construed claims").

13        **1.    "Restoring Previous Operating States"**

14       Nordstrom argues that "restoring previous operating states" is limited in the following

15   ways:  the state must be (1) "particular to a user," (2) "maintained on a server," (3) "restored by

16   sending [information] to the client so that the user does not have to re-enter it and the server does

17   not have to re-determine it."  ECF No. 611 at 15:21-23.  Nordstrom claims that the accused

18   products do not do this because they "recreate" the state, rather restoring it.  ECF No. 611 at 16:1-

19   17:11.  Nordstrom analogizes this difference to restarting a video in the same position (restoring

20   the state) and starting a video in the beginning and then fast forwarding to a previous position

21   (recreating the state).  *Id.* at 15:24-28.

22       As an initial matter, Nordstrom is correct that the "previous operating state" must refer to a

23   particular user's prior state.[5]  The '745 Patent provides three concrete examples of restoring prior

---

[4] Nordstrom cites expert report errata showing that Droplets deleted references to adding Legacy feature code in Dr. Schmidt's report.  *See* ECF No. 612-16 ¶ 61; ECF No. 612-17 ¶ 101, 283.  Because these paragraphs do not clearly relate to the "interactive link" limitation, they are of limited relevance.

[5] This interpretation is further required by issue preclusion, as the Court explained in the order confirming claim construction.  ECF No. 749.

United States District Court
Northern District of California

1    operating states.  First, with respect to the disclaimed prior art, the patent describes technologies

2    such as bookmarks that "may return a user to a previously displayed web page, such as a form for

3    completing a commercial transaction, but information that may have been completed on the form

4    is generally not saved."  ECF No. 612-1 at 3:55-60.  Bookmarks are thus disparaged as failing to

5    "maintain information pertaining to a previous operating state of the web site."  *Id.*  The

6    implication is that showing a previously displayed web page (the form) does not constitute

7    "restoring a previous operating state" unless data provided by the user is displayed.

8         Second, with respect to the exemplary "Stock Watcher" application, the specification

9    describes a user "alter[ing] the size of the window representing the stock watcher application" and

10   then having the same sized window reopen when the user starts a new session on another device.

11   *Id*. at 25:31-55.  Again, resizing a window is a user action – merely showing a window with the

12   same dimensions does not constitute restoring an operating state.  Finally, also with respect to

13   "Stock Watcher," the specification describes a user "add[ing] a number of personal stock offerings

14   to a list of 'watched' stocks" and then having the same list displayed when "re-invoking the Stock

15   Watcher application."  *Id*.  In this case also, an "operating state" refers to "modifications made to

16   an application invoked by a user."  *Id*. at 25:58-65; *see also id.* at 25:66-26:4.  This interpretation

17   is further supported by descriptions of retrieving the operating state via user id, *id*. at 24:66-25:6,

18   storing state information in long-term storage to account for "prolonged delay in user activity," *id*.

19   at 26:4-7, and resolving conflicts when a user attempts to open multiple sessions.  *Id*. at 26:23-36.

20   Accordingly, the Court finds that "previous operating state" must refer to a particular user's

21   operating state and particularly to "modifications made to an application" by the user.

22        However, Nordstrom has not shown that this broad proposition justifies importing the

23   other requirements it seeks – such as "server" storage or resending information – nor, indeed, that

24   these requirements would justify summary judgment.[6]  Although the embodiments described in

25   the specification use a remote server to store information for retrieval when the user restarts the

26

27   _____

28   [6] Nordstrom does not articulate a precise proposed construction of this term and thus refers to
     requirements that are not found in all of the claims.  For instance, claim 1 does not require a
     "server" and thus cannot plausibly require a server to store information.

United States District Court
Northern District of California

1    application, Nordstrom has not explained why the claims should be limited to this highly specific

2    method for restoring a state.  *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368,

3    1375 (Fed. Cir. 2015) ("Claims are not necessarily and not usually limited in scope simply to the

4    preferred embodiment."); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1377 (Fed. Cir.

5    2014) (improper to limit claim terms to embodiments "in accordance with the present invention"

6    without an indication of their "importance, essentiality, or criticality").

7           Moreover, Nordstrom has not clearly explained which aspects of the proposed construction

8    the accused products fail to meet.  Nordstrom claims that "restoration" of a state in the accused

9    products "cause[s] new invocations of the remote applications and the generation of new output,

10   independent of any previous user interaction."  ECF No. 611 at 17:2-5, 16:11-14.  However, Dr.

11   Schmidt explains that the previous operating state may be based on user input.  For instance, in the

12   search suggest functionality, a user may enter the word "test" and then delete the second letter "t,"

13   to recreate the state of searching for "tes."  ECF No. 612-20 ¶ 23.  A reasonable jury could find

14   that "tes" reflects previous input by the user.  Similarly, a user may select the filters A, B, and C,

15   and then deselect filter C to restore the previous state where the user selected A and B.  ECF No.

16   612-20 ¶ 62.  That the accused products use a different method for recreating states – rerunning

17   the application instead of storing individual results – does not clearly fail to meet this limitation

18   where Nordstrom has not shown that any particular method is required.[7]

19          In short, Nordstrom has not shown that the claims are limited to any specific method of

20   restoring operating states or that no reasonable jury could find that the accused products do so.

21   Summary judgment on this issue is denied.

22                          **2.    "Storing on the Client Computer"**

23          Nordstrom next claims that Droplets' infringement theory that the interactive link is

24   "stored" in the random access memory ("RAM") of the client computer is barred by prosecution

25

26   ───────────────────
     [7] Similarly, Nordstrom has not explained why the operating state is not "maintained on a server,"
27   ECF No. 611 at 15:22, particularly since search suggestions and other output is presumably stored
     somewhere.  And it has not explained why a user would have to re-enter information to recreate
28   the state (e.g., by retyping "tes" after deleting a "t" in "test").  *Id.*  Thus, even assuming the extra
     requirements asserted in Nordstrom's brief, Nordstrom has not connected the dots of its argument.

                                              11

United States District Court
Northern District of California

disclaimer.  Nordstrom focuses on two aspects of the prosecution:  the initial reexamination of the '745 Patent and the '838 Patent reexamination and subsequent Federal Circuit appeal.  Nordstrom also argues that the "ordinary meaning" of the term is not met by Droplets' interpretation.  As with the previous issue, the Court first considers the scope of the claims and then the application to the accused products.  *See Freedman Seating*, 420 F.3d at 1356.

### a.  Limitations on Claim Scope

Prosecution disclaimer narrows the ordinary meaning of a claim term when the patentee "unequivocally and unambiguously disavows a certain meaning to obtain a patent."  *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013).  The purpose is two-fold:  first, prosecution disclaimer protects competitors' rights "to rely on those representations [in the prosecution] when determining a course of lawful conduct," and second, it ensures that "claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."  *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359-60 (Fed. Cir. 2017) (citations omitted).  The prosecution history also "provides evidence of how the PTO and the inventor understood the patent."  *Id*. (citing *Biogen*, 713 F.3d at 1095).  However, prosecution disclaimer only attaches to statements that are "clear and unmistakable."  *Id*. at 1359.

Ordinarily, prosecution disclaimer requires analysis of the prosecution history as a whole.  *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999).  In this case, however, Nordstrom's second basis for prosecution disclaimer – the '838 Patent reexamination – presents a different issue because both the PTO and the Federal Circuit rejected Droplets' arguments about claim meaning.[8]  There, the PTO found that a prior art "Hickman" reference disclosed "storing" an interactive link because its "processor can only access [the interactive link] if it is stored (whether short-term or long-term) somewhere in the memory of the computer."  ECF No. 612-13 at 6.  "All programs and data are stored in the memory to be executed" because otherwise "a processor has no access to the program and data to be executed."  *Id*.  On appeal, Droplets argued that the PTO

---

[8] That the '838 Patent reexamination relates to a different patent does not necessarily defeat prosecution disclaimer because the patents are related.  *See Teva Pharma. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).

United States District Court
Northern District of California

1

2   erred because "[t]he entire point of *storing* the link was not simply to say that it was lodged in the

3   computer's transient memory."  ECG No. 612-12 at 14.  The Federal Circuit was not convinced

    and affirmed the PTO's decision.  *See* 698 F. App'x 612.

4           The PTO's rejection of Droplets' argument likely prevents application of prosecution

5   disclaimer.  Numerous district courts have declined to apply prosecution disclaimer to arguments

6   rejected by the PTO.  *See, e.g.*, *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp.

7   3d 851, 364 (N.D. Cal. 2019); *Zoho Corp. v. Sentius Int'l LLC*, No. 4:19-cv-0001-YGR, 2020 WL

8   3128910, at *11 (N.D. Cal. June 12, 2020); *Motiva Patents, LLC v. Sony Corp.*, No. 9:18-CV-180-

9   JRG-KFG, 2019 WL 3933670, at **19-20 (E.D. Tex. Aug. 20, 2019).  The Federal Circuit has

10  done the same in an unpublished opinion.  *Galderma Labs., L.P. v. Amneal Pharmas. LLC*, 806 F.

11  App'x 1007, 1010-11 (Fed. Cir. 2020).  That rule makes sense because rejected arguments do not

12  implicate the policies served by prosecution disclaimer:  they pose no risk that claims will be

13  construed one way to obtain allowance and another for purposes of infringement, and the PTO's

14  rejection defeats any reasonable reliance on the statements by competitors.  *See Zoho*, 2020 WL

15  3128910, at *11 & n.11; *Power Integrations*, 396 F. Supp. 3d at 864.

16          If there was any doubt against applying prosecution disclaimer, the parties here also

17  dispute the characterization of the prosecution history.  ECF No. 720 at 9:17-10:18.  Nordstrom

18  claims that the PTO rejected a different argument than the one creating prosecution disclaimer, but

19  it does not describe the outcome of the relevant argument or explain how the Federal Circuit

20  affirmed the PTO's rejection without rejecting it.[9]  Recognizing the lack of clarity, Nordstrom

21  states that the Court "need not consider whether Droplets disavowed use of RAM or transient

22  memory for storage" in its reply.  ECF No. 720 at 9:17-18.  The Court accepts Nordstrom's

23  suggestion for the '838 Patent reexamination and does not consider it further.

24          As for the '745 Patent reexamination, Nordstrom cites the following passage as evidence

25  of prosecution disclaimer:

26  _____

27  [9] Nordstrom seeks to apply prosecution disclaimer in part based on arguments Droplets raised in
    an appeal brief.  *See* ECF No. 611 at 19:4-17.  The Federal Circuit presumably rejected those

28  arguments in affirming the PTO.  In any case, the dispute over the nature of those arguments
    means that Nordstrom has not shown the disclaimer to be "clear and unmistakable."

United States District Court
Northern District of California

Shaw discusses a "webtop" system with icons for user selection, those icons providing for launching an application on the application server 280. Shaw discusses the server gathering all objects (applications, documents, etc.) associated with a user and dynamically creating a web page to represent this information. Accordingly, links to applications are not stored on the client or the server, rather these links are generated by the server in response to a user request.

Adobe improperly mischaracterizes the disclosure of Shaw in the reexamination request, and hence by the Office Action reliance on this mischaracterization, the Office Action also mischaracterizes the disclosure of Shaw. For example, on page 115, the section relating to the limitation, states that "Shaw discloses downloading, i.e., storing, a webtop to the client computer. Shaw, col. 13, lines 63-66." Rather, the cited passage states that upon confirmation of password information, the "session managers downloads to client device 214 a webtop that is built up using the bottom up traversal of the data store 273 containing icons representing the application programs available to the user." Adobe's mischaracterization includes 2 significant oversights - (1) equating the step of downloading to storing; and (2) asserting that the download of the webtop identically discloses the storage of an interactive link. Neither of these is proper.

ECF No. 612-5 at 4-5.

This passage shows, at most, disclaimer of "downloading" as storage. Because Droplets does not assert that the accused products meet the claimed "storing" limitation through downloading, the relevance of this passage is limited. In its brief, Nordstrom claims disclaimer of "downloading to RAM or transient memory." ECF No. 611 at 18:21-22. The cited passage above does not mention RAM or transient memory, and the Court finds that Droplets did not disclaim this specific formulation proposed by Nordstrom. The Court does not consider the issue further.

Accordingly, prosecution disclaimer does not limit the ordinary meaning of the "storing" limitations in this case.

### b.    Storing in the Accused Products

Nordstrom claims that the accused products do not satisfy the ordinary meaning of the "storing" limitation for two reasons: first, the interactive links are only placed into RAM, not into permanent storage, and second, Droplets identifies multiple JavaScript files as the interactive link but fails to show that they are stored on the computer "at the same time." ECF 611 at 19-20.

With respect to the first argument, Nordstrom's own expert acknowledges that placing data into RAM constitutes storage. *See* ECF No. 670-20 at 213:2-19 ("If you corner a computer scientist

on the street and you ask him, 'If I put some data into random-access memory, is that storing?' he would say 'Yes.'"); *see also* ECF No. 670-21 ¶ 149 ("No doubt the word 'storing' to a POSITA would normally include placing data in processor memory and would not require persistent (non-transitory) storage, as, for example, on a disk drive.").  That demonstrates disputes of fact over whether placing into RAM constitutes "storing."

With respect to the second argument, Nordstrom fails to explain its basis for arguing that "storing" requires storage of files "at the same time."  Nordstrom cites paragraph 21 of the Shamos Report to argue that "[i]f the constituent files are not all present at the same time, the interactive link is not present," but Dr. Shamos does not support that opinion.  *See* ECF No. 611 at 21:3-5; ECF No. 612-15 ¶ 21; *see generally* ECF No. 612-15 (Dr. Shamos opining broadly on disclaimer in the prosecution history without mentioning storing files "at the same time").  Absent any context or analysis for this limitation, Dr. Schmidt's opinion that the JavaScript files are stored on a client computer is sufficient to demonstrate a dispute of fact.  *See, e.g.*, ECF No. 612-20 ¶ 150.

Accordingly, the Court denies summary judgment on this issue.

### D.        Selectively Re-Establish

Next, Nordstrom claims that prosecution disclaimer bars Droplets' infringement theory for "selectively re-establishing" a communication channel.  During reexamination of the '745 Patent, Droplets argued that two prior art references – "Britton" and "LeMole" – did not meet the "selectively re-establishing" limitation.  *See* ECF No. 612-5.  The Court again reviews the prosecution history for potential disclaimer of claim scope and then considers the accused products.

#### 1.        Limitations on Claim Scope

During the '745 Patent reexamination, Droplets argued that Britton does not teach re-establishing communications because it does not "rely on parameters of a previous session" to re-establish the connection but requires "the steps of optimizing content tailoring" to be "performed again."  ECF No. 612-5 at 3.  Droplets explained:

> As noted above, Britton expressly describes a session-specific technique for content tailoring.  A given example is a PDA that may be connected through a satellite in one session and then through an Ethernet another time.  (col. 10, lines 26-29).  In fact, Britton notes that "because the connection type may change from session to session, the distribution of

United States District Court
Northern District of California

content tailoring may change from session to session.  (col. 10, lines 24-26).

Therefore, it is a basic tenant of the Britton system to not allocate a client device to a specific configuration (e.g. session) because it would be problematic when the client device ends communication and re-establishes communication.  Britton refuses to rely on the parameters of a previous session, as client-specific conditions may have changed.  Rather, Britton emphasizes the benefit of performing the optimization of content tailor functions whenever a new session begins.

Because Britton teaches against tying a client device to a specific content tailoring framework, it is in contrary to this very teaching that Britton would store an "interactive link" to "re-establish" the second communication connection.  Rather, the express nature of Britton's session-specific content tailor requires that when the client device engages the server after completion of a session, the steps of optimizing content tailoring (e.g. accessing the policy and rule repository 30) is performed again because there may have been a change in the "session specific information.

*Id.*

Furthermore, Droplets argued that LeMole does not teach "re-establishing the second communication connection" because it "generates a new web page or advertisement access" each time to create a "new and different page."  *Id*. at 6.  Droplets explained:

In support of the reexamination and the present rejection, Adobe and the Office Action improperly mischaracterize the teachings of LeMole because when web pages are dynamically created, they are continuously updated, changed or created in real-time.  The described hyperlink of LeMole does not "re-establish" the second communication connection, but rather generates a new web page or advertisement access.  Under the LeMole system, re-establishment of a previous session is not possible since the web page is always a new and different page.  New sessions are always created as a result of dynamically created pages.

As explicitly noted in LeMole, once connected to database 112, an advertising page is dynamically configured for the user (LeMole, column 4, ll. 18-27).  Each time a user enters the commercial context mode a dynamically created and customized HTML formatted page is presented to the user (LeMole, column 4, ll. 55-58).  Dynamically created pages indicate that each user session is a new session.  As such, Patent Owner respectfully submits that a new session is not a re-established or restored communication connection to a host because a new session establishes another or different communication connection to the host.

More expressly, the intent of LeMole is to not have the same pages shown again (LeMole, column 5, lines 15-22).  LeMole would not have wanted to re-establish a connection because it aims to show a different advertisement to users every time.  And hence it is improper to interpret LeMole as teaching or suggesting the claimed

16

"reestablishing."

*Id.*  Further emphasizing the point, Droplets explained that "dynamically creating web pages . . . does not allow for selective re-establishment of a communication profile."  *Id.* at 7.  For instance, "a user can not directly select or affect the advertisements displayed on the advertising pages" and "cannot selectively view a previous advertisement."  *Id.*  "By contrast, [the '745 Patent] claims provide[] for a user to be able to restore a previous session or start a new session."  *Id.*

Based on these statements, the Court agrees that "re-establishing" a connection must restore and "rely on the parameters of the previous session."  In both Britton and LeMole, a content page is recreated from scratch and the user may see a new operating state.  By contrast, the whole point of the interactive link in the '745 Patent is to display the previously accessed applications "without re-navigating back to the web page 110 that originally presented [them] to the user" and while restoring "previous operating states."[10]  *See, e.g.*, ECF No. 612-1 at 17:45-51, 4:25-30, 3:66-4:5.  Moreover, during the '838 Patent reexamination – which provides relevant evidence for parties' understanding of this term – Droplets clearly explained that "re-establishing" a connection "does not mean simply stumbling across the same website or the same host computer twice."[11]  ECF No. 612-12 at 11. Rather, it means that the connections are not "independent" and not "unrelated."  *Id.* at 12.

Based on the foregoing, the Court finds that "re-establishing" a connection means that the connection is established based on a previous connection and restores the previous operating state.

### 2.    Re-Establishing Connections in the Accused Products

Nordstrom argues that its accused products do not meet this limitation because each connection is wholly independent of the previous one.  For instance, Dr. Shamos explains that in Search Suggest, "[e]ach time the user enters a character, a Search Suggest server dynamically creates a new page insert to send to the user."  ECF No. 612-15 ¶ 162; *see also id.* ¶ 167 (noting

---

[10] The claims refer to "selectively" re-establishing a communication connection.  *See* ECF No. 612-1 at 30:21-25.  This corresponds to the description that a user "is given an option of re-loading or not re-loading the state information" of the last session.  *Id.* at 25:17-18.

[11] Although the '838 Patent has different claim language, claim 2 is the same in relevant part:  it requires "re-establishing" a communication connection through an interactive link, but recites a "host" computer" rather than a "second host computer." ECF No. 670-22 30:3-7.  Both host computer refer to the application server of the specification.  *See id.* at 29:48-30:2.

that the second connection "is an entirely new session"). However, Dr. Shamos does not opine on any other accused product. Nordstrom also cites Dr. Schmidt's report to argue the accused products "cause new invocations" and "generation of new output, independent of any previous user interaction," each time. ECF No. 611 at 17:2-11. The cited paragraphs, however, describe source code for establishing a connection in the first instance – not "re-establishing" it later on. *E.g.*, ECF No. 612-20 ¶¶ 39-56; ECF No. 612-21 ¶¶ 73-84.

Accordingly, Nordstrom has not met its burden to show that the accused products re-establish a connection independent of the previous connection.

### E.    Presentation Client Code

Turning to the next issue, Nordstrom claims that the accused "presentation client code" – a browser such as Chrome, Safari, and Internet Explorer – is not "platform independent software." According to Nordstrom's expert, Dr. Shamos, the software required to run a particular browser on a Windows system is "completely different" from the software required to run it on an Apple computer, even if the program is nominally the same. *See* ECF No. 612-15 ¶ 112.

As an initial matter, the Court questions whether Nordstrom's position is consistent with its prior claim construction arguments. At *Markman*, all parties agreed that a "presentation client code" must be platform-independent. *See* ECF No. 404 at 28. Nordstrom and its co-defendant Yahoo! Inc. had explained that "platform independent software" "does not mean that the same piece of software that implements the presentation client is operable on all client computers." *Id.* at 22:20-22. Rather, Defendants claimed that "platform independent" means "that a particular client computer specific instance of the presentation client is able to work with any application that is enabled for the alleged invention." *Id.* at 22:22-24.

Defendants' interpretation had strong support: the specification explains that because the presentation client is platform independent, "one instance of the droplet presentation client 25 can execute all instances of droplet-enabled applications whether downloaded from a web page or a standalone application running on the desktop." ECF No. 612-1 at 27:17-21. "However, the implementation of the droplets presentation client 25 *may differ over various hardware and software platforms*." *Id.* at 27:21-23 (emphasis added). Accordingly, the Court finds Nordstrom's

18

1   original interpretation of the construction more persuasive than its current interpretation that

2   "platform independent" requires operability on all client computers.

3          In any case, Dr. Schmidt disagrees that the browser code is not platform independent.  *E.g.*,

4   ECF No. 612-20 ¶ 170 ("The browsers can be used on any computers of mobile devices, and in

5   coordination with different operating systems, such as Windows Microsoft and iOS, and are thus

6   platform independent.").  Disputes of fact therefore remain even under Nordstrom's current

7   interpretation.  Summary judgment on this issue is denied.

8          **F.      Willful Infringement**

9          Nordstrom last moves for summary judgment of no willful infringement.  Willful

10  infringement must rise to the level of "wanton, malicious, and bad faith behavior."  *SRI Int'l, Inc.*

11  *v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019); *see also Halo Elecs., Inc. v. Pulse Elecs.,*

12  *Inc.*, 136 S.Ct. 1923, 1932 (2016) (requiring conduct that is "willful, wanton, malicious, bad-faith,

13  deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate.").  Willfulness

14  is a question of fact that the patentee must prove by a preponderance of the evidence.  *Polara*

15  *Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1353 (Fed. Cir. 2018).

16         Here, Droplets claims willful infringement because (1) the asserted patent survived

17  reexamination, (2) Nordstrom relies on an invalidity reference similar to a reference cited by the

18  PTO, (3) Nordstrom refused to take out a license and settle the case, even after a jury found other

19  defendants infringing, (4) Nordstrom did not adopt non-infringing alternatives when migrating the

20  MWP platform, and (5) Nordstrom lacks established policies for patent licensing, patent search,

21  and responding to allegations of infringement.[12]  ECF No. 670 at 27-30.

22         This is not the kind of "wanton, malicious, [or] bad-faith" behavior that will support a

23  finding of willful infringement.  Litigation tactics – such as refusing to settle a case or choosing to

24  assert invalidity – generally cannot support a finding of willfulness.  *See Jurgens v. CBK, Ltd.*, 80

25  F.3d 1566, 1570 (Fed. Cir. 1996).  That is because aggressively litigating a case and

26  "unnecessarily prolonging litigation" is "not related to the underlying act of infringement and

27

28  _____

[12] Droplets initially asserted willful infringement for pre-suit conduct.  However,

United States District Court
Northern District of California

1    say[s] nothing about the culpability of the infringer." *Id.*  Were the rule otherwise, any party that

2    risked litigation rather than settling a borderline case would be liable for willfulness.  That is not

3    the law.  *See Halo*, 136 S.Ct. at 1932 (explaining that enhanced damages for willfulness "are not

4    to be meted out in a typical infringement case, but are instead designed as a 'punitive' or

5    'vindictive' sanction for egregious conduct").

6            The remaining conduct is similar to that found insufficient for willful infringement in *SRI*

7    *International, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295 (Fed. Cir. 2019).  There, the Federal

8    Circuit vacated a district court's denial of JMOL where the accused infringer did not know of the

9    patent until litigation and willfulness rested on employees failing to read the patent and continuing

10   to infringe.  *Id.*  at 1309.  Here, too, Droplets alleges no more than ordinary infringement.  *See*

11   *Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 612 (D. Del. 2017), *aff'd*, 725

12   F. App'x 976 (Fed. Cir. 2018) (rejecting argument that "enhanced damages are warranted because

13   Symantec has continued to update, produce, and sell VVR even [after] this suit was filed").

14   Droplets' cited authorities are distinguishable:  *Apple Inc. v. Samsung Electronics Co.,* 258 F.

15   Supp. 3d 1013, 1027 (N.D. Cal. 2017), involved allegations of copying, and *Packet Intelligence*

16   *LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1315-16 (Fed. Cir. 2020), had the infringer claim that

17   the patentee "lied and stole the inventions" dispute never reading the patent.  Neither of these

18   issues is present here.

19           Accordingly, the Court grants summary judgment of no willful infringement.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

## CONCLUSION

2     For the foregoing reasons, the Court grants summary judgment of no willful infringement

3 but otherwise denies Nordstrom's motion.[13]

4     **IT IS SO ORDERED.**

5 Dated:  July 2, 2021

6 

7 JON S. TIGAR
United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[13] Droplets' motion for leave to file a supplemental in opposition, ECF No. 753, is denied.  The Court has denied the relevant part of Nordstrom's motion, and, as Droplets acknowledges, "that additional briefing would appear to be unnecessary."  *Id*. at 2.