1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DROPLETS, INC.,

          Plaintiff,

     v.

YAHOO! INC.,

          Defendant.

Case No. 12-cv-03733-JST

**ORDER REGARDING DAMAGES DAUBERT MOTIONS**

Re: ECF Nos. 602, 613, 617

Before the Court are motions to exclude expert testimony regarding damages, filed by Defendant Yahoo! Inc., Defendant Nordstrom, Inc., and Plaintiff Droplets, Inc.  ECF Nos. 602, 613, 617.  The Court will deny Yahoo's motion and grant in part and deny in part Nordstrom's and Droplets' motions.

## I.      BACKGROUND

Droplets seeks $260 million in damages from Yahoo and $148 million from Nordstrom for alleged patent infringement.  Droplets accuses certain features on Defendants' websites, including "search suggest," which accounts for the bulk of the purported damages, and "interactive features" like "opening folders and mail" and "quick view."  Defendants counter that damages should be no more than $4.5 million for Yahoo and $1 million for Nordstrom.

### A.      Droplets' Expert:  Dr. Bergman

Droplets' damages expert, Dr. Jim Bergman, uses an "income approach" to calculate damages.  His analysis follows the same steps for both Defendants.  First, Dr. Bergman identifies "accused websites" and calculates their associated revenues.  Second, Dr. Bergman apportions the revenue attributable to infringing features.  His attribution method differs for features that have noninfringing alternatives (and thus can be implemented without a license) and those that do not.  Last, he determines a profit split between Defendants and Droplets to obtain a royalty rate.  *See*

1   ECF No. 628-1 ¶¶ 525-553; ECF No. 620-2 ¶¶ 362-388.

2   For Yahoo, Dr. Bergman focuses on revenues derived from advertising.  ECF No. 628-1 ¶

3   518.  To apportion revenues to features that lack noninfringing alternatives, Dr. Bergman relies on

4   a second expert, Elliot Schwartz, who performed a survey to determine a percentage decrease in

5   search and website visits without the infringing features.  *Id*. ¶¶ 201-06.  To apportion revenues for

6   features that have noninfringing alternatives, Dr. Bergman relies on a third expert, Doug Schmidt,

7   who calculated increases in website load times from implementing the noninfringing alternative

8   compared to the infringing feature, as well as a fourth expert, Ivan Zatkovich, who calculated the

9   impact of such load times on Yahoo website traffic (and resulting advertising revenue).[1]  *Id*. ¶¶

10   201, 207-12.  Then, to obtain the royalty rate, Dr. Bergman analyzes *Georgia-Pacific* factors to

11   determine a 30/70 profit split between Yahoo and Droplets in a hypothetical negotiation, which he

12   multiplies by the attributable revenue percentage to find a royalty rate.[2]  *Id*. ¶¶ 544-53.

13   For Nordstrom, Dr. Bergman concentrates on profits from on-line sales made on the

14   Nordstrom.com website.  ECF No. 620-2 ¶ 362.  For features that lack noninfringing alternatives,

15   Dr. Bergman again relies on Dr. Schwartz's survey to determine profits lost without infringement.

16   *Id*. ¶¶ 373, 155.  For features that have noninfringing alternative, the analysis is more complicated:

17   Dr. Bergman applies Dr. Schmidt's website load time calculations to various Nordstrom and

18   industry studies that found increased load times leading to decreased sales.  *Id*. ¶¶ 156-176.  For

19   example, one Nordstrom study found that a half-second delay in website performance causes sales

20   to decline by 11%.  *Id*. ¶ 163.  Dr. Bergman calculates the overall "time penalty" from using

21   noninfringing alternatives to find a 2.78% impact on sales from infringement.[3]  *Id*. ¶ 176.

22   _____

23   [1] Dr. Bergman opines that a decrease in web traffic would be directly proportional to a decrease in Yahoo's advertising revenue.  *See* ECF No. 628-1 ¶¶ 524, 536.

24   [2] Thus, to illustrate, Dr. Bergman opines that search suggest accounts for 13.48% of Yahoo Search

25   website revenues (because that is how many searches Yahoo would lose if it had to forego search suggest), of which 30% would go to Droplets in a hypothetical negotiation for an overall royalty

26   rate of 4.04% on Yahoo Search revenues.  *Id*. ¶¶ 544, 553.

27   [3] For example, Dr. Bergman estimates that if each page load is associated with one infringing feature and customers views a certain number of pages before making a purchase, the total time

28   penalty from implementing noninfringing alternatives is 1.93 seconds per transaction (or 116 milliseconds per page).  ECF No. 620-2 ¶¶ 174-75.  Based on an average of Nordstrom and

United States District Court
Northern District of California

To then calculate the profit split, Dr. Bergman again analyzes *Georgia-Pacific* factors and further analyzes "the ability of its higher spending customers to find and purchase products." *Id*. ¶¶ 374-88, 380. Using Dr. Schwartz's survey results, Dr. Bergman first isolates high-spending customers. *Id*. ¶ 381. He then looks at the reasons they gave for why they would spend less on Nordstrom's website without the infringing features. *Id*. ¶ 385. Classifying some reasons as "product discovery," Dr. Bergman calculates that 35% of high spending customers would spend less on Nordstrom.com for product discovery reasons. *Id*. ¶¶ 385-86. Claiming that this reflects the *Georgia-Pacific* factor 6 (convoyed sales), Dr. Bergman adopts 35% as Droplets' portion of the hypothetical negotiation revenue split. *Id*. ¶ 386. Dr. Bergman then multiples 35% by the lost sales for each feature to calculate damages. *Id*. ¶ 388.

In addition to the income approach, Dr. Bergman also provides an alternative "market approach." As explained below, Defendants' experts opine that a reasonable royalty would be based on Droplets' settlement license to RPX, which included "options" for several companies to sublicense the patents. *Id.* ¶ 222. Dr. Bergman disagrees that the RXP license is comparable, but opines that to the extent it applies, the numbers should be adjusted to account for "litigation factors."[4] *Id.* ¶¶ 245-66. Specifically, Dr. Bergman compares option values for two companies later found of infringement (Sears and Overstock) to the ultimate jury verdicts to find that the option values are understated by a multiple of five. *Id.* ¶ 294. Dr. Bergman therefore opines that the option values should be multiplied by a factor of fifteen to account for litigation and other differences. *Id.* ¶ 301; *see id.* ¶¶ 265-300.

### B.      Droplets' Expert:  Dr. Schwartz

As noted above, Dr. Schwartz provides a survey to help apportion the revenues from Defendants' websites to the infringing features. The survey relies on self-reporting. Dr. Schwartz asked respondents who used the infringing features how much they valued them and whether they

---

industry studies, Dr. Bergman estimates that each 100 millisecond per page delay causes 2.4% fewer sales, for a total of 2.78% sales impact. *Id.* ¶¶ 165, 167,  175-76.

[4] Namely, because the RXP license was part of a settlement, Dr. Bergman opines that it represents a discount for reduced litigation risks.  ECF No. 628-1 ¶ 289.

would search or spend "more," "the same amount," or "less" without the feature. ECF No. 620-4 at 32-33; ECF No. 617-6 at 36-41. He also asked respondents to provide reasons for using the website less without the feature (where appropriate) by selecting from pre-selected reasons. ECF No. 617-6 at 42; ECF No. 620-4 at 34. These reasons include:

> (1) "It would be too difficult to find the items I'm looking for on [the website],"
>
> (2) "It would take too long to find what I'm looking for on [the website],"
>
> (3) "Without these features, [the website] would not seem as contemporary as other sites,"
>
> (4) "Without these features, I'd be less likely to discover items I didn't start out looking for,"
>
> (5) "Without these features, searching on [the website] would be frustrating," and
>
> (6) "Other."

*Id.* Dr. Bergman subsequently characterizes reasons one, two, and four as "product discovery." *See* ECF No. 620-2 ¶ 385.

## C. Droplets' Expert: Dr. Zatkovich

Dr. Zatkovich provides a noninfringing alternative analysis for Dr. Bergman. ECF No. 617-8 ¶ 62. For some features, including search suggest, Dr. Bergman opines that the available noninfringing alternatives are not commercially viable because they would have "such an adverse impact on these features, that it would render them unacceptable to the customer." *Id.* ¶¶ 62, 65. As support, Dr. Zatkovich cites studies showing that users easily abandon features that do not meet their expectations. *Id.* ¶¶ 68-74. For other features, including panning and zooming, Dr. Zatkovich opines that noninfringing alternatives are commercially viable, but that they would lead to significant abandonment of online transactions. *Id.* ¶ 75. As support, Dr. Zatkovich relies on various "source metrics" – 18 studies showing the impact of speed on user behaviors. *Id.* ¶ 91. He standardizes these studies, selects the ones measuring relevant metrics, and removes outliers to conclude that a 100 millisecond delay creates a 0.63% to 2.00% negative impact. *Id.* ¶¶ 93-94. This number is further validated by Yahoo's own studies evaluating the impact of speed on website traffic. *Id.* ¶ 95.

United States District Court
Northern District of California

### D.    Defendants' Experts:  Dr. Bakewell and Dr. Mody

Defendants' experts provide their own damages calculations.  Yahoo's expert, Dr. W. Christopher Bakewell, provides three different approaches for calculating a reasonable royalty and ultimately concludes that damages should be limited to $4.5 million.  ECF No. 695-1 ¶¶ 12-14. Nordstrom's expert, Dr. Nisha Mody, focuses on rebutting Dr. Bergman.  *See* ECF No. 602-3 at 6. However, Dr. Mody also briefly opines that damages should be limited to $600,000 to $1 million based on an RPX license.  *Id.*

According to Dr. Mody, RPX is a company focused on "introduc[ing] efficiency to the patent market" by acquiring and managing patent rights for its members.  *Id.* at 47.  In 2012, RPX entered into a patent license agreement with Droplets for its entire patent portfolio in exchange for $31.65 million.  *Id.*  As the result, RPX members – including Apple, Google, Amazon, Facebook, and eBay, who were then being sued by Droplets – acquired a license to the asserted patent.  *Id.* In addition, RPX secured an "option" for other companies, including Nordstrom and Yahoo, to become RPX members and also acquire a license.  *Id.*

With respect to Nordstrom, RPX and Droplets agreed to a $1 million option.  *Id.* at 48. Negotiation documents show that Droplets considered $5.8 million to be the "minimum litigation value" and rejected RPX's initial offer of $600,000.  *Id.*  Dr. Mody thus opines that "Droplets would have accepted $1 million in a fully paid-up lump sum amount for a license to multiple patents," but that Nordstrom would have agreed to less in a negotiation because "it would make little economic sense for Nordstrom to pay more than what Droplets revealed it was prepared to accept."  *Id.* at 49.  Dr. Mody acknowledges other differences with the hypothetical negotiation, including (1) timeframe, (2) the parties to the negotiation, (3) a willing licensee's position, (4) assumption of validity and infringement, and (5) number of patents, but only analyzes the time difference in detail.  *Id.* at 49-50.  She also examines Droplets' settlement licenses with Adobe and Charles Schwab to support her lump sum conclusion.  *Id.* at 41-46.

With respect to Yahoo, RPX and Droplets agreed to a $35 million option.  *See* ECF No. 695-1 ¶ 25.  However, Dr. Bakewell disputes the relevance of this number and focuses instead on "Droplets Defendants" – companies that were sued by Droplets that contributed to RPX's payment

of the license.  *See id.* ¶¶ 184- 208, 572-583.  In particular, Dr. Bakewell adjusts each "Droplets

Defendant's" payment by market share in search and focuses on Google's payment relative to its

market share.  *Id.* ¶¶ 202-14.  Using this comparison, Dr. Bakewell concludes that Yahoo (as a

relatively minor player in search) would pay only $1 to $6 million.  *Id.* ¶ 207.[5]

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert

testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (citing *Daubert v.

Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).  They should screen "unreliable nonsense

opinions, but not exclude opinions merely because they are impeachable."  *City of Pomona v.

SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  "Shaky but admissible evidence

is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not

exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

To assure reliability, the expert testimony must have "a reliable basis in the knowledge and

experience of the relevant discipline."  *Id.* at 565 (citation omitted).  "Reliable expert testimony

need only be relevant, and need not establish every element that the [party] must prove, in order to

be admissible."  *Id.*  Federal Rule of Evidence 401 provides that evidence is relevant if "it has any

tendency to make a fact more or less probable than it would be without the evidence" and "the fact

is of consequence in determining the action."  "Irrelevant evidence is not admissible."  Fed. R.

Evid. 402.  Relevant evidence may be excluded "if its probative value is substantially outweighed

by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

---

[5] Droplets seeks to exclude Dr. Mody's affirmative opinions only, not Dr. Bakewell's opinions or Dr. Mody's rebuttal.

jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid.

403.  "When the methodology is sound, and the evidence relied upon sufficiently related to the

case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold)

may go to the testimony's weight, but not its admissibility."  *i4i Ltd. P'ship v. Microsoft Corp.*,

598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

The proponent of the expert testimony has the burden of proving admissibility.  *Lust By &*

*Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

### III.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### IV.    DISCUSSION

#### A.    Dr. Bergman

Yahoo moves to exclude Dr. Bergman's damages opinions on the grounds of (1) failure to

apportion damages, and (2) conclusory 30/70 profit split opinions that are not tied to the facts of

the case.  ECF. No. 617 at 9.  Nordstrom moves to exclude on the same grounds and further argues

that Dr. Bergman did not conduct a proper *Georgia-Pacific* analysis,[6] improperly assumed that

damages from each feature were additive, and offered no basis to support a running royalty (as

opposed to a lump sum royalty payment).  ECF No. 613 at 10-18.  Both Defendants further

challenge Dr. Bergman's market approach.

##### 1.    Income Approach

###### a.    Apportionment

Beginning with the first issue, apportionment embodies the principle that "[a] patentee is

only entitled to a reasonable royalty attributable to the infringing features."[7]  *Power Integrations,*

---

[6] A *Georgia-Pacific* analysis uses the factors outlined in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), to determine damages, including by looking at royalty rates that the parties would have negotiated in a hypothetical negotiation.

[7] Apportionment includes both a substantive rule and an "evidentiary principle" that "care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product," such as by selecting an overly large royalty base that "cannot help but skew the damages horizon for the jury."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-27 (Fed. Cir. 2014) (quoting *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012)).  The evidentiary principle is not at issue here, and the Court does not address it.

*Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018).  "[I]t is only the patented technology that is taken from the owner, so the value to be determined is only the value that the infringing features contribute to the value of an accused product."  *Id*.  An exception to this rule, called the "entire market value rule," permits a patentee to recover damages "based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand."  *Lucent Techs, Inc, v, Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).  But where a reasonable royalty analysis is not "based on the incremental value that the patented invention adds to the end product" or the basis for consumer demand, the expert opinion does not reliably measure the invention and must be excluded.  *Commonwealth Sci. & Indus. Res. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (citation omitted).

Here, Dr. Bergman properly apportions damages because "[t]he ultimate combination of royalty base and royalty rate . . . reflect[s] the value attributable to the infringing features of the product, and no more."  *Ericsson*, 773 F.3d at 1226.  The case is closely analogous to *Summit 6, LLC v. Samsung Electronics Co., Ltd.*  802 F.3d 1283 (Fed. Cir. 2015).  There, the patent owner accused a smartphone maker of infringing a patent by sending digital photos over MMS.  *Id*. at 1288.  The patentee's damages expert began by calculating the amount of revenue from device sales attributable to the camera component.  *Id*. at 1296-97.  He then used surveys to estimate the number of users who used the camera in infringing ways compared to noninfringing methods to arrive at a percentage of defendant's camera-based revenues "due to the infringing features."  *Id*.  Last, he opined that in a hypothetical negotiation, "the parties would focus on allocating the . . . benefit Samsung gained by utilizing the patented features" and would split the profit evenly based on equally strong negotiating positions.  *Id*. at 1297.  Because the infringing methods lacked noninfringing alternatives, the entire benefit was subject to negotiation.  *Id*.  The Federal Circuit upheld this analysis as "structurally sound and tied to the facts of the case."  *Id*. at 1298.

Similarly here, Dr. Bergman begins with Defendants' revenues from the smallest salable unit – the accused websites – which the Federal Circuit approved as a "realistic starting point" for damages analysis.  *Ericsson*, 773 F.3d at 1227; *see LaserDynamics*, 694 F.3d at 67.  He then calculates the revenues attributable to the infringing components and further apportions between

infringing and noninfringing methods of utilizing them.  Thus, where a feature lacks noninfringing alternatives, the entire benefit of the feature is relevant, while features that have noninfringing alternatives only implicate the marginal benefit of the patent.  Last, Dr. Bergman considers a hypothetical negotiation to calculate a profit split for the Defendants' incremental benefit from the patented invention.  This analysis is consistent with *Summit 6* and further supported by *Georgia-Pacific* factors, such as "the benefits to those who have used the invention" and "the utility and advantages of the invention over old modes or devices," which may itself lead to apportionment.  *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018); *Georgia-Pacific*, 318 F. Supp. at 1120.

Defendants nevertheless argue that Dr. Bergman should have apportioned further because the infringing features themselves require other technologies.  For example, Yahoo argues that implementing search suggest "necessitates assembling massive databases of searches, creating and applying machine-learning algorithms to those datasets to generate suggestions, and matching suggestions to an individual user's search queries – none of which are alleged to be covered by the [asserted] patent."  ECF No. 617 at 20.  Nordstrom argues that "Search Suggest . . . requires a search algorithm that generates the suggestions," and "Quick View requires a data repository that can store vast numbers of images and associate them with particular products," as well as image rendering and compression technologies.  ECF No. 613 at 13.  Defendants contend that because Dr. Bergman did not account for these additional technologies or apply the entire market value rule, he failed to apportion.  In other words, Defendants seek to require apportionment of features, not just products that contain features.

That, however, is not required.  Apportionment is needed "if the accused unit is 'a multi component-product containing several non-infringing features with no relation to the patented feature.'"  *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1337 (Fed. Cir. 2015) (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014)).  Here, on the other hand, each accused feature appears to be a single component enabled by several different technologies that "function together to achieve one result."  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1550-51 (Fed. Cir. 1995) (en banc).  That makes the case different from apportionment cases that

United States District Court
Northern District of California

United States District Court
Northern District of California

involve clearly distinct components.  *See, e.g.*, *Lucent*, 580 F.3d at 1337 (date picker feature in Outlook); *Virnetx*, 767 F.3d at 1329 (FaceTime software in iOS devices); *Ericsson*, 773 F.3d at 1225 (WiFi chips in laptops); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319 (Fed. Cir. 20110) (product activation in Microsoft Office and Windows).

Yahoo relies on *Finjan, Inc. v. Blue Coat Systems, Inc.*, for the proposition that the "smallest, identifiable technical component" must be apportioned, but that case illustrates the difference here.  879 F.3d 1299, 1311 (Fed. Cir. 2018).  There, the patent covered a method for categorizing malware.  *Id*. at 1303.  The patentee accused a "dynamic real-time rating engine" ("DRTR") that categorized URLs into multiple categories, such as "pornography," "gambling," or "suspicious."  *Id*. at 1310.  Only the "suspicious" category fell within the scope of the claims.  *Id*.  The court found that apportionment down to DRTR was insufficient because "DRTR is itself a multi-component software" that "also performs the non-infringing functions."  *Id*. at 1310-11.  Here, by contrast, Droplets' theory is that the accused features necessarily infringe and that both patented and unpatented technologies combine to "make possible a single, discrete accused feature."  ECF No. 663 at 19:16-24.  Apportionment is not required in this case.[8]  *See Rite-Hite*, 56 F.3d at 1550 (no apportionment where "patented and unpatented components were analogous to a single functioning unit").[9]

Moreover, Dr. Bergman's comparison with noninfringing alternatives also apportions the "incremental value [of] the patented invention" over other technologies.  *Ericsson*, 773 F.3d at 1226; *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), ("[T]here may

---

[8] Notably, the patentee in *Summit 6* did not have to apportion beyond the infringing feature to account for the value of the camera, image quality, etc., even though those elements likely drove demand more than the patented photo resizing method.  803 F.3d at 1297.  Nor did the Federal Circuit in *Finjan* suggest that the patentee had to account for databases, algorithms, or any other element necessary to perform the claimed malware categorization.  *See* 879 F.3d at 1310.

[9] Yahoo also relies on district court cases, including *MLC Intellectual Property, LLC v. Micron Tech. Inc*., No. 14-cv-03657, 2019 WL 3070567, at *3 (N.D. Cal. July 12, 2019), where the defendant did not dispute that the accused component "has non-infringing features," *Limelight Networks, Inc. v. XO Communications, LLC*, No. 15-cv-720, 2018 WL 1460703 (E.D. Vir. Mar. 23, 2018), where the patentee relied on web traffic alone to apportion, and *Contour IP Holding, LLC v. GoPro, Inc*., No. 17-cv-04738, 2021 WL 75666, at *11 (N.D. Cal. Jan. 8, 2021), where the valuation was "untethered" to the patentee's arguments for the incremental value of the patent. Those cases are distinguishable because none of those issues are present here.

be more than one reliable method for estimating a reasonable royalty . . . .  For example, a party may . . . estimate the value of the benefit provided by the infringed features by comparing the accused product to non-infringing alternatives."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).  Where such alternatives are available, Dr. Bergman quantifies the incremental benefit through speed tests.  Where they are not available, Dr. Bergman reasonably opines that the entire benefit of the feature is at issue in a hypothetical negotiation.  That is consistent with *Summit 6*, which found that "Samsung had no non-infringing alternatives, and the entire benefit was therefore incremental profit from using the patent."  802 F.3d at 1297.  It also makes sense.  A patent "gives nothing but the right to exclude."  *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370 (Fed. Cir. 2017).  Where Droplets' patent permits it to block certain features in their entirety, that ability would plausibly drive a hypothetical negotiation towards a higher royalty rate.

Accordingly, the Court does not exclude Dr. Bergman's opinions based on apportionment.

### b.      Grounding in the Facts of the Case

In addition to apportionment, a "distinct but integral part of the [admissibility] inquiry is whether the data utilized in the methodology is sufficiently tied to the facts of the case."  *Summit 6*, 802 F.3d at 1296.  A proper analysis of *Georgia-Pacific* factors satisfies this requirement.  *See Uniloc*, 632 F.3d at 1317.  However, an expert must go beyond "reciting each factor and making a conclusory remark about its impact on the damages calculation."  *See Whitserve, LLC v. Comp. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).  To satisfy this requirement using a *Georgia-Pacific* analysis, the expert must "tie the relevant *Georgia-Pacific* factors to the . . .  royalty rate" and "explain how she calculated [the] royalty rate using these factors."  *Exmark*, 879 F.3d at 1349.

Here, Defendants challenge Dr. Bergman's profit split analysis as conclusory and detached from the facts of this case, and Nordstrom further challenges his assumption of a running and additive royalty on this basis.

### i.      Yahoo Profit Split

With respect to Yahoo, the Court finds that the 30/70 profit split opinion is sufficiently tied to the facts of the case.  As explained above, Dr. Bergman's damages analysis is based on

United States District Court
Northern District of California

11

Yahoo's advertising revenues on its websites due to increased traffic from the accused features. To determine a profit split in a hypothetical negotiation, Dr. Bergman looks at "traffic acquisition costs" that Yahoo pays to third-parties that "integrate[] Yahoo's advertising offerings on their websites" or that "direct consumer and business traffic to Yahoo Properties."  ECF No. 628-1 ¶ 550.  Yahoo data shows that these payments amounted to 23% of revenues between 2008 and 2010 (the hypothetical negotiation being in 2005 to 2008) and then fluctuated between 5% and 33% until 2017.  *Id.* ¶ 550.  Dr. Bergman adjusts the numbers upwards based on *Georgia-Pacific* factors four (patentee's licensing policy), five (parties' competition), and six (convoyed sales).  *Id.* ¶ 546.  Specifically, he opines that Droplets' policy of licensing the patents would have decreased the royalty rate, while its sale of competing products and additional benefits provided to Yahoo by the accused features would have increased it.  *Id.* ¶¶ 547-49

At this point, Dr. Bergman's analysis is admittedly vague.  He does not explain how he balanced the factors or why the balance led him to increase the traffic acquisition costs by the amount that he did.[10]  Nevertheless, because the numbers from those costs are grounded squarely in the facts of the case, Dr. Bergman's profit split analysis "fits" the case sufficiently to be helpful to the jury.  *Daubert*, 509 U.S. at 591.  As such, the analytical gap between the traffic acquisition costs and Dr. Bergman's conclusions is best addressed through cross-examination, rather than exclusion, and the Court will allow the opinion.  *Primiano*, 598 F.3d 564.

### ii.    Nordstrom Profit Split

With respect to Nordstrom, however, Dr. Bergman's profit split analysis borders on the arbitrary.  Up until that point, his reasonable royalty analysis focuses on lost sales on Nordstrom's website.  As explained above, he relies on a survey to show how much users would decrease their spending if certain features were not available and then on speed metrics to calculate the decrease in spending from increased website load times.  Thus, the "benefit" the parties would bargain for in a hypothetical negotiation is the benefit of higher sales due to having certain features and faster

---

[10] Yahoo's traffic acquisition costs appear to be only 18% on average across ten years.  *See* ECF No. 628-1 at 186.  The 30/70 split thus appears to be significantly higher than average.

website load times.  ECF No. 620-2 ¶¶ 373-74, 147.

To calculate the profit split, however, Dr. Bergman relies on an entirely different theory of value and looks at high-end customers and product discovery.  *Id.* ¶ 384 (stating that those factors would "significantly drive the bargaining split among the parties").  There is no logical connection between the alleged benefit and product discovery for high-spending customers.[11]  For instance, if a customer spends less without search suggestions, the result is the same whether they do so for "product discovery" or other reasons.  There is therefore a fundamental disconnect between the alleged incremental benefit of the patents ("fewer sales" due to "a slower website, or one lacking significant features") and the parties' alleged reasons for splitting the profits.  *Id.* ¶ 147.

Droplets nonetheless contends that the analysis is proper because "it gives credit to Nordstrom for its contributions to the website when respondents selected reasons not connected to the accused features."  ECF No. 669 at 21.  That is not supported by the evidence.  First, Droplets acknowledges that non-accused features on the website also support product discovery.[12]  *Id.* at 22.  Second, several of the reasons not counted as product discovery are nevertheless claimed to be benefits of the patents.  For instance, Dr. Bergman opines that the accused features "contribute to Nordstrom having a modern website," but then counts a "modern website" as a non-product discovery reason.  ECF No. 620-1 ¶¶ 378, 385.  Third, the patent at issue has nothing to do with product discovery.  As explained in previous orders, the asserted patent concerns an "interactive link" used to retrieve previously accessed content.  *See* ECF No. 792.  The breadth of the accused products in this case, which include zooming and changing views on a shopping page, shows that the patent is not tied to product discovery.  ECF No. 620-1 ¶¶ 125-26.

In any case, to the extent that Dr. Bergman sought to measure "the contribution of the patented technology" to product discovery by high spending customers, the analysis is backwards.

---

[11] The profit split analysis appears to concern only the features that lack noninfringing alternatives, not those whose main contribution is faster processing.  *See* ECF No. 620-2 ¶ 385.

[12] Droplets responds that the analysis already excludes Nordstrom's other product discovery features.  ECF No. 669 at 17.  Not so.  The whole point of the profit split analysis is to apportion the value beyond the accused feature.  Nordstrom's own contributions to that feature (e.g., the search algorithm) also promote product discovery.

United States District Court
Northern District of California

1    *Id.* ¶ 384.  As analyzed, Dr. Bergman counts the number of product discovery reasons given by

2    high-spending customers who indicated they would spend less without the accused feature.  *See*

3    *id.* ¶ 385.  He thus measures the importance of product discovery to the accused feature, not the

4    importance of the accused feature to product discovery.  The analysis does nothing to capture the

5    overall change in product discovery on Nordstrom's website due to the accused feature (for either

6    high or low spenders) because it is limited to users who consider the feature important.  Because

7    this methodology does not "evaluate[] the importance of the accused features to product discovery

8    by high-spending Nordstrom customers," it is not admissible even for the stated purpose.  ECF

9    No. 669 at 21.  Accordingly, the Court excludes Dr. Bergman's Nordstrom profit split analysis.[13]

10                   **c.      Nordstrom's Running and Additive Royalties**

11           Nordstrom also challenges Dr. Bergman's use of a running royalty and his assumption that

12   royalties for different features would be added together for damages.

13           With respect to the first issue, Nordstrom acknowledges that Dr. Bergman justifies his

14   choice of a running royalty based on the facts of the case.  *See* ECF No. 620 at 23.  Specifically,

15   Dr. Bergman opines that the parties would choose a running royalty in a hypothetical negotiation

16   because it reduces the burden of calculating future profits and because factors that favor lump sum

17   royalties (desire to keep information secret, uncertain profits) are not present.  *See* ECF No. 620-1

18   ¶¶ 356-60.  Nordstrom disagrees with this conclusion because the parties have previously only

19   agreed to lump sum licenses.  ECF No. 620 at 24.  But that goes to weight, not admissibility.  *See*

20   *i4i*, 598 F.3d at 854.  "The test under *Daubert* is not the correctness of the expert's conclusions but

21   the soundness of his methodology."  *Primiano*, 598 F.3d at 565.  Here, the reasoning is sound, tied

22   to the facts of the case, and relevant, which makes it admissible.

23           With respect to the second issue, Dr. Bergman does not expressly add royalty rates.

---

[13] Nordstrom points out other problems with the methodology, including that the "product discovery" reasons are redundant, that the number of reasons selected does not indicate their importance, and that the numerator is limited to high spenders while the denominator includes all customers who indicated they would spend less.  *See* ECF No. 613 at 17-18, 28.  These additional reasons reinforce the unreliability of the methodology.  Dr. Bergman's *Georgia-Pacific* analysis does not rescue the opinions because it is not tied to his conclusions and is itself conclusory.  *See Exmark*, 879 F.3d at 1349

United States District Court
Northern District of California

1    Instead, he separately calculates the revenues attributable to each accused feature and then adds

2    their corresponding royalties together.  *See* ECF No. 620-1 ¶ 377 & Ex. 1.  Nordstrom's quarrel

3    rests on a theory that some shoppers who reduce their spending due to not having certain features

4    may not then reduce their spending due to a slower website.  ECF No. 613 at 20.  But there is no

5    reason to think that is the case.  Dr. Bergman provides separate analysis for different features

6    based on different reasons for reduced spending.  *See* ECF No. 620-1 ¶ 373.  Absent some

7    indication that the royalties are duplicative, the analysis is not apparently unreliable.

8           Accordingly, the Court does not exclude Dr. Bergman's opinions on these grounds.

9                           **2.      Market Approach**

10          Defendants further challenge Dr. Bergman's alternative market approach based on the

11   RPX license.  Yahoo claims that the analysis is unreliable because it "cherry picks a figure from a

12   comparable license agreement and then . . .  grossly inflates it by applying a first-of-its-kind jury

13   verdict multiplier."  ECF No. 617 at 10.  Nordstrom claims that the analysis fails apportionment.

14   ECF No. 613 at 25.  These arguments are largely unpersuasive because both Defendants rely on

15   the RPX license in their damages calculations.  For instance, Yahoo claims that Droplets "cherry

16   picked" the payment figures for Yahoo, but its own expert uses the payment figures for Google.

17   *See* ECF No. 695-1 ¶¶ 192-216.  To the extent that *Google* is sufficiently comparable to Yahoo,

18   *Yahoo* is surely comparable as well.  Similarly, Nordstrom challenges apportionment, but its own

19   expert relies on the same base figure to calculate a reasonable royalty.  *See* ECF No. 601-3 at 47.

20   Thus, Dr. Bergman's opinions are proper rebuttal to Defendants' own experts.

21          In any case, these critiques do not warrant exclusion.  With respect to the multiplier, the

22   Federal Circuit has acknowledged that settlement licenses (such as the RPX license) may be lower

23   than justified due to a "desire to avoid further litigation."  *Prism*, 849 F.3d at 1370.  Dr. Bergman

24   reasonably accounts for this factor by examining the difference between option payments under

25   the license and ultimate damages paid by companies later found of infringement.  Yahoo critiques

26   this adjustment because the jury verdicts were not final (the parties settled before final judgment)

27

28

United States District Court
Northern District of California

1    and because other companies were later found to have not infringed.[14]  ECF No. 617 at 26.  The

2    first criticism goes to weight, not admissibility, and the second criticism misunderstands the nature

3    of the hypothetical negotiation, which *assumes* infringement.  *See Prism*, 849 F.3d at 1369.  Thus,

4    companies found of infringement are comparable, and those found otherwise are not.

5            With respect to apportionment, Nordstrom's sole criticism is that the royalty base is not

6    apportioned to the accused feature.  ECF No. 613 at 24.  However, Dr. Bergman's royalty rate

7    reasonably reflects the value of the patent, which the Federal Circuit has upheld as an appropriate

8    method of apportionment even when the royalty base includes all product revenues.  *See Exmark*,

9    879 F.3d at 1348; *see also Ericsson*, 773 F.3d at 1226 (requiring the "combination of royalty base

10   and royalty rate" to reflect apportionment); *cf. Sprint Commn's Co., L.P. v. Time Warner Cable,

11   Inc.*, 760 F. App'x 977, 980 (Fed. Cir. 2019) (endorsing "flexible approach" for admitting prior

12   verdicts).  It is thus not the case that Dr. Bergman "apportion[s] 100 percent of the revenue of

13   Nordstrom.com to Nordstrom's alleged use of the patent in its website," as Nordstrom claims.

14   ECF No. 613 at 25.

15           Accordingly, the Court does not exclude Dr. Bergman's alternative market approach.

16   **B.        Dr. Schwartz**

17           Defendants next raise a barrage of objections to Dr. Schwartz's survey methodology.

18   Surveys are generally admissible "as long as they are conducted according to accepted principles

19   and are relevant."  *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).  "Challenges to

20   survey methodology go to the weight given the survey, not its admissibility."  *Id*.  That is because,

21   unlike novel scientific evidence, "a jury should be able to determine whether asserted technical

22   deficiencies undermine a survey's probative value."  *Southland Sod Farms v. Stover Seed Co.*, 108

23   F.3d 1124, 1143 n.8 (9th Cir. 1997).  Thus, "technical inadequacies in a survey, including the

24   format of the questions or the manner in which it was taken, bear on the weight of the evidence,

25   not its admissibility."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618

26

27   ──────────────────

28   [14] Yahoo's criticism that the option payment does not reflect the value of the asserted patent fails
     because Yahoo does not distinguish its own reliance on payment values negotiated by RPX.
     Again, Dr. Bergman's opinions are proper rebuttal to Defendants' own calculations.

United States District Court
Northern District of California

16

F.3d 1025, 1036 (9th Cir. 2010) (simplified).

Here, Defendants' arguments raise the type of technical deficiencies best addressed through cross-examination.  Yahoo argues that Dr. Schwartz (1) failed to perform a "conjoint analysis," (2) did not include controls, (3) did not include an "I don't know option," (4) used 2020 survey responses for a 2005 hypothetical negotiation, and (5) was not personally involved in identifying the features and their presentation.[15]  ECF No. 617 at 27-30.  These criticisms go to weight, not admissibility.  *See Sentius Int'l, LLC v. Microsoft Corp.*, No. 5:13-cv-00825-PSG, 2015 WL 331939, at *5 (N.D. Cal. Jan. 23, 2015) (conjoined analysis);[16] *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, 2011 WL 5417090, at *5 (N.D. Cal. Oct. 27, 2011) (controls);  *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 794328, at *18 (N.D. Cal. Feb. 25, 2014) (question framing); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1029 (N.D. Cal. 2013) (fifteen-year time lapse).

Similarly, Nordstrom argues that (1) the survey reasons were not validated, (2) some survey respondents did not understand the question, (3) Dr. Schwartz removed survey respondents for subjective and unjustified reasons, including where the "[r]esponse pattern was not credible" and where responses were inconsistent (e.g., ranking all features as important but not indicating that respondent would decrease usage), (4) Dr. Schwartz did not remove other respondents who gave non-credible answers (e.g., indicating six purchases totaling $4.00), and (5) a survey of 2020 respondents cannot be extrapolated to a 2009 hypothetical negotiation.  ECF No. 613 at 28-31.  On balance, these arguments also go to weight, rather than admissibility.  According to Droplets, Dr. Schwartz conducted a pretest to validate the survey design and further used "objective" reasons for

---

[15] Defendants also argue that that the survey is not tied to the claimed invention because it asks about features as whole.  ECF No. 617 at 27.  As explained above with respect to apportionment, such evidence is admissible under Droplets' theory that it could exclude entire features in a hypothetical negotiation, which renders their whole benefit subject to negotiation.  *See Summit 6*, 802 F.3d at 1297.  Because the feature definitions derive from Droplets' analysis of noninfringing alternatives, Dr. Schwartz's survey is not unreliable for relying on them.

[16] The Court recognizes contrary authority in *Oracle America, Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012), where Judge Alsup excluded conjoint analysis that included too few features – but only "on this record for this application."  Notably, Judge Alsup acknowledged as "true in theory" that not all features need to be included, but found that "irrational results" in that case confirmed the survey's unreliability.  *Id.* at *11.

United States District Court
Northern District of California

1    removing respondents.  *See* ECF No. 666 at 27-28.  Nordstrom's criticisms of these processes go

2    to survey methodology, not overall compliance with accepted principles, and are not proper

3    grounds for exclusion.  *Wendt*, 125 F.3d at 814.

4         Accordingly, the Court does not exclude Dr. Schwartz's opinions on these bases.

5    **C.    Dr. Zatkovich**

6         Yahoo moves to exclude Dr. Zatkovich's opinions concerning commercial viability of

7    noninfringing alternatives as *ipse dixit* and further seeks to exclude his speed metric analysis as

8    unreliable.  ECF No. 617 at 30-31.  With respect to the first issue, Dr. Zaktovich relies on several

9    studies that show users expect near-instantaneous results from some features, that they perceive

10   anything less as "broken," and that a broken implementation leads to 67-90% abandonment rates,

11   which are unacceptably high.  ECF. No. 617-8 ¶ 68.  Yahoo may disagree with this analysis, but it

12   is not *ipse dixit*, and Yahoo cites no case to suggest that anything more is required.

13        With respect to the second issue, Yahoo claims that the methodology is unreliable because

14   (1) Dr. Zatkovich did not explain his method for selecting speed impact studies, (2) the studies are

15   hearsay that he did not independently verify, and (3) the studies concern different contexts than

16   Yahoo's accused features.  ECF No. 617 at 31-33.  Again, however, Yahoo does not show that any

17   of this is required.  Yahoo may well rely on different studies to rebut Dr. Zatkovich, that does not

18   show that Dr. Zatkovich's selection is unreasonable, much less unreliable.  And it is black letter

19   law that "[t]he facts or data relied upon [by an expert] need not be otherwise admissible if they are

20   'of a type reasonably relied upon by experts in a particular field.'"  *Scott v. Ross*, 140 F.3d 1275,

21   1285-86 (9th Cir. 1998) (quoting Fed. R. Evid. 703).  Yahoo faults Dr. Zatkovich for not expressly

22   stating that the studies fit this criteria, but they appear to be in line with Yahoo's own internal

23   analysis, notwithstanding the different contexts.  *See* ECF. No. 617-8 ¶ 95.  Yahoo thus has not

24   demonstrated that Droplets cannot "make such a showing as a matter of law," and exclusion is not

25   warranted.  *See Southland Sod Farms*, 108 F.3d at 1142.

26        Accordingly, the Court does not exclude Dr. Zatkovich's opinions on these grounds.

27   / / /

28   / / /

United States District Court
Northern District of California

18

**D.   Dr. Mody**

Turning to Plaintiff's motion, Droplets seeks to exclude Dr. Mody's affirmative damages opinions and opinions regarding survey design and human perception.  ECF No. 602 at 8.

**1.   Affirmative Damages Opinions**

Beginning with the affirmative opinions, Droplets claims that Dr. Mody insufficiently accounted for the differences between the RPX license and a hypothetical negotiation agreement. Generally, a party may rely on a sufficiently comparable licenses as evidence of royalty rates in a hypothetical negotiation.  *Commonwealth*, 809 F.3d at 1303.  However, because past licenses are "almost never perfectly analogous to the infringement action," an expert "must account for . . . distinguishing facts when invoking them to value the patented invention."  *Ericsson*, 773 F.3d at 1228.  Where the license is "sufficiently comparable" and any differences are "accounted for," the analysis is admissible.  *See Elbit Sys. Land & C4I Ltd. v. Hughes Network Systems, LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019) (citing cases); *see also Finjan, Inc. v. Secure Comp. Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2012) (where differences are accounted for, "[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject").

Here, Droplets does not directly dispute that the RPX license – which "included the same patent, involved the same technology, and involved (albeit through RPX) the same defendant" – is comparable.[17]  ECF No. 602 at 13.  Instead, Droplets challenges Dr. Mody's accounting of the differences with the hypothetical negotiation.  *Id.*  Specifically, Droplets points out that Dr. Mody listed five differences in her report, but then arrived at the same royalty amount without significant analysis or quantification.  *See id.*; ECF No. 602-3 at 49.  Moreover, Dr. Mody did not account for underlying litigation factors, which the Federal Circuit has warned may particularly affect license values.  *See Prism*, 849 F.3d at 1368-70.  And the same problems affect Dr. Mody's analysis of the Adobe and Charles Schwab settlement licenses.  *See* ECF No. 602-3 at 41-45.

On balance, these criticisms go to weight, rather than admissibility.  The gist of Dr.

---

[17] Notably, Droplets does not cite – and the Court has not found – any case where otherwise "sufficiently comparable" licenses were excluded for failure to sufficiently analyze properly identified differences.

1    Mody's opinion is that Droplets has been willing historically to accept relatively low lump-sum

2    payments in exchange for a license. *See id.* at 41-42. That tends to rebut Dr. Bergman's claims

3    for a running royalty and further leaves a question mark next to the much-higher valuation he

4    provides in a hypothetical negotiation. Further, Dr. Mody opines that the RPX license payment

5    would become a "critical benchmark" in a hypothetical negotiation beyond which Nordstrom

6    would not agree to pay. *Id*. at 49. While this analysis leaves several questions – including how

7    Nordstrom would have known in a 2009 hypothetical negotiation about the terms of a 2012 license

8    – it is not unreliable, and Droplets may address the analytical gaps on cross-examination, not

9    unlike Dr. Bergman's profit split opinions.[18]

10          Accordingly, the Court does not exclude Dr. Mody's affirmative opinions on this ground.

11                        **2.      Survey and Human Perception Opinions**

12          Turning to the other opinions, Droplets argues that Dr. Mody is not qualified to opine on

13   survey design and human perception. Dr. Mody expressly testified that she is not an expert in

14   those areas. *See* ECF No. 602 at 18. In her report, however, Dr. Mody criticizes Dr. Schwartz's

15   survey by quoting extensively from a survey research publication and claiming that Dr. Schwartz

16   did not meet the stated standards. ECF No. 602-3 at 55-57. Dr. Mody also independently

17   criticizes Dr. Schwartz's sampling method and survey bias. *Id*. at 58-60. With respect to human

18   perception, Dr. Mody critiques Dr. Bergman's conclusion that 100 milliseconds of delay would

19   lead to reduced sales by comparing that time frame to a human blink. *Id*. at 31. She opines that

20   such short delays constitutes "human reaction time" that would be inconsequential to a consumer

21   making a large-dollar purchase. *Id*. at 37.

22          The Court agrees that Dr. Mody is not qualified to testify on these issues. Nordstrom is

23   welcome to cross-examine Dr. Schwartz on the survey research publication or otherwise elicit the

24   problems outlined by Dr. Mody. However, permitting a non-survey and non-human perception

---

[18] The Charles Schwab license further tends to rebut Droplets' claim that the RPX payments were significantly discounted for litigation factors. *See* ECF No. 672 at 10. Thus, to the extent that this evidence does not perfectly support a damages case, it may still be used for rebuttal. *See MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 WL 2847285, at *2 (N.D. Cal. July 2, 2019).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  expert to testify on the topics is likely to prejudice Droplets through the "aura of authority experts

2  often exude." *MacDougall v. Am. Honda Motor Co., Inc.*, No. SACV 17-1079 JGB (DFMx), 2020

3  WL 5583534, at *9 (C.D. Cal. Sept. 11, 2020).  For instance, Dr. Mody's opinion about "human

4  reaction time" – which is otherwise easy for a jury to understand and consider – is likely to carry

5  undue force when delivered by an expert, particularly in light of the extensive studies provided by

6  Dr. Zatkovich showing that short delays do make a difference.  Because Dr. Mody specifically

7  disclaims any expertise in these areas, the opinions are not admissible.[19]

8       Accordingly, the Court excludes Dr. Mody's survey and human perception opinions.

9                                    **CONCLUSION**

10      For the foregoing reasons, the Court excludes Dr. Bergman's Yahoo profit split opinions

11  and Dr. Mody's survey and human perception opinions.  The motions are otherwise denied.

12      **IT IS SO ORDERED.**

13  Dated:  August 9, 2021

14  _____

15                      JON S. TIGAR
                    United States District Judge

---

[19] Nordstrom's cited authorities, which concern an expert's reliance on studies and sources in her own field, are inapposite because the issues here are expressly outside Dr. Mody's field.