Jennifer Haltom Doan (admitted *pro hac vice*)
Joshua R. Thane (admitted *pro hac vice*)
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
903.255.1000 (phone)
903.255.0800 (fax)
jdoan@haltomdoan.com
jthane@haltomdoan.com

George D. Niespolo (SBN: 72107)
Meghan C. Killian (SBN: 310195)
DUANE MORRIS LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105
415.957.3013 (phone)
415.358.4394 (fax)
GDNiespolo@duanemorris.com
MCKillian@DuaneMorris.com

**ATTORNEYS FOR
DEFENDANT YAHOO, INC. AND
INTERVENOR-PLAINTIFFS OATH, INC.
AND OATH HOLDINGS, INC.**

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| DROPLETS, INC., | Case No. 4:12-cv-03733-JST (KAW) |
| Plaintiff, | |
| v. | **DEFENDANT YAHOO, INC. AND INTERVENOR-PLAINTIFFS OATH, INC. AND OATH HOLDINGS, INC.'S OPPOSITION TO DROPLETS, INC.'S OMNIBUS POST-TRIAL MOTION** |
| YAHOO!, INC. | |
| Defendant. | |
| | Date: August 25, 2022, 2:00 pm |
| | Courtroom: 6 |
| | Judge: Hon. Jon S. Tigar |
| OATH INC. AND OATH HOLDINGS, INC. | |
| Intervenor-Plaintiffs, | **PUBLIC REDACTED VERSION** |
| v. | |
| DROPLETS, INC., | |
| Intervenor-Defendant. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................... 1

II.     DROPLETS' MOTION FOR ATTORNEYS' FEES SHOULD BE DENIED .................. 2

     A.      This is not an exceptional case .............................................................. 2

     B.      Yahoo's conduct throughout the case was not vexatious or intended to delay ................................................................................................. 4

         1.      Droplets ignores four controlling legal principles ...................... 4

         2.      Droplets' discussion of Yahoo's litigation activities presents a one-sided, out-of-context picture ................................. 6

             a.      The "Prior Art Invalidity Case" arguments fail ............ 6

             b.      The "Trial 'Exceptional' Case" arguments fail ............ 11

             c.      The "License Defense" arguments fail ...................... 13

     C.      Droplets' methodology is conceptually unsound and inadequately supported ........................................................................................ 14

         1.      Droplets apparently was not paid under a fixed-fee arrangement ............................................................................. 14

         2.      Droplets fails to provide adequate record support ................... 16

III.    DROPLETS' MOTION FOR PREJUDGMENT INTEREST SHOULD BE DENIED ........................................................................................................ 17

     A.      Courts in this District consistently use the 52-week T-bill rate for prejudgment interest, and no compelling reason exists to deviate from this practice .................................................................................. 18

         1.      Three reasons compel the use of the T-bill rate in this case ...... 18

         2.      Droplets' legal authority for a statutory or prime rate is unpersuasive ......................................................................... 22

         3.      Droplets' delays in prosecuting this suit further justify the T-bill rate ............................................................................. 23

     B.      Accrual: Interest should be limited to the windows from December 12, 2012 through April 12, 2016 and from November 1, 2018 through judgment. .......................................................................................... 23

         1.      Droplets incorrectly starts the accrual period on October 1, 2005 ...................................................................................... 23

2.   The first accrual window should not start until December 12,
     2012 ........................................................................................24

3.   Interest should not be awarded from April 12, 2016 to October
     31, 2018 ...................................................................................26

IV.  DROPLETS' MOTION FOR A NEW TRIAL SHOULD BE DENIED...........................27

A.   Droplets failed to preserve its "peripheral use" claim-construction
     position ......................................................................................28

B.   For the "cookied products," the negative-limitation question about
     cookie use was properly tried as a fact issue to the jury ........................30

C.   Droplets' alternate argument about "modifications" is irrelevant .........................37

V.   CONCLUSION ..................................................................................38

DEFENDANT YAHOO, INC.'S OPPOSITION TO DROPLETS' OMNIBUS MOTION, CASE NO. 12-cv-03733-JST

# TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
   67 F. Supp. 3d 1100 (N.D. Cal. 2014) .......................................................................18-21

*Apple, Inc. v. Samsung Elecs. Co.*,
   926 F. Supp. 2d 1100 (N.D. Cal. 2013) ....................................................................19-20

*Beckman Instruments, Inc. v. LKB Produkter AB*,
   892 F.2d 1547 (Fed. Cir. 1989) ............................................................................... 6, 9

*Broadcom Corp. v. Qualcomm Inc.*,
   543 F.3d 683 (Fed. Cir. 2008) .................................................................................... 28

*Cave Consulting Group, LLC v. Optuminsight, Inc.*,
   2016 WL 4658979 (N.D. Cal. Sept. 7, 2016) ........................................................... 19

*Chalumeau Power Sys. v. Alcatel-Lucent*,
   2014 WL 4675002 (D. Del. Sep. 12, 2014) ................................................................ 8

*Checkpoint Sys. v. All-Tag Sec. S.A.*,
   858 F.3d 1371 (Fed. Cir. 2017) ................................................................................... 4

*Columbia Sportswear N. Am. v. Seirus Innovative Assocs.*,
   942 F.3d 1119 (Fed. Cir. 2019) ................................................................................. 27

*Cosmo Tech. v. Actavis Laboratories FL, Inc.*,
   2019 WL 1417459 (D. Del. Mar. 28, 2019) ............................................................... 8

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) ................................................................................. 25

*Datascope Corp. v. SMEC, Inc.*,
   879 F.2d 820 (Fed. Cir. 1989) ................................................................................... 22

*Ecolab, Inc. v. Paraclipse, Inc.*,
   285 F.3d 1362 (Fed. Cir. 2002) ................................................................................. 30

*Enzo Biochem, Inc. v. Applera Corp.*,
   2014 WL 29126 (D. Conn. Jan. 3, 2014) ................................................................... 23

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*,
   2016 WL 6246590 (D. Neb. May 11, 2016) .............................................................. 23

*Finjan v. Blue Coat Systems*,
   2016 WL 3880774 (N.D. Cal. July 18, 2016) ............................................... 3, 19, 21

*Finjan, Inc. v. Sophos, Inc.*,
    244 F. Supp. 3d 1016 (N.D. Cal. 2017) ......................................................19-21

*Fitness Anywhere LLC v. WOSS Enters. LLC*,
    2018 WL 6069511 (N.D. Cal. Nov. 20, 2018) ............................................20, 23

*Gilead Sciences, Inc. v. Merck & Co.*,
    2017 WL 3007071 (N.D. Cal. July 14, 2017) .........................................13, 15-16

*Gotro v. R&B Realty Group*,
    69 F.3d 1485 (9th Cir. 1995) ........................................................................... 17

*Grain Processing Corp. v. Am. Maize Prod. Co.*,
    893 F. Supp. 1386 (N.D. Ind. 1995) ................................................................. 22

*In re Hayes Microcomputer Prods. Inc. Patent Litig.*,
    766 F. Supp. 818 (N.D. Cal. 1991) ................................................................... 22

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...................................................................................11, 16

*Hewlett-Packard Co. v. Mustek Sys.*,
    340 F.3d 1314 (Fed. Cir. 2003) ..................................................................28, 31

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    687 F.3d 1300 (Fed. Cir. 2012) ..................................................................... 6, 8

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
    2006 WL 2522506 (N.D. Cal. Aug. 30, 2006) .................................................. 20

*Illumina, Inc. v. BGI Genomics Co.*,
    2022 WL 899421 (N.D. Cal. Mar. 27, 2022) ............................................3, 6, 8

*Indivior Inc. v. Dr. Reddy's Labs., S.A.*,
    930 F.3d 1325 (Fed. Cir. 2019) ....................................................................... 27

*Ironburg Inventions Ltd. v. Valve Corp.*,
    2021 WL 4426702 (W.D. Wa. Sept. 27, 2021) .......................................3, 9, 25-26

*Kaneka Corp. v. SKC Colon PI*,
    198 F. Supp. 3d 1089 (C.D. Cal. 2016) ............................................................ 25

*Kaufman v. Microsoft Corp.*,
    34 F.4th 1360 (Fed. Cir. 2022)....................................................................29-30

*Laitram Corp. v. NEC Corp.*,
    115 F.3d 947 (Fed. Cir. 1997)......................................................................18-22

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
    628 F.3d 1359 (Fed. Cir. 2010)................................................................27, 29-31

DEFENDANT YAHOO, INC.'S OPPOSITION TO DROPLETS' OMNIBUS MOTION, CASE NO. 12-cv-03733-JST

*Linear Tech. Corp. v. Micrel, Inc.*,
    2006 WL 8425047 (N.D. Cal. Jun. 9, 2006) .................................................................... 20

*Location Based Servs. LLC v. Niantic, Inc.*,
    2018 WL 7569160 (N.D. Cal. Feb. 16, 2018) ..................................................................... 5

*In re Markhurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    831 F. Supp. 1354 (N.D. Ill. 1993) ................................................................................... 22

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
    288 F. Supp. 3d 872 (E.D. Wisc. 2017) ............................................................................ 25

*Monaghan v. SZS Assocs. L.P.*,
    154 F.R.D. 78 (S.D.N.Y. 1994) ........................................................................................ 17

*Motorola, Inc. v. Interdigital Tech. Corp.*,
    121 F.3d 1461 (Fed. Cir. 1997) ........................................................................................... 6

*Munchkin, Inc. v. Luvn' Care, Ltd.*,
    960 F.3d 1373 (Fed. Cir. 2020) ........................................................................................... 4

*Nickson Indus. v. Rol. Mfg. Co.*,
    847 F.2d 795 (Fed. Cir. 1988) .......................................................................................... 25

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ........................................................................................ 27

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ....................................................................................................... 2, 4

*Oiness v. Walgreens Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) .......................................................................................... 23

*Omega Patents, LLC v. CalAmp Corp.*,
    920 F.3d 1337 (Fed. Cir. 2019) ........................................................................................ 27

*Optis Wireless Tech. LLC v. Huawei Device USA, Inc.*,
    421 F. Supp. 3d 410 (E.D. Tex. 2019) ............................................................................... 8

*PeriRx, Inc. v. Regents of the Univ. of Cal.*,
    2022 WL 622784 (E.D. Pa. Mar. 3, 2022) ....................................................................... 15

*PersonalWeb Techs. LLC v. EMC Corp.*,
    2020 WL 3639676 (N.D. Cal. July 6, 2020) .................................................................. 4, 12

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
    904 F.3d 965 (Fed. Cir. 2018) ............................................................................... 27, 29, 31

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*,
    2016 WL 4446991 (N.D. Cal. Aug. 24, 2016) ............................................................ 20, 29

*Radware, Ltd. v. F5 Networks, Inc.*,
   2016 WL 4427490 (N.D. Cal. Aug. 22, 2016) ................................................. 5, 8, 19

*In re Rembrandt Techs. LP Patent Litig.*,
   899 F.3d 1254 (Fed. Cir. 2018) .......................................................... 2, 6, 9, 16

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
   959 F.3d 1065 (Fed. Cir. 2020) ........................................................... 18, 22-23

*Sensonics, Inc. v. Aerosonic Corp.*,
   81 F.3d 1566 (Fed. Cir. 1996) ............................................................. 2-3, 6, 8

*SFA Sys. LLC v. Newegg Inc.*,
   793 F.3d 1344 (Fed. Cir. 2015) ................................................................... 14

*SiOnyx LLC v. Hamamastu Photonics K.K.*,
   981 F.3d 1339 (Fed. Cir. 2020) ..................................................................... 5

*Solvay S.A. v. Honeywell Int'l, Inc.*,
   742 F.3d 998 (Fed. Cir. 2014) .................................................................... 27

*Special Devices, Inc. v. OEA, Inc.*,
   269 F.3d 1340 (Fed. Cir. 2001) ............................................................... 11, 13

*Stone Basket Innovations, LLC v. Cook Medical LLC*,
   892 F.3d 1175 (Fed. Cir. 2018) .................................................... 2, 9, 11, 14, 17

*Straight Path IP Group, Inc. v. Cisco Sys., Inc.*,
   2020 WL 2539002 (N.D. Cal. May 19, 2020) .............................................. 15-17

*Straight Path IP Group, Inc. v. Cisco Sys. Inc.*,
   2020 WL 5522993 (N.D. Cal. Mar. 4, 2020) .............................................. 16-17

*Telemac Corp. v. US/Intellicom, Inc.*,
   185 F. Supp. 2d 1084 (N.D. Cal. 2001) ......................................................... 20

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
   2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) ........................................ 5, 12, 20

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ................................................................... 38

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
   939 F.2d 1540 (Fed .Cir. 1991) ................................................................... 26

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
   2018 WL 4849681 (N.D. Cal. Oct. 4, 2018) .............................................. 18-19

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
   809 Fed. App'x 965 (Fed. Cir. 2020) ...................................................... 19, 22

**Statutes**

28 U.S.C. § 1927 ............................................................................................................ 17

35 U.S.C. § 285 ................................................................................1-4, 6, 8, 10, 14-17

DEFENDANT YAHOO, INC.'S OPPOSITION TO DROPLETS' OMNIBUS MOTION, CASE NO. 12-cv-03733-JST

# I.     INTRODUCTION

Each of the three branches of Droplets' Omnibus Post-Trial Motion should be denied.

**First**, this Court should deny Droplets' motion for attorneys' fees because this case is not "exceptional" within the meaning of 35 U.S.C. § 285. Yahoo (a) was found **not** to have willfully infringed any patent claim; (b) prevailed completely on four of the five products accused of infringement; (c) on the one remaining product, prevailed on one of the two asserted claims; and (d) as to the other asserted claim on that product, limited Droplets' recovery to less than 10% of what Droplets asked the jury to award and 1% of its original damages demand. *See* Section II.A. *infra*. Moreover, none of the litigation conduct that Droplets identifies can be fairly portrayed as "vexatious" or "scorched earth," particularly when measured against the overall context and history of this hard-fought case. *See* Section II.B. *infra*. Finally, even if the Court *arguendo* were to entertain a fee award, the methodology Droplets proposes is rooted in an apparently non-existent agreement, is conceptually unsound, and lacks supporting documentation. *See* Section II.C. *infra*.

**Second**, the Court should not accept Droplets' request for prejudgment interest on the terms in its motion. Droplets seeks **more** in prejudgment interest than the lump-sum damages the jury awarded. To get there, Droplets proposes either the California statutory interest rate or the prime rate, both of which are outlier rates that are seldom used in this District. Instead, this Court should use the 52-week T-bill rate widely accepted in this District for cases—like here—where the patentee cannot show that earlier non-payment of a royalty caused it to borrow at higher interest rates. Droplets then applies its aggressive rate to an exceptionally long period (17 years) without meaningful examination of the facts causing this case to last so long, including Droplets' own actions. Specifically, Droplets uses the wrong infringement start date, requests interest to cover its own delay in prosecuting the case, and then seeks to benefit from the multi-year stay it requested to pursue its unsuccessful appeal of the invalidation in reexamination of another patent-in-suit (through which it tried but failed to secure additional patent rights to assert at this trial). *See* Section III.B. *infra*. The case law directs that none of Droplets' delays should be charged to Yahoo.

**Third**, the Court should deny Droplets' motion for a new trial based on Droplets' allegation of an improper construction of "interactive link." Under controlling Federal Circuit law, Droplets

waived any argument to add "peripheral uses" to the "interactive link" construction because Droplets did not object to the Court's proposed instructions or otherwise raise the issue until—for the first time—in post-trial motions. *See* Section IV.A. *infra*. Under the governing construction, substantial evidence supports the jury's verdict that Search History, Mail, Maps, and My Yahoo—the so-called "cookied products"—do not infringe the asserted claims. *See* Section IV.B. *infra*.

## II.   DROPLETS' MOTION FOR ATTORNEYS' FEES SHOULD BE DENIED

This Court should deny Droplets' motion for attorneys' fees, for at least three reasons. *See* Droplets' Corrected Omnibus Post-Trial Motion, ECF No. 1175 (hereinafter, "Mot.") at 2-20. *First*, this is not close to an exceptional case. *See* Section II.A. *Second*, the litigation conduct Droplets now paints rhetorically as "vexatious" was never so, particularly when viewed in the overall context of this hard-fought case. *See* Section II.B. *Third*, and finally, Droplets' novel methodology for quantifying its fees is flawed conceptually and lacks record support. *See* Section II.C.

### A.   This is not an exceptional case

"The award of attorney fees requires a threshold determination that this is an 'exceptional case.'" *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996), quoting 35 U.S.C. § 285. To find a case "exceptional," a court must assess the case as a whole to see if it "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). This is not that kind of case. Importantly, courts analyze exceptionality through "the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* It is "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at 555. Equally important, a fee award should not be a "penalty for failure to win a patent infringement suit." *Stone Basket Innovations, LLC v. Cook Medical LLC*, 892 F.3d 1175, 1184 (Fed. Cir. 2018); *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1278 (Fed. Cir. 2018) ("attorney fees under 285 are compensatory, not punitive").

The "exceptional" label does not fit the circumstances and results in this case. The jury found **no** infringement by four of Yahoo's five accused products: Search History, Mail, Maps, and My

Yahoo. ECF No. 1125. This is why Droplets seeks a new trial on those four products. Mot. at 26-40. The jury found infringement by only one product (Search Suggest) of only one claim (claim 1), and it rejected infringement of asserted claim 5 on that product. Further, the jury held that the infringement of claim 1 was not willful. *Id*. And the jury's final award of $15 million was less than 7% of the "$260.63 million" amount Droplets presented at trial, Ex. 1, Trial Tr. Vol. 7 at 1300:14-15—and less than ███ of the damages disclosure Droplets made when this case emerged from stay, Ex. 2, June 21, 2019 Plaintiff's Damages Contentions, at Ex. A (claiming "Total Royalty Before Interest" of ████ ████). In its totality, this case does not stand out as "exceptional" in plaintiff's favor.

Like many infringement cases where a patentee seeks an enormous sum, this case was hard-fought—on **both** sides. *See Sensonics,* 81 F.3d at 1575 ("Indeed, the court may consider the litigation actions of both sides in connection with § 285."). Against the backdrop of Droplets asserting ten claims up until the eve of trial, accusing five products, and calculating in discovery a total royalty of ████████ dollars, it is neither surprising nor exceptional that both sides zealously represented their clients. As this Court observed during trial, "I'm sure each of you is trying to choke the life out of each other." Ex. 3, Trial Tr. Vol. 9 at 1645:9-13. But as multiple courts have concluded, spirited advocacy is not "exceptional" conduct. In *Finjan v. Blue Coat Systems*, 2016 WL 3880774 (N.D. Cal. July 18, 2016) (Freeman, J.) *aff'd in part, rev'd in part on other grounds*, 879 F.3d 1299 (Fed. Cir. 2018), for example, the court denied fees even where the patentee won infringement on five of six patents, the jury rejected the defense of invalidity, and the jury "awarded Finjan a total of $39,528,487 in lump-sum damages." *Id*. at *1. Like Yahoo here, "Blue Coat vigorously defended its position" and "once sued, defended itself in a determined manner." *Id*. at *15. That vigorous, determined defense did not render the case exceptional, however. *Id*.; *see also, e.g. Illumina, Inc. v. BGI Genomics Co.*, 2022 WL 899421, at *29 (N.D. Cal. Mar. 27, 2022) (Orrick, J.) (denying fees in part because "this case was closely contested and resulted in a split verdict after five days of jury deliberation" and the defendant "succeeded on two of the three patents against" it); *Ironburg Inventions Ltd. v. Valve Corp.*, 2021 WL 4426702, at *2 (W.D. Wa. Sept. 27, 2021) (denying fees:

DEFENDANT YAHOO, INC.'S OPPOSITION TO DROPLETS' OMNIBUS MOTION, CASE NO. 12-cv-03733-JST

"This matter was hard fought by **both** sides," emphasis in original).[1]

> **B.    Yahoo's conduct throughout the case was not vexatious or intended to delay**

Given that the *totality* of this case is not exceptional in Droplets' favor, Droplets builds its motion around Yahoo's alleged "abusive" litigation misconduct. *See* Mot. at 3, 13 & 16. The full picture on each issue is far different from what Droplets' brief depicts, *see* Section II.B.2 *infra*—especially when considered against the legal framework governing the determination of exceptionality, *see* Section II.B.1 *infra*. This case law is largely absent from Droplets' brief.

> **1.    Droplets ignores four controlling legal principles**

*First*, it is "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Octane*, 572 U.S. at 555. The "legislative purpose behind 35 U.S.C. § 285 is to prevent a party from suffering a gross injustice, and not to punish a party for losing." *Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020) (cleaned up); *see also Checkpoint Sys. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017) (same). Here, Droplets' fee motion fails to show that Yahoo's litigation conduct was unreasonable at all, let alone that it was "so exceptional" that a "gross injustice" arose.

The case that Droplets cited (Mot. at 16)—*PersonalWeb Techs. LLC v. EMC Corp.*, 2020 WL 3639676 (N.D. Cal. July 6, 2020) (Davila, J.)—supports Yahoo, not Droplets. In *PersonalWeb*, the court denied a fee motion that was based on a long list of alleged misbehavior, including "delet[ing] emails that it was under a duty to preserve" and "refus[ing] to consent to a stay pending IPR proceedings." *Id* at *2. Emphasizing that "gross injustice" is required, the court concluded that "[a]t no point, or in aggregate, did Plaintiff's conduct rise to litigation misconduct" and that "Defendants distort and take out of context Plaintiff's actions." *Id*. at *3. Droplets adopts that same failed stratagem here, and should likewise fail.

*Second*, in a case where the movant's theory of exceptionality is based on alleged litigation

---

[1] Even on the Search Suggest product on which Droplets prevailed at trial, the trial record reflects Droplets changing its theory on the eve of trial, apparently recognizing the thin read on which its theory rested. ECF No. 1166 at 16-21. Yahoo believes that new theory cannot withstand scrutiny against the Court's relevant claim constructions, and has raised this as a JMOL ground in Yahoo's Rule 50 motion. *Id*. Regardless, even as to this one product on which Droplets prevailed as to one claim, there is nothing about that win that rises to the level of "exceptional."

misconduct, the court can properly consider whether the movant provided "evidence that counsel deliberately attempted to increase the cost and complexity of the case for any improper purpose." *SiOnyx LLC v. Hamamastu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020). For instance, merely taking aggressive positions or inadvertent noncompliance with schedules or procedures does not rise to the level of *exceptional* conduct. *E.g.*, *Location Based Servs. LLC v. Niantic, Inc.*, 2018 WL 7569160, at *2 (N.D. Cal. Feb. 16, 2018) (Cousins, J.) ("merely taking an aggressive stance with positions stretched or unsuccessful infringement theories does not, without more, warrant fee-shifting"); *TransPerfect Global, Inc. v. MotionPoint Corp.*, 2014 WL 6068384, at *8 (N.D. Cal. Nov. 13, 2014) (Wilken, J.) ("MotionPoint's…alleged misstatements of fact…were relatively minor…its alleged failure to comply with the Court's…appears to have been inadvertent.").

Droplets cannot meet that standard on any of the specific points it raises. For example, Droplets uses invective alone to turn Yahoo's invalidity case into exceptional misconduct. Yahoo constructed a sound invalidity case, presented through Dr. Benjamin Bederson, a respected computer scientist. Far from a "sham," *see* Mot. at 12, Yahoo's invalidity case survived multiple legal challenges, including a motion for partial summary judgment and a motions to strike. *See, e.g.*, ECF No. 747, 793. Like most hard-fought issues in this case, the Court ruled both for and against each side on various points. Droplets' real complaint is that Yahoo made a real-time, strategic decision mid-trial to drop its invalidity case. But that decision—as Yahoo's counsel told the jury—was based on a difficult judgment call that Droplet's infringement case had failed ("we felt the noninfringement issues were so clear-cut") and Yahoo wished to "get this case over with so we can move on in life." Ex. 4, Trial Tr. Vol. 13 at 2512:22-2153:3. The jury validated this strategy call, with the net result across all accused products being overwhelmingly in Yahoo's favor when compared with Droplets' ask. But regardless of the outcome, dropping invalidity defenses at trial is a tactical decision that must be made before the result can be known; it is not exceptional conduct. *E.g. Radware, Ltd. v. F5 Networks, Inc.*, 2016 WL 4427490, at *9 (N.D. Cal. Aug. 22, 2016) (Whyte, J.) ("Nor does the court find that F5's decision to abandon its obviousness defense at trial was exceptional"). Even the Court commented on this strategy call in the context of a colloquy about Droplets suddenly dropping three of its five patent claims mid-trial and Yahoo dropping its invalidity case: "aren't the parties entitled to

do that?" Ex. 5, Trial Tr. Vol. 11 at 2174:25-2176:16.

**Third**, in a litigation-misconduct case, the fees claimed must "bear some relation" to the alleged misconduct and must specifically compensate for the "*extra* legal effort" expended "to counteract th[e] misconduct." *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552-53 (Fed. Cir. 1989) (emphasis in original). Where—as here—no willful infringement is found, "the purpose of discouraging infringement is not relevant" so "the fee award can be justified solely by the need to prevent injustice." *Id*. at 1552. Thus, the focus should be on whether the movant had to "expend *extra* legal effort" to respond to the misconduct. *Id*. at 1553; *see also Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1316 (Fed. Cir. 2012) (same); *In re Rembrandt Techs. LP Patent Litigation*, 899 F.3d 1254 (Fed. Cir. 2018) (vacating fee award because "the district court failed to establish a causal connection between the claimed misconduct and the fees awarded"). Here, Droplets does not meaningfully address this requirement.

**Fourth**, and finally, the Federal Circuit makes clear that a "court may consider the litigation actions of both sides in connection with § 285." *Sensonics*, 81 F.3d at 1575. Thus, "even if the district court had found the case exceptional, it would have enjoyed considerable leeway to deny fees in light of [the patentee's] own litigation misconduct." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1468 (Fed. Cir. 1997); *see also Illumina*, 2022 WL 899421, at *29. In this brief, Yahoo will refrain from the mud-slinging approach of Droplets' brief with respect to the number of times Droplets' advocacy was at least in kind with its laundry list of complaints against Yahoo. In appropriate places below, however, Yahoo provides examples of Droplets' own mirror-image conduct to reinforce the broader point, acknowledged by the Federal Circuit, that **both** sides' engagement in zealous, aggressive litigation tactics weighs against a finding of exceptionality.

### 2. Droplets' discussion of Yahoo's litigation activities presents a one-sided, out-of-context picture

Droplets organizes its fee request around three broad categories (Mot. at 4-16; ECF No. 1179, Estremera Decl. at Ex. B), each of which is refuted in turn below.

#### a. The "Prior Art Invalidity Case" arguments fail

Although the points above about the invalidity case should be sufficient for the Court to dispose of Droplets' position, Yahoo will elaborate below out of an abundance of caution.

6

**In general.** Droplets allocates the largest portion of its fee request, $2.5 of the $3 million, to the "Prior Art Invalidity Case," broadly asserting that Yahoo—from the beginning—never intended to put on a proper invalidity defense. Mot. at 12. Droplets' speculation is off-base. Yahoo prepared a invalidity defense it believed would win. As trial circumstances developed, however, Yahoo's tactical decisions evolved with them, as explained above. Yahoo's trial strategy also was impacted by the need to get the case to the full jury. The trial was falling behind schedule, having lost a half-day due to unexpected illness of a juror (Ex. 1, Trial Tr. Vol. 7 at 1337:12-1343:25), in addition to the number of trial disputes brought to the Court during jury sessions. Yahoo's desire to bring the trial to closure was also influenced by the fact that that one juror would leave the panel on March 30 pursuant to an agreement of the parties. (Ex. 6, Trial Tr. Vol. 1 at 191:1-192:7). Yahoo's desire for the full jury panel to deliberate necessitated tough decisions to streamline the case, and dropping its invalidity case was one of them. Yahoo's assessment of the merits was largely vindicated: the jury held four of five accused products to be noninfringing, found no willful infringement, and awarded Droplets only a fraction of its damages ask. ECF No. 1125. And again, Yahoo's own pending Rule 50 motion explains why Yahoo should prevail against Search Suggest as well.

Droplets' complaints against Yahoo dropping its invalidity case also should be measured in the context of its own mid-trial decisions to abandon liability claims, dropping three of its five asserted claims while its infringement expert, Dr. Douglas Schmidt, was still on the stand. The record shows that the Court specifically questioned Droplets at the end of the first Thursday of trial, at the conclusion of a full day of Dr. Schmidt's testimony on infringement and many infringement PowerPoint slides, as to whether Droplets is "still asserting the same five claims." Counsel responded "Yes, Your Honor." Ex. 7, Trial Tr. Vol. 4 at 871:2-25. This colloquy resulted from Yahoo specifically raising the issue with the Court because it appeared that Droplets simply did not have the trial time to address five different claims or to get through all the slides it had disclosed. The Court noted it was asking about this topic to avoid Droplets "sandbagging" Yahoo. *Id.* at 872:23-873:3. Nonetheless, after Yahoo prepared over the weekend to deal with all five claims, Droplets dropped three of them on "Sunday at 4:00 o'clock." Ex. 8, Trial Tr. Vol. 5 at 885:22-889:24. Droplets' explanation to the Court was that "we had thought and worked over the weekend" and "looking at the

timing of the evidence, we decided to narrow the issues, as I think is common as trial progresses," and "then informed Yahoo! as soon as we'd made that decision." *Id*. at 888:22-889:2.

Yahoo underwent a similar up-to-the-minute calculus in deciding whether to put on its invalidity expert. Just as Droplets worked no "gross injustice" on Yahoo from its last-minute tactical decision to abandon claims (and hence Yahoo notified but sought no relief from the Court), so too Yahoo's parallel decision to drop invalidity worked no "gross injustice" on Droplets. *Cf. Sensonics*, 81 F.3d at 1575 ("the Court may consider the litigation actions of both sides in connection with § 285); *Illumina*, 2022 WL 89942, at \*29 ("But if Illumina is entitled to fees on these grounds then Defendants are also entitled to fees for Illumina's losses."). Even the Court saw no issue with **either side's** dropping of claims or defenses. Indeed, when Droplets asked for a Rule 50 judgment on Yahoo's invalidity defense, the Court expressly noted the symmetry of both sides' behavior: "I think I'm just going to tell the jury that these claims have been dropped. I think the parties – aren't the parties entitled to do that?" Ex. 5, Trial Tr. Vol. 11 at 2174:25-2176:16. At the time, Droplets had no answer. *Id*. For good reason, courts have held that dropping invalidity defenses at trial is not exceptional conduct. *E.g.*, *Radware,* 2016 WL 4427490, at \*9 ("Nor does the court find that F5's decision to abandon its obviousness defense at trial was exceptional"). To hold otherwise would turn § 285 into handcuffs on important trial decisions, in derogation of the statute's purpose. *E.g.*, *Highmark*, 687 F.3d at 1309 n.1 (§ 285's goal, unlike Rule 11, is "not to control the local bar's litigation practices").[2]

***Losing certain prior-art references and arguments pre-trial.*** Droplets' fee motion also singles out specific phases of the invalidity case. For instance, Droplets points to (a) the Court's order

---

[2] Droplets' three cited cases (Mot. at 12-13) all concern radically different scenarios with no applicability here and do not help Droplets. In *Cosmo Tech. v. Actavis Laboratories FL, Inc.*, 2019 WL 1417459 (D. Del. Mar. 28, 2019), the Court ordered claims to be narrowed and set an express deadline, but the plaintiff nonetheless dropped additional claims thereafter. *Id*. at \*1. In *Optis Wireless Tech. LLC v. Huawei Device USA, Inc.*, 421 F. Supp. 3d 410 (E.D. Tex. 2019)—highly idiosyncratic—the defendants wished to present "FRAND defense" facts to the jury to argue for lower damages and no willfulness, but did not want the court to actually decide the patentee's FRAND compliance at the subsequent bench trial where the issue was to be resolved. So the defendants withdrew the defense "while the jury deliberated." *Id*. at 414-15. In *Chalumeau Power Sys. v. Alcatel-Lucent*, 2014 WL 4675002 (D. Del. Sep. 12, 2014), the patentee dropped its lawsuit after learning about a dispositive license defense and dragging its feet for a while. *Id*. at \*3. The court ultimately concluded that the patentee "filed a frivolous lawsuit with the sole purpose of extorting a settlement." *Id*.

on Droplets' motion to strike (ECF No. 747), which limited Yahoo's invalidity expert from testifying about certain source code files; and (b) the Court's order on Droplets' motion for partial summary judgment (ECF No. 793), which eliminated seven system references as prior art. Mot. at 10. This Court should not credit this aspect of Droplets' fee request for at least three reasons.

First, Droplets never asked for fees at the time the Court handed down its orders, over a year ago. Under Federal Circuit case law, this failure to ask for contemporaneous relief is compelling evidence that no "gross injustice" was suffered: a "party cannot simply hide under a rock, quietly documenting all the ways it's been wronged, so that it can march out its 'parade of horribles' after all is said and done." *Stone Basket Innovations, LLC v. Cook Medical LLC*, 892 F.3d 1175 (Fed. Cir. 2018); *Ironburg*, 2021 WL 4426702, at *3 (lack of "warnings about possible sanctions…reflects the ordinariness of the discovery squabbles in this matter").

Second, even after the Court's two orders, Yahoo continued to have a substantial invalidity defense with multiple remaining prior-art references to present to the jury. *E.g.*, ECF No. 816, Joint Pretrial Statement, at 6 (listing at least eight remaining references for trial). In fact, one of Yahoo's references—Hickman—was a primary reference the Patent Office used to invalidate the other patent Droplets asserted in its complaint, U.S. Patent No. 7,502,838 ("the '838 Patent"). As Yahoo's technical expert explained in his report, claims 1 and 2 of the '838 patent, invalidated by the Patent Office using Hickman *inter alia*, is strikingly similarly to claim 1 of the '745 patent. *See* Ex. 9, Shamos Report, at ¶¶ 199-226. Yahoo's expert even included a chart mapping the parallel limitations in the two sets of claims. *Id.* at ¶ 207. Given such strong prior art remained in the case after the Court's orders on Droplets' partial motions, Yahoo's invalidity defense was not frivolous, unreasonable, or maintained in bad faith.

Third, Droplets does not isolate the fees attributable to its specific effort on these motions, claiming instead an aggregate "$2.5 million" fee for "in excess of 16,000 hours" spent on the *entire* invalidity case. ECF No. 1179, Estremera Decl. at ¶¶ 12-13. Under controlling law, however, fees are awarded for the *"extra* legal effort" expended—not for *all* the legal effort spent. *Beckman*, 892 F.2d at 1553 (emphasis in original); *Rembrandt*, 899 F.3d at 1277 (requiring a "causal connection between the claimed misconduct and the fees awarded").

**_David Filo's testimony about RocketMail._** Droplets next asserts that Yahoo's co-founder testified improperly at trial about RocketMail source code the Court had previously stricken. *See* Mot. at 11-12. This is a rehash of an issue already addressed and ultimately mooted at trial. Droplets' counsel raised the same objection at sidebar (Ex. 3, Trial Tr. Vol. 9 at 1618:10-1650:5), at the conclusion of which the Court and counsel arrived at a mechanism for handling the issue—counsel would object "same grounds" before the jury and follow up with a motion to strike. *Id.* at 1648:21-1649:20. Counsel never made a "same grounds" objection, and so counsel's concern never materialized. Droplets did not file a motion to strike, so the issue was mooted—in fact, the Court the next day remembered that as "a little ray of sunshine." Ex. 10, Trial Tr. Vol. 10 at 1854:6-8. This inconsequential trial skirmish should not be the basis of an exceptionality finding.

**_No supplementation of Dr. Bederson's report._** Droplets resurrects another sidebar-at-trial issue, this time over whether Dr. Bederson could provide any invalidity opinions before the jury at all, given that he had not issued a supplemental report after the Court's clarification of "cookies" component of the "interactive link" construction, *i.e.*, that, under the construction's negative limitation, the link could not *use* cookies, not just that it could not *be* a cookie (as Droplets had insisted). *See* Mot. at 11. This point was argued to the Court during trial. Ex. 10, Trial Tr. Vol. 10 at 1847:7-1859:14. Yahoo's counsel explained that Dr. Bederson did not supplement because he "understood from the get-go, from the original construction" that cookies could not be used (*id.* at 1847:7-1852:18) and hence "there is not a single discussion of a cookie…in the art that he cited" (*id.* at 1853:21-1854:15). Ultimately, the Court indicated it would deny Droplets relief: "If Droplets felt that he could not give testimony reflected in that report or his deposition in the face of the Court's new claim construction now, it could have asked for that relief a long time ago." *Id.* at 1857:6-21; *id.* at 1859:5-14 ("I think I've spent enough time on this."). This issue then became moot because Dr. Bederson never took the stand. Droplets cannot now support a § 285 claim with an objection it lost.

**_Source code production and invalidity contentions._** Finally, Droplets travels back in time two years, arguing about Yahoo's "voluminous invalidity contentions" and about the completeness and timeliness of Yahoo's source-code production. *See* Mot. at 8-10. This is another set of discovery grievances that, had they constituted the kind of "gross injustice" § 285 demands, should have been

the subject of a contemporaneous sanctions motion—but never were. Under *Stone Basket* from the Federal Circuit, such complaints are not sound bases for a long-after-the-fact fee petition. And again, Droplets does not attempt anywhere in its papers to isolate (with supporting factual basis) the portion of its overall "Prior Art Invalidity Case" fee-award request tied to these alleged deficiencies.

### b. The "Trial 'Exceptional' Case" arguments fail

A second category of alleged litigation misconduct is what Droplets calls "Trial 'Exceptional' Conduct" and for which it seeks $100,000. *See* Mot. at 13-16; ECF No. 1179, Estremera Decl. at Ex. B. Droplets' arguments here should be rejected for four reasons.

**First**, at the highest level, this Court spent weeks observing each side's conduct at trial, and did not express concern that a "gross injustice" had been perpetrated on either party. Of course, the trial record is replete with skirmishes, with both sides winning some and losing some, as is customary in a vigorously disputed trial. As to lawyer conduct, the Court at one point complimented the lawyering ("I just enjoy watching all the different styles of lawyering. So I want to thank you all for that." Ex. 3, Trial Tr. Vol. 9 at 1822:23-1823:7), and at another point wished both parties' counsel luck before closing: "Well, congratulations. You made it to today. I wish I could give a closing argument sometime, but I can't. So my second favorite is that I get to watch good lawyers give them. Good luck to you both." Ex. 4, Trial Tr. Vol. 13 at 2464:4-8.

**Second**, for many of the trial activities it identifies, Droplets did not even prevail on the relevant substantive issue, which provides grounds for rejecting any fee award on that issue. *E.g, Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) (explaining that the "degree of success obtained" is a "critical factor"); *Special Devices, Inc. v. OEA, Inc.,* 269 F.3d 1340, 1344 (Fed. Cir. 2001) ("In fact, the amount of attorney fees awarded may be zero, even though the case is exceptional."). As one example, Droplets again raises the sales letters that it sent to Yahoo a decade before the lawsuit, which Droplets got into evidence based on an argument that Yahoo opened the door to the letters' admission during opening statements. *See* Mot. at 13-14. The purpose of these letters was to support Droplets' claim for willful infringement—but the jury explicitly rejected willfulness in its verdict, after all the facts (including an explicit acknowledgement and apology from Yahoo's counsel about

his mistake regarding those letters) were before the jury. ECF No. 1125.[3] Notably, as the letters were sent prior to the asserted patent being issued, those letters cannot suffice as proof of willful infringement of a non-existent (at the time of the letters) patent.

**Third**, Droplets' remaining complaints are all minor, *e.g.*, (a) demonstrative and exhibit disclosures made 30-90 minutes after the deadline, *see* Mot. at 14-15; (b) not providing demonstrative slides promptly enough, *id.*; (c) requests to limit the number of trial witnesses, *id.* at 13; and (d) requests to have David Filo serve as a corporate representative at trial, *id.* at 13. Droplets should have pressed for specific relief from the Court on issues (a) and (b) at time of trial if Droplets really believed it necessary—but Droplets did not do so. By Droplets' standard, Yahoo should seek fees for all the time it spent most nights dealing with Droplets' boilerplate objections to most exhibits Yahoo identified for use with a witness, only for the objections to be withdrawn at a late hour or even the next morning of trial. Issues (c) and (d) are prototypical trial disputes that courts routinely resolve. Such "minor" and "inadvertent" issues do not rise to the level of "gross injustice" necessary to trigger a finding of exceptionality. *E.g. TransPerfect*, 2014 WL 6068384, at *8 ("MotionPoint's alleged discovery abuses…do not appear to have been committed in bad faith, and its alleged misstatements…were relatively minor…its alleged failure to comply with the Court's orders on motions in limine appears to have been inadvertent."); *PersonalWeb*, 2020 WL 3639676, at *3 ("gross injustice" is required; "the motion practice must be demonstrably frivolous or in bad faith").[4]

**Fourth**, while none of the fee requests are properly supported as to the requested amounts, Droplets barely even attempts to do so for this "Trial 'Exceptional' Conduct" category. Droplets provides no competent basis or support for the $100,000 amount it seeks. All that the Estremera Declaration provides is a conclusion: The $100,000 is ostensibly based on "150 hours of work" for

---

[3] As another example, Droplets cites Yahoo statements about its intent to have a representative testify to Yahoo's knowledge of the reexamination of the '838 patent, which testimony Droplets succeeded in excluding at trial. *See* Mot. at 15. But this dispute too was about evidence relevant only to willfulness—an issue on which Droplets failed before the jury. ECF No. 1125.

[4] On this topic, it also must be noted that Droplets' aggressive use of the rules prompted a criticism of Droplets' approach when it insisted on keeping Sarah Forth-Smith on standby to be recalled remotely during Droplets' rebuttal case, despite her attending to a death in the family. As the Court noted, "I do not like it and I think Droplets knows I do not like it." Ex 11, Trial Tr. Vol. 12, at 2255:13-19. Then, after so burdening Ms. Forth-Smith, Droplets did not recall her or any of the other four Yahoo technical witnesses who Droplets insisted be on standby for its rebuttal case.

the "tasks" that are "detailed in the Motion and Ex B to this declaration." ECF No. 1179 at ¶ 11. But Exhibit B does not list tasks associated with so-called "Trial 'Exceptional' Conduct." It merely refers to whatever is "set forth in the Motion." *Id*. at Ex. B. And the motion does not recite any "tasks" let alone document time spent on them—it only provides a list of grievances. Mot. at 13-16. Droplets' failure to meet its burden is an additional basis to deny any award. *E.g.*, *Gilead Sciences, Inc. v. Merck & Co.*, 2017 WL 3007071, at *3 (N.D. Cal. July 14, 2017) (Freeman, J.) ("The party seeking fees bears the initial burden of establishing the hours expended litigating the case and must provide detailed time records documenting the tasks completed and the amount of time spent."); *Special Devices*, 269 F.3d at 1344 ("the amount of attorney fees awarded may be zero").

### c. The "License Defense" arguments fail

Droplets' third and final category of alleged litigation misconduct is the "License Defense and Related Motion Practice," for which it seeks $400,000. Mot. at 4-8; ECF No. 1179, Estremera Ex. B. Droplets fosters the impression that Yahoo had the Oath entities intervene for the sole purpose of filing a **second** summary judgment motion to press a license defense that the Court had previously denied in response to a **first** summary judgment motion. The record is otherwise.

***First***, the Court denied Yahoo's original motion for summary judgment as moot, because Oath held the license, and could not be substituted in. The Court did not reach the merits of the argument that the RPX Agreement extinguished Yahoo's past infringement liabilities: "The Court having denied the motion to substitute, Oath is not a party in this case and its status as a sublicensee is irrelevant. Thus summary judgment is denied." ECF No. 411 at 7. The Court recognized that the merits question "is an issue of contract interpretation," but it was "one that the Court will not resolve at this time." *Id*. at 3. ***Second***, contrary to Droplets' implication, Oath's second summary judgment motion was expressly authorized, at a February 25, 2020 case management conference. *See* ECF No. 444, Civil Minutes ("Verizon License Motion for Summary Judgment due April 29, 2020); *see also* ECF No. 417 at 57:5-8 (Yahoo counsel at an earlier Oct. 9, 2019 hearing: "if we do move for summary judgment…we'll move for leave on that, as we would for any other party."). ***Third***, the Court reached and resolved the merits of the license defense in its November 4, 2020 "Order Denying Verizon Media's Motion for Summary Judgment." ECF No. 551 at 6-7. Once the Court determined

the issue of contract interpretation, Yahoo and Oath abided.

None of this rises to the level of sanctionable conduct, let alone the kind of "gross injustice" necessary for a § 285 fee award. *E.g.*, *SFA Sys. LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) ("A party's position on issues of law ultimately need not be correct for them to not 'stand out,' or be found reasonable."). Indeed, the fact that Droplets did not seek any sanctions when this license question arose over 18 months ago weighs heavily against predicating a § 285 claim on this theory. *E.g.*, *Stone Basket*, 892 F.3d at 1181 ("Cook's failure to provide early, focused, and supported notice of its belief that it was being subjected to exceptional litigation behavior further supports the District Court's determination that Stone's litigating position did not 'stand out' from others.'").[5]

## C.    Droplets' methodology is conceptually unsound and inadequately supported

Turning to the methodology for determining the attorneys' fee amount, Droplets spends most of its time attempting to justify the use of a "fixed-fee" agreement as opposed to a lodestar calculation. Mot. at 16-20. As a threshold matter, this Court should find that neither this case nor Yahoo's litigation conduct was "exceptional" under § 285, *see supra* Sections II.A.-B., which would obviate the need to assess the reasonableness of Droplets' proffered methodology. But if the Court is inclined to reach the methodology question, it should reject Droplets' approach for two reasons.

### 1.    Droplets apparently was not paid under a fixed-fee arrangement

First, it appears that Droplets never paid its law firm, "RJLF," on a "fixed-fee basis" in this case. Mot. at 17. Although the motion asserts that RJLF "as a matter of policy…has rejected billing by the hour" and now typically "bills clients on a fixed-fee basis," *id.*, the motion then concedes that this case was *a*typical: "In this case, RJLF was compensated for its services with a contingency fee." Mot. at 17 n.12. The Estremera Declaration confirms this point. ECF No. 1179 at ¶ 6.

If in fact Droplets never paid RJLF on a fixed-fee basis, but RJLF instead will be paid on a contingent-fee basis, then Droplets' framing and briefing of the attorneys' fee issue deserves close

---

[5] In an attempt to link the RPX-Verizon license issue to something closer in time, Droplets asserts that Yahoo "continued to press the issue" at the motions-in-limine stage. Mot. at 7. To the contrary, it is **Droplets** who resurfaced the issue, via its Motion in Limine No. 1, in an attempt to set up a straw-man argument. ECF No. 808 at 1. Yahoo responded, explaining why the *existence* of the RPX-Verizon license continued to be relevant at trial, *e.g.*, to damages issues. *See* ECF No. 834 at 1-3. Whereupon Droplets wisely withdrew the motion outright. *See* ECF No. 1044 at 1.

scrutiny. Droplets asserts to the Court that "Reichman Jorgensen Lehman & Feldberg's Flat Fees Are Reasonable," Mot. at 15, and that "Droplets seeks $3 million in attorneys' fees. This is only approximately 25% of the fees incurred in this case." *Id.* at 16. But if Yahoo has correctly dissected Droplets' briefing—such that RJLF has no "flat fee" at all in this case—then no such "fees" were "incurred" by Droplets. And if that is so, then Droplets' approach to its entire fees argument is troubling, particularly in the context of an "exceptional" case motion.

With respect to the contingency agreement RJLF appears to have had with Droplets here, Droplets neither (a) includes the agreement in its supporting papers nor (b) summarizes the arrangement terms nor (c) discloses how much Droplets actually paid (or would be obligated to pay on a $15 million damages award) to RJLF. This material omission dooms Droplets' attempt to calculate its § 285 award using a fixed-fee method since that method bears no relation to what Droplets **actually paid**, or would be obligated to pay, to RJLF in this case. For this same reason, the submitted declarations from John Desmarais and Professor Renee Jefferson are irrelevant—they attempt to justify a billing approach that Droplets and RJLF apparently did not employ here.

Judge Alsup's decision in *Straight Path IP Group, Inc. v. Cisco Sys., Inc.*, 2020 WL 2539002 (N.D. Cal. May 19, 2020) ("*Straight Path I*") is especially informative. There, defendant Cisco paid its lawyers (including Mr. Desmarais) under a "flat-monthly fee" arrangement. *Id.* at *2. Judge Alsup affirmed the special master's conclusion that this "alternative billing method" was "compensable under § 285" but only because Cisco **actually paid** its lawyers under that arrangement: as *Straight Path I* explained, § 285's purpose in that case was to compensate "Cisco for fees actually paid." *Id.* (emphasis added). Section "285 fees compensate for what was actually and reasonably spent." *Id.* at *5; *see also PeriRx, Inc. v. Regents of the Univ. of Cal.*, 2022 WL 622784, at *3 (E.D. Pa. Mar. 3, 2022) (explaining that in *Straight Path I*, "the Court awarded the flat fee that a client actually paid its client [*sic*, lawyers]").

Judge Freeman's decision in *Gilead Sciences, Inc. v. Merck & Co.*, 2017 WL 3007071 (N.D. Cal. July 14, 2017), although not directly on point, also provides some measure of guidance. There, for a 27-month period in the litigation, Gilead, the plaintiff recovering fees, paid its outside counsel under "a fixed fee arrangement." *Id.* at *2. For § 285 purposes, Gilead asked the Court to ignore the

fixed-fee outright and to use a lodestar method instead, but the Court nonetheless found **the actual fixed fees paid** to be important as a check the reasonableness of the award: "While the Court is not persuaded that the fixed fee agreement should act as an automatic ceiling on the reasonable rate, the Court can take it into account to consider the amount involved to consider whether the total number of hours expended is reasonable." *Id*. at *9.

Here, Droplets seems to have obscured the actual fees it paid to RJLF, as nothing about the contingent-fee relationship with RJLF is presented, other than an oblique reference to its existence. Moreover, Droplets does not cite a single case in which a court based a § 285 award entirely on a hypothetical fixed-fee contract that the parties never actually entered into. Indeed, permitting a litigant to base a fee award on a hypothetical instead of a real-world transaction threatens to subvert § 285's purpose. The rationale behind that provision is to compensate a litigant for financial harm actually incurred (fees actually paid)—not to punish the other side or to tack onto a damages award. *E.g.*, *Rembrandt*, 899 F.3d at 1278 ("attorney fees under 285 are compensatory, not punitive").

## 2. Droplets fails to provide adequate record support

Droplets' fee calculation should also be rejected because of the lack of meaningful record support. "The party seeking fees bears the initial burden of establishing the hours expended litigating the case and must provide detailed time records documenting the tasks completed and the amount of time spent." *Gilead*, 2017 WL 3007071, at *3, citing *Hensley*, 461 U.S. at 434. Illustratively, *Straight Path I* quoted the special master's directive as to the billing-record support required:

> [P]rovide the special master a detailed declaration, organized by discrete projects, breaking down all attorney and paralegal time sought to be recovered. For each project, there must be a detailed description of work, giving the date, hours expended, attorney name, and task for each work entry, in chronological order. A "project" means a deposition, a motion, a witness interview, and so forth. It does not mean generalized statements like "trial preparation" or "attended trial." It includes discrete items like "prepare supplemental trial brief on issue X."

*Straight Path I*, 2020 WL 2539002, at *2; *see also Gilead*, 2017 WL 3007071, at *3. The purpose of requiring such detailed support is to provide "a meaningful check against overbilling." *Straight Path IP Group, Inc. v. Cisco Sys. Inc.*, 2020 WL 5522993, at *11 (N.D. Cal. Mar. 4, 2020) (special master's report) ("*Straight Path II*"). "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.

16

Here, Droplets' papers do not come close to providing the billing support that is required. RJLF had one of its partners, Jennifer Estremera, present a high-level hours figure, justified only through repeated references to her "case management and firmwide workflow responsibilities." ECF No. 1176 at ¶¶ 13-16. Droplets also had Mr. Desmarais, another lawyer, repeat Ms. Estermera's statements and pronounce them—again without explanation—"in the range of what is reasonable." ECF No. 1178 at ¶¶ 30, 32-33, 35-37. But attorney say-so is no substitute for adequate billing-record support, as Mr. Desmarais should know from his experience handling Cisco's *Straight Path* fee motion. *See Straight Path I*, 2020 WL 2539002, at *2 (affirming 50% fee reduction because "the records did not paint a clear picture of counsel's billable activities").

Droplets tries to excuse its noncompliance by stating that "as a matter of policy, RJLF does not keep or maintain records of time spent on matters." ECF No. 1176, Estremera Decl. at ¶ 6. But RJLF's internal preferences neither bind this Court nor dictate § 285 procedures. In fact, "courts have held that regardless of how a firm bills its clients, it may be required to provide hourly billing records"—or to reconstruct them "using emails, calendar entries, its document management system, and other materials"—"to the extent it wants to recoup its attorney's fees." *Straight Path II*, 2020 WL 5522993, at *13, citing *Gotro v. R&B Realty Group*, 69 F.3d 1485 (9th Cir. 1995); *Monaghan v. SZS Assocs. L.P.*, 154 F.R.D. 78, 84 (S.D.N.Y. 1994) (ordering contingency-fee firm to reconstruct records). No fees should be awarded absent such supporting documentation.[6]

### III.    DROPLETS' MOTION FOR PREJUDGMENT INTEREST SHOULD BE DENIED

In the second branch of its Omnibus Motion, Droplets requests a prejudgment-interest award (at least as of July 1, 2022) of $17,585,342 using California's 7% statutory rate or, alternatively, $16,047,497 using the prime rate, compounded annually. Mot. at 22-23; ECF No. 1176, Bergman Decl., at ¶¶ 4, 5 n.3 & Ex. 1-2.[7] Both amounts eclipse the $15 million in damages the jury awarded.

[6] Besides 35 U.S.C. § 285, Droplets also cites to "28 U.S.C. § 1927" and the Court's "inherent authority" as legal support for its fee request. *See* Mot. at 2-3. But Droplets does not separately argue for any circumstance in which fees might be denied under § 285, but granted under one or both of these other bases. Consequently, this Court can deny Droplets' § 1927 and inherent-authority positions for the same reasons it denies Droplets' § 285 motion. *See, e.g.*, *Stone Basket*, 895 F.3d at 1184 n.3 ("Because we uphold the District Court's finding of no exceptionality, we also affirm the District Court's denial of Cook's motion for attorney fees pursuant to 28 U.S.C. § 1927.").

[7] Although Droplets' motion states that its alternate request is for "the prime rate compounded quarterly" (Mot. at 23), this appears to be a mistake. Mr. Bergman's prime-rate calculation—to which

They do so by using an overly aggressive interest rate and an overly aggressive accrual period that rewards Droplets for the delays it caused. As shown below, the appropriate prejudgment-interest calculation should (a) use the 52-week T-bill rate, compounded annually and (b) limit the interest-accrual periods to two windows together totaling around eight years, December 12, 2012 through April 12, 2016 and November 1, 2018 through judgment. The correction of the rate will reduce the interest amount to $2,173,253, even if Droplets is credited with the periods during which it caused the delay. Removing those delay periods would reduce the interest amount to $736,410, which Yahoo submits is the appropriate amount in this case.

**A.      Courts in this District consistently use the 52-week T-bill rate for prejudgment interest, and no compelling reason exists to deviate from this practice**

A district court is "afforded wide latitude in the selection of interest rates" and other aspects of prejudgment interest. *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020). Here, three compelling arguments exist for why this Court should use its discretion to apply the 52-week T-bill rate and not Droplets' higher statutory and prime rates.

**1.      Three reasons compel the use of the T-bill rate in this case**

*First*, courts in this District have regularly favored the T-bill rate, following the Federal Circuit's guidance in *Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed. Cir. 1997). There, the appeals court affirmed a prejudgment-interest "rate at the U.S. Treasury bill rate compounded annually" because "there was no evidence that Laitram borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of NEC's infringement." *Id.* At least **eight** Northern District cases have followed *Laitram* in adopting the T-bill rate where the patentee, like Droplets here, fails to make the "causal connection" showing—*i.e.*, does not demonstrate that it had to actually borrow money because it was deprived of a damages award. Tellingly, Droplets does not cite or distinguish *Laitram* or any of these

Droplets expressly refers the Court, *id.*—uses "compounding annually." ECF No. 1176 at ¶ 5 n. 3 & Ex. 2. Yahoo assumes that Droplets' prime-rate request is for annual compounding which would be the more appropriate form of compounding. *See, e.g.*, *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 2018 WL 4849681, at *2 (N.D. Cal. Oct. 4, 2018) (Illston, J.) ("The Court is unconvinced that quarterly compounding is necessary and awards plaintiffs annual compounding prejudgment interest."); *Apple, Inc. v. Samsung Elecs. Co.*, 67 F. Supp. 3d 1100, 1122 (N.D. Cal. 2014) (Koh, J.) ("annual compounding should be utilized").

eight cases, many of recent vintage, in its motion.

In *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 2018 WL 4849681 (N.D. Cal. Oct. 4, 2018), Judge Illston found "that the 52-week Treasury Bill rate is appropriate" and "has been accepted and employed by many courts in patent cases as a reasonable method of placing a patent owner in a position equivalent to where it would have been had there been no infringement." *Id.* at *2. Moreover, "plaintiffs ha[d] not presented evidence suggesting it needed to borrow money because it was deprived of the damages award." *Id.* On appeal, the Federal Circuit affirmed and rejected the patentee's argument for the prime rate instead, explaining that "prejudgment interest awards at the Treasury Bill rate are well within the court's discretion." *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 809 Fed. App'x 965, 977 (Fed. Cir. 2020).

In *Finjan, Inc. v. Sophos, Inc.*, 244 F. Supp. 3d 1016 (N.D. Cal. 2017), Judge Orrick explained that "[c]ourts have declined to use the prime rate where the plaintiff does not present any evidence that it needed to borrow money *because* it was deprived of the damages award." *Id.* at 1042. The court adopted the T-bill rate when patentee Finjan "failed to demonstrate that Sophos's infringement required it to borrow money at the prime rate." *Id.* In *Cave Consulting Group, LLC v. Optuminsight, Inc.*, 2016 WL 4658979 (N.D. Cal. Sept. 7, 2016), Judge Davila, citing *Laitram*, used the T-bill rate because there was "no evidence that [patentee] CCGroup borrowed any money because it was deprived of the damages award." *Id.* at *25. In *Radware Ltd. v. F5 Networks, Inc.*, 2016 WL 4427490 (N.D. Cal. Aug. 22, 2016), Judge Whyte found "it appropriate to utilize the T-bill rate with annual compounding" because "Radware submitted no evidence that it borrowed any money during the infringement period at the prime rate." *Id.* at *12. In *Finjan v. Blue Coat*, Judge Freeman found "the more appropriate approach is to utilize the T-Bill rate" because "Finjan has not put forth evidence that it borrowed any money during the infringement period at the prime rate." 2016 WL 3880774 at *18. In *Apple, Inc. v. Samsung Elecs.*, 67 F. Supp. 3d 1100 (N.D. Cal. 2014), *aff'd* 816 F.3d 788 (Fed. Cir. 2016), Judge Koh explained the "Treasury Bill rate has been accepted and employed by many courts in patent cases as a reasonable method of placing a patent owner in a position equivalent to where it would have been had there been no infringement." *Id.* at 1121-22. In *Apple, Inc. v. Samsung Elecs.*, 926 F. Supp. 2d 1100 (N.D. Cal. 2013), *vacated and remanded on other grounds*, 786 F.3d 983 (Fed.

Cir. 2015), Judge Koh held that because "Apple maintains substantial cash reserves and there is no evidence that Apple borrowed any money because it was deprived of the damages award…as in *Laitram*, the Court finds that the 52-week Treasury Bill Rate is sufficient." *Id.* at 1107-08. Finally, in *Hynix Semiconductor v. Rambus*, 2006 WL 2522506 (N.D. Cal. Aug. 30, 2006), Judge Whyte adopted "the five-year constant maturity Treasury" bill rate because "[a]lthough each time Hynix failed to pay Rambus royalties, Rambus theoretically could have gone to the capital markets and obtained the same amount of money, there is no evidence that Rambus needed to seek or actually did seek funds from the capital markets during the infringement period." *Id.* at *1.[8]

**Second,** Droplets cannot meet *Laitram*'s "causal connection" requirement. Droplets does not present a single fact indicating that, during the claimed infringement period, Droplets ever had to borrow at a higher statutory or prime rate because it had not received its $15 million lump-sum royalty. In fact, during that time, the company received ███████████████████ ████████████████████████████████████████████ CEO David Berberian volunteered that Droplets had received ████████████████████████," Ex. 13, Trial Tr. Vol. 3 [Sealed] at 633:6-11—all before the case emerged from stay in October 2018.[9] Especially given that Droplets appears to have had a contingent fee arrangement with its counsel (RJLF) and had no ongoing non-litigation activities, Droplets has not even proven that it had expenses it could not have covered with that licensing revenue.

In this way, Droplets for prejudgment-interest purposes is situated similarly to the patentees in *Apple, Inc. v. Samsung Elecs.*, 67 F. Supp. 1100 (N.D. Cal. 2014) and *Finjan, Inc. v. Sophos, Inc.*, 244 F. Supp. 3d 1016 (N.D. Cal. 2017). In *Apple*, Judge Koh adopted the 52-week T-bill rate, relying

[8] At least five other patent cases in this District have used the T-bill rate for prejudgment interest, albeit without the substantive discussion found in the eight cases above. *See Fitness Anywhere LLC v. WOSS Enters. LLC*, 2018 WL 6069511, at *7 (N.D. Cal. Nov. 20, 2018) (Freeman, J.); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 2016 WL 4446991, at *12 (N.D. Cal. August 24, 2016) (Chesney, J.); *TransPerfect Global, Inc. v. MotionPoint Corp.*, 2014 WL 6068384, at *5 (N.D. Cal. Nov. 13, 2014) (Wilken, J.); *Linear Tech. Corp. v. Micrel, Inc.*, 2006 WL 8425047, at *90 (N.D. Cal. Jun. 9, 2006) (Patel, J.); *Telemac Corp. v. US/Intellicom, Inc.*, 185 F. Supp. 2d 1084, 1102 (N.D. Cal. 2001) (Wilken, J.).
[9] The record and Droplets' damages expert corroborate these figures. Ex. 13, Trial Tr. Vol. 3 [Sealed] at 617:13-17 (███████████████████████████████████████████████████████; Ex. 14, Bergman Report at ¶¶ 225, 238, 302, 313█████

on *Laitram* and explaining that "although Apple submitted a declaration stating that Apple borrowed in the public markets at rates higher than the Treasury Bill rate, Apple maintains substantial cash reserves and has not presented any evidence that it needed to borrow money *because* it was deprived of the damages award." *Apple*, 67 F. Supp. at 1122. In *Finjan*, Judge Orrick likewise chose the 52-week T-Bill rate (over the prime rate) because Finjan—like Droplets, in the technology patent licensing business—had "secured tens of millions of dollars in verdicts and licensing agreements" such that "it is unlikely that Finjan's case against Sophos specifically put it into a position that required it to borrow money." *Finjan*, 244 F. Supp. 3d at 1043. With substantial licensing revenue of its own during the relevant timeframe, Droplets cannot credibly argue that, without another $15 million, it would have had to borrow at the prime or statutory rates. Thus, under the dominant line of prejudgment-interest cases in this District, the 52-week T-bill rate should apply.

**Third,** the six exhibits Droplets offers to assert that ███████████████████ ████████████████████████████████████████████████ ████████████████ Mot. at 22—are all self-serving and circular. To begin with, two of those exhibits, 35 and 39, are ███████████████████ ECF No. 1179 at Ex. 35, 39. ████ ███████████████████████████████████████ Tellingly, Droplets does not cite a single case where ██████████████ was used to support a prime- or statutory-rate award.[10] The four remaining exhibits—34, 36, 37, and 38—are either ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ ECF No. 1179 at Ex. 37.[11] Not only are these agreements unreliable

[10] Moreover, one of these ████████████ is from October 2020 (ECF No. 1179 at Ex. 39), two years into this litigation, after the October 2018 lifting of the stay. By that point, ████████████████████ ████ Ex. 15, Theuerkauf Nov. 11, 2020 Dep. Tr. at 33:18-34:1 ████████████████████ ████████████████████████████████████████ *E.g.*, Ex. 16, Berberian Nov. 13, 2020 Dep. Tr. at 143:17-148:15 (numerous instructions not to answer).

[11] ████████████████████████████████████████████████ ████████████████████████████

as related-party transactions, but they are all also in service of ██████████ Droplets cites

no case, and Yahoo could find no case, permitting the use of such ██████████

as support for prime-or-above prejudgment interest rates—for good reason. Such loans are virtually

guaranteed to reflect above-market interest rates because they typically ██████████

██████████

██████████

### 2. Droplets' legal authority for a statutory or prime rate is unpersuasive

Against *Laitram* from the Federal Circuit and the dominant line of cases from this District, all

preferring the T-bill rate, Droplets' motion offers only scant and unpersuasive authority. Droplets'

citation to two Federal Circuit cases affirming "application of state statutory rates" (Mot. at 22) is

neither here nor there, given that the Federal Circuit has also approved the use of the T-bill rate at

least three times. *E.g, Verinata*, 809 Fed. App'x. at 967; *Laitram*, 115 F.3d at 955; *Datascope Corp.*

*v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989). In fact, one of the two Federal Circuit opinions

Droplets cites makes clear that district courts have "wide latitude in the selection of rates" and "have

permitted the…U.S. Treasury bill rate." *Schwendiman*, 959 F.3d at 1076.

To support the California statutory rate, Droplets (Mot. at 22) offers only one case from this

District—over three decades old—*In re Hayes Microcomputer Prods. Inc. Patent Litig.*, 766 F. Supp.

818 (N.D. Cal. 1991) (Conti, J.). But *Hayes'* discussion of the rate issue is conclusory and, given the

macroeconomic circumstances in 1991, the motivation for its use of the statutory rate appears to have

been a desire to avoid the plaintiff's demand for an even-higher-at-the-time prime rate. *Id.* at 824

(explaining that plaintiff is seeking a "greater-than-statutory interest rate"). To support the prime rate,

Droplets chiefly relies on two old district-court decisions from outside of this District—*Mahurkar*

from the Northern District of Illinois[12] and *Grain Processing* from the Northern District of

Indiana[13]—which analogize prejudgment interest to a "large, involuntary, unsecured loan to a debtor

██████████

██████████

---

*In re Markhurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1354-55
(N.D. Ill. 1993).
[13] *Grain Processing Corp. v. Am. Maize Prod. Co.*, 893 F. Supp. 1386, 1396 (N.D. Ind. 1995).

of uncertain creditworthiness that is doing its utmost to avoid paying." Mot. at 23. This framing is inapt. For one thing, it implies that courts should **never** award less than the prime rate for an unsecured loan—contradicting consistent Federal Circuit guidance that courts have "wide latitude" to select rates. *Schwendiman*, 959 F.3d at 1076. Moreover, the rhetoric suggests a degree of punishment, of a party "doing its utmost to avoid paying." But "prejudgment interest has no punitive…only compensatory purposes." *Oiness v. Walgreens Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996); *Fitness Anywhere*, 2018 WL 6069511, at *7.[14]

### 3. Droplets' delays in prosecuting this suit further justify the T-bill rate

Finally, this Court may also use Droplets' delay in filing and prosecuting this suit—as detailed immediately below—as further support for awarding the T-bill rate, regardless of whether the Court also adjusts the interest accrual period and even in the absence of an explicit prejudice showing from Yahoo from the delay. *E.g. Enzo Biochem, Inc. v. Applera Corp.*, 2014 WL 29126, at *4-5 (D. Conn. Jan. 3, 2014) (using T-bill rate so as not to reward a patentee's "self-inflicted delay" through late lawsuit filing and "failed assertion" of "five other patents," even where the defendant "may not have suffered prejudice as a result"); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*, 2016 WL 6246590, at * (D. Neb. May 11, 2016).

### B. **Accrual**: Interest should be limited to the windows from December 12, 2012 through April 12, 2016 and from November 1, 2018 through judgment.

In addition to correcting the rate to the T-bill rate, the Court should also correct the interest accrual period. The 17-year period of interest proposed by Droplets—running from October 1, 2005 through July 1, 2022 (ECF No. 1176 at ¶ 4)—would be an extreme result, and could be justified only in a case where delays were either inevitable or were caused by the defendant.

### 1. Droplets incorrectly starts the accrual period on October 1, 2005

First, Droplets' start date of October 1, 2005 is not the "first date of the infringement," as required under the law. *Schwendimann*, 959 F.3d at 1076. The jury held that only Yahoo's Search

---

[14] As shown in the accompanying declaration of Yahoo's damages expert, W. Christopher Bakewell, recalculating Mr. Bergman's Exhibit 2 (ECF No. 1176) using the 52-week T-bill rate (and leaving all other assumptions the same) reduces the prejudgment interest figure to $3,738,920.

Suggest product infringed. *See* ECF No. 1125. It was stipulated at trial that Search Suggest was not publicly released—and therefore did not first infringe—until July 2007. Ex. 17, Trial Tr. Vol. 8 at 1517:1-3 (stipulation Droplets read to the jury: "Yahoo represents that the first version of Yahoo's Search Suggest accused functionality that Droplets alleges infringed the '745 patent was put into operation in July 2007."). Consequently, Droplets' damages expert used ████████████████ ████████████████████████████████████ (Ex. 14, Bergman Report, at ¶ 25) and started his ████████████████████████████████████ (*id.* at ¶ 33).

Although the parties agreed to tell the jury that September 2005 was the date of the "*hypothetical negotiation*" (Ex. 17, Trial Tr. Vol. 8 at 1515:25-1516:1), that was because another accused product—Yahoo Mail—was publicly released then, and the parties assumed that a license for all infringing products would be negotiated together. *Id.* at 1516:22-25 (stipulation that "the first version of Yahoo!'s Yahoo Mail accused functionality that Droplets alleges infringed the '745 patent was put into operation in September 2005"); Ex. 14, Bergman Report, at ¶ 25████████████████ ████████████████████████████████████ But the jury has now held Mail to **not** infringe, which removes it from any hypothetical negotiation. The only **infringing** product under the jury's verdict did not have its infringement period start until around October 1, 2007.[15]

### 2. The first accrual window should not start until December 12, 2012

A further adjustment to the start date of the accrual period is appropriate. Specifically, interest should not start until December 12, 2012, the date on which venue for this dispute in the Northern District—over Droplets' undue delay and further objection—was finally confirmed.

There are two components to the delay caused by Droplets between the August 1, 2007 date of first infringement and Yahoo's proposed opening of the accrual window on December 12, 2012. The first is Droplets' undue delay in bringing this suit, which it did not file until September 7, 2011. ECF No. 1. Droplets' inventors and executives were aware of potential infringement by the accused Yahoo Mail product as early as July 2005, even before its public launch. On ████████████████ ████████████████████████████████████

---

[15] As set forth in Mr. Bakewell's declaration, adjusting the start of accrual to October 1, 2007 would reduce the T-bill-rate calculation to $2,173,253; Mr. Bergman's statutory-rate calculation to $15,485,342; and Mr. Bergman's prime-rate calculation to $11,654,553.

1 ███████████████████████████████████████████████████████

2 ██████████████████████████████████████████████ Ex. 18, DTX-

3 2398. ███████████████████████████████████████████████████

4 ████████████████████ *Id.*[16] Further Droplets' CEO explained Droplets' belief that "Ajax

5 technology was a broad infringer that many people were using" (Ex. 12, Trial Tr. Vol. 3 at 545:22-

6 546:24) ████████████████████████████████████████████████████

7 ██████ *id.* at 598:2-18; Ex. 19, DTX-2290; Ex. 12, Trial Tr. Vol. 3 at 606:5-8.

8       In like circumstances, courts have deferred the start of the interest period where "the patent

9 owner caused undue delay in the lawsuit." *Nickson Indus. v. Rol. Mfg. Co.*, 847 F.2d 795, 800 (Fed.

10 Cir. 1988). This includes a patentee's two-or-more year delay in filing suit as a "self-serving"

11 "litigation tactic." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d

12 1336, 1362 (Fed. Cir. 2001); *see also Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d

13 872, 907 (E.D. Wisc. 2017) (improper five-year delay based "strategic decision to sue larger

14 competitors first"); *Kaneka Corp. v. SKC Colon PI*, 198 F. Supp. 3d 1089, 1124 (C.D. Cal. 2016)

15 (improper four-year delay). Moreover, Droplets' delay prejudiced Yahoo because, *inter alia,* in the

16 interim, accused technologies like Search Suggest received increased acceptance and popularity, to

17 the point that Droplets could claim they had become "an industry standard," suggesting a higher

18 valuation and higher damages. *E.g.*, Ex. 14, Bergman Report, at ¶ 482.

19       The second component of delay in Droplets' prosecution of the suit was an improper venue,

20 causing delay from the date it filed the lawsuit (September 7, 2011) until the date that proper venue

21 was resolved (December 12, 2012). *E.g.*, *Ironburg Inventions Ltd. v. Valve Corp.*, 2021 WL 4426702,

22 at *4 (W.D. Wash. Sept. 27, 2021 (not awarding interest for "the 20 months from December 2015

23 through August 2017 spent litigating in Ironburg's inappropriate choice of forum"). Here, Droplets

24 initially filed this case in the Eastern District of Texas, and then it contested and lost a motion to

25 transfer the matter to this District. Droplets also sought and received a stay while pursuing an MDL

---

27 [16] As the jury heard at trial, Droplets believed that AJAX was "broad infring[ing] technology to
Droplets' '745 patent and its use in Yahoo's accused products was a basis Droplets' technical expert,
Dr. Schmidt, used to determine infringement. *E.g.*, Ex. 12, Trial Tr. Vol. 3 at 545:22-546:24; *id.* at
539:2-540:1; Ex. 8, Trial Tr. Vol. 5 at 995:16-996:22.

transfer back to Texas or to New York. *See* ECF No. 204, 222. The MDL panel ultimately denied Droplet's request on December 12, 2012, at which point the stay (which it had requested) was lifted. *See* ECF No. 224. This is the proper accrual start date.[17]

### 3. Interest should not be awarded from April 12, 2016 to October 31, 2018

Finally, this Court should not award prejudgment interest for the period between April 12, 2016 (when Droplets asked and received stays so it could appeal to the Federal Circuit and the Supreme Court adverse Patent Office decisions invaliding the '838 patent originally asserted in this case) and October 31, 2018 (when the stay was lifted). In *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540 (Fed .Cir. 1991), the Federal Circuit affirmed denial of interest during a four-year period during which "the proceedings were stayed" pending Patent Office reexamination; although "both parties" had agreed to the stay, the patentee had "originally requested the stay." *Id.* at 1546; *see also Ironburg*, 2021 WL 4426702, at *4 (denying interest while "the stay of this matter [was] in effect…while waiting the Federal Circuit's decision on the IPR proceedings" because awarding interest during the stay "would constitute a windfall to Ironburg").

The *Uniroyal* decision applies with full force here. On March 30, 2016, Droplets received a complete adverse decision from the Patent Office Appeal Board confirming rejection of all claims of the '838 patent. *See* ECF No. 292. On April 12, 2016, in response to the Court's show-cause order, Droplets asked for a continued stay so Droplets could further appeal to the Federal Circuit and eventually the Supreme Court. *See* ECF Nos. 293, 294. The Court granted the stay on April 21, 2016. *See* ECF No. 295. Thereafter, Droplets continued to seek extensions of the stay, even as its arguments were consistently rejected at the appellate level. *See* ECF Nos. 296, 304, 306. Ultimately, the Court lifted the stay on October 31, 2018, after the Supreme Court denied Droplets' certiorari petition. *See* ECF No. 309. Throughout this time, Droplets cannot fairly be said to have been pursuing simplification of the underlying case—if anything, it was seeking to *complicate* the case further by attempting to reinject a repeatedly-invalidated patent as a further ground for alleged infringement. Its unsuccessful 18-month efforts should not be rewarded. This Court should exclude the April 12, 2016

---

[17] As set forth in Mr. Bakewell's declaration, adjusting the start of the interest period to December 12, 2012 would reduce the T-bill-rate calculation to $1,084,518; Mr. Bergman's statutory-rate calculation to $10,028,219; and. Mr. Bergman's prime-rate calculation to $6,362,578.

through October 31, 2018 window from any prejudgment-interest award.[18]

## IV. DROPLETS' MOTION FOR A NEW TRIAL SHOULD BE DENIED

In the third and final branch of its Omnibus Post-Trial Motion (at 26-40), Droplets moves for a new trial under Rule 59 on the noninfringment verdict the jury delivered for Search History, Mail, My Yahoo, and Maps (ECF No. 1125)—what Droplets calls the "cookied products." Mot. at 26 ("Droplets seeks a new trial on the cookied products"); *id.* at 40 ("Accordingly, Droplets requests a new trial on the cookied products."). "In the Ninth Circuit, a 'trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'" *Columbia Sportswear N. Am. v. Seirus Innovative Assocs.*, 942 F.3d 1119, 1125 (Fed. Cir. 2019).

Here, Droplets' motion attempts to plug into a line of Federal Circuit cases—originating with *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)—permitting a new trial where a party successfully argues that the district court erred in its claim construction and instructed the jury under that incorrect construction. *See e.g.*, *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1346-47 (Fed. Cir. 2019) (new trial on claim 12 because "the court" improperly "instructed the jury to give undefined terms their plain and ordinary meaning"). But Droplets—unlike the litigants in *O2 Micro* and its progeny—waived its current claim-construction position by failing to object on those grounds to the Court's proposed jury instructions and by not otherwise presenting its argument to the Court before the case went to the jury.

"It is well-settled that a party cannot reserve a new claim construction argument for the post-trial motion stage of litigation." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 904 F.3d 965, 974 (Fed. Cir. 2018); *see also Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (waiver where the party "first asserted the claim construction it presses on appeal in a post-trial motion").[19] Droplets waived its new "peripheral use" argument so it cannot

---

[18] As set forth in Mr. Bakewell's declaration, further adjusting the interest-rate calculation by removing this window would reduce the T-bill-rate calculation to $736,277; Mr. Bergman's statutory-rate calculation to $7,342,730; and Mr. Bergman's prime-rate calculation to $4,421,522.

[19] The Federal Circuit has repeatedly affirmed this point. *See e.g.*, *Indivior Inc. v. Dr. Reddy's Labs., S.A.*, 930 F.3d 1325, 1338 (Fed. Cir. 2019) ("Indivior plainly waived this limited disclaimer argument by not raising it in the DRL case until post-trial briefing."); *Solvay S.A. v. Honeywell Int'l, Inc.*, 742 F.3d 998, 1004 (Fed. Cir. 2014) (claim-construction argument waived where the party "did not ask

serve as a basis for granting a new trial. *See* Section IV.A. *infra*. Moreover, substantial evidence supports the jury's verdict that Search History, Mail, Maps, and My Yahoo do not infringe, further compelling denial of Droplets' motion. *See* Section IV.B. *infra*. Against clear, controlling Federal Circuit law—which Droplets does not address—its new-trial motion fails.

## A. Droplets failed to preserve its "peripheral use" claim-construction position

The chief alleged error Droplets now claims is the lack of "peripheral use" language in the "interactive link" language presented in the jury instructions. *See* Mot. at 34-36 (section headed "Peripheral Uses of Cookies are Permissible and the Jury Should Have Been So Instructed"). To refresh the Court, the specific context for Droplets' argument is as follows.

The "interactive link" was a central limitation argued to the jury, since it is present in all the asserted claims, including the two (claims 1 and 5) that ultimately went to the jury. Consistent with its pretrial claim-construction rulings, the Court instructed the jury as follows on the "interactive link":

> The '745 patent contains the terms "interactive link" and "link." The Court has construed these terms to mean computer code that retrieves and presents – excuse me – computer code that, one, retrieves and presents applications and/or information stored at remote locations across the network when selected by an end user, and two, includes facilities for restoring a particular user's previous operating states of the application as the application is re-presented at a user's computer.

> An interactive link cannot be a bookmark, cookie, shortcut, hyperlink, or Internet address, i.e., URL, or use those elements to restore previous operating states.

> The claim term "previous operating state" means a particular user's operating state and particularly modifications made to the application by the user.

Ex. 11, Trial Tr. Vol. 12 at 2435:22-2436:11. This construction includes a so-called negative limitation: In relevant part, the "interactive link" cannot "use" a "cookie…to restore previous operating states." *Id*. If an accused product **does** use a cookie to restore previous operating states, by operation of the negative limitation, it cannot infringe. On the other hand, if an accused product restores previous operating states but **without** using a cookie, it may infringe, provided the other limitations of the asserted claims are met. None of this was controversial at trial—indeed, Droplets

the district court to modify the claim construction or accompanying jury instructions"); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) ("litigants waive their right to present new claim construction disputes if they are raised for the first time after trial"); *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003) ("At the outset, we note that the parties cannot reserve issues of claim construction for the stage of post-trial motions.");

never objected to the above-quoted jury instruction.

In its current motion, however, Droplets manufactures a **new** issue with the negative limitation—the "peripheral use" issue. *See* Mot. at 34. In May 2021, after the Court had confirmed that an "interactive link" could not "use" cookies "to restore previous operating states," Yahoo moved for partial summary judgment of noninfringement on the issue, arguing that the undisputed facts showed each of the cookied products use cookies to restore previous operating states. *See* ECF No. 769 at 11-15. In July 2021—more than seven months before trial—the Court denied that motion, in the process referencing "peripheral use" that was permitted by the words of the construction: "Although Yahoo's construction of the claim term is correct, the Court is not convinced that the peripheral use of cookies in this instance defeats infringement." ECF No. 801 at 9. Droplets now seeks to exploit that sentence, as if it were different than what the construction already says. The core of Droplets' new-trial motion is the assertion that the Court should have added language about "peripheral uses" to its claim construction. Droplets' motion does not specify the exact new construction it wants, but presumably it is something like this: The "interactive link" cannot "use" a cookie "to restore previous operating states" but it can make "peripheral uses" of cookies, like storing user IDs to authenticate or identify users. *See* Mot. at 34.

Droplets, however, has waived any such further "peripheral use" construction. Like the losing litigants in the *Power Integrations* and *Lazare* cases above, Droplets did **not** object to the Court's "interactive link" jury instruction and did not otherwise present the "peripheral use" issue to the Court before the case was submitted to the jury. This is fatal to Droplets' new-trial argument: "in order to preserve an objection to the district court's claim construction, Fairchild was required to raise the issue before submission to the jury." *Power Integrations*, 904 F.3d at 973-74; *see also Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370 (Fed. Cir. 2022) (requiring the "timely raising of distinct objections to jury instructions" to effectuate a "clear, timely raising of an argument for a claim construction"). This Court took objections to its proposed jury instructions on the morning of March 24, 2022, and Droplets lodged **no** objection to any of the Court's claim-construction-related instructions, including on its now-asserted "peripheral use" issue. Ex. 11, Trial Tr. Vol. 12 at 2239:23-2249:5 (starting "THE COURT: Good morning. What changes are required to the proposed

jury instructions?"). Indeed, Droplets did not include a "peripheral use" construction in its proposed jury instructions, despite the fact that Droplets submitted those back on August 6, 2021 (ECF No. 815-3 at 2), after the Court's summary judgment ruling (ECF No. 801). Droplets is thus like Microsoft in *Lazare*, who "did not include a definition of the scope of the 'automatically' requirement in its proposed jury instructions. Nor [did] Microsoft point to anything it said in the charging conference that raised the issue." *Kaufman*, 2022 WL 1592598, at *6. Microsoft was deemed to have waived its new claim-construction position, *id.*; so too should Droplets.

The Federal Circuit does recognize a "futility exception" to the trial-objection requirement. *See, e.g. Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1370 (Fed. Cir. 2002). Under that exception, a litigant need not reargue a claim-construction position that was previously presented to the Court in clear fashion (*e.g.*, at *Markman*) and rejected. *See e.g.*, *Kaufman*, 34 F.4th at 1370 ("An issue sometimes need not be re-raised in the specific setting of making proposals for or airing objections to jury instructions if it was sufficiently raised and settled earlier."). But Droplets cannot benefit from the futility exception in this case. In the **eight months** between the Court's July 2021 reference to "peripheral uses" and the end of the jury trial, Droplets never flagged the need to add "peripheral use" language to the "interactive link" claim construction. Droplets did not move to clarify or modify the Court's extant constructions to add "peripheral uses," for example.[20] Nor did Droplets raise the issue in any pretrial conference. In fact, the August 2021 Joint Pretrial Statement included an Exhibit J, which listed the parties' claim-construction disputes; but Droplets did **not** identify the need to add "peripheral use" language as one of the disputed issues (ECF No. 816-10)—and never in the months thereafter asked to supplement the statement to add the "peripheral use" issue.

In short, Droplets' waiver is clear and its motion offers no basis for taking up its new claim-construction position now, post-trial, after a jury verdict already rendered under an unchallenged construction. Droplets' Rule 59 motion can and should be denied on this basis alone.

**B.     For the "cookied products," the negative-limitation question about cookie use was properly tried as a fact issue to the jury**

---

[20] Droplets filed a motion for clarification of the negative limitation's cookie-use language in May 2021, but on a different claim-construction point: Droplets wanted the Court to modify its construction to make clear that the interactive link "cannot use a…cookie…to restore locally stored operating states." ECF No. 760 at 1 (Notice of Motion).

Because Droplets has waived its "peripheral use" argument, the only Rule 59 question remaining is whether "substantial evidence" supports the jury's verdict that the cookied products did not infringe under the unchallenged-at-trial construction. *E.g.*, *Power Integrations*, 904 F.3d at 974 ("Because Fairchild has waived its 'per second' claim-construction objection, we only review whether substantial evidence supported the jury verdict under the court's construction."); *Lazare*, 628 F.3d 1376 (reviewing for "substantial evidence"); *Hewlett-Packard*, 340 F.3d at 1320 ("the issue here should have been limited to the question of whether substantial evidence supported the verdict under the agreed construction"). Droplets' motion does not make a serious argument along these lines—failing to even mention the "substantial evidence" standard. Out of an abundance of a caution, Yahoo addresses that standard here. The relevant question is whether substantial evidence supports the jury's determination that the cookied products—Search History, Maps, My Yahoo, and Mail—do not infringe because they do not meet the "interactive link" limitation, because the products either (a) use cookies "to restore previous operating states" and/or (b) do not restore "a particular user's previous operating states" in the first place.

Abundant evidence supports that determination. For one thing, for each of the cookied products, Yahoo offered testimony from Yahoo product engineers, who carefully explained how their respective product worked. For Search History, My Yahoo, and Mail, these engineers informed the jury about the ways in which their product used cookies—Yahoo's B, T, or Y cookies—to store and retrieve information. For example:

- For **Search History**, Sarah Forth-Smith explained how "cookies are used as the key to do the look-up in the database in order to retrieve the search results for a particular user." Ex. 3, Trial Tr. Vol. 9 at 1713:18-23. She went on to describe in detail how that "look-up" process using the cookie "key" worked. *Id.* at 1714:3-1716:19 ("either the value of the B cookie or the value of Y cookie and P cookie were used as the key" to "write" data "to the search history data list"). Forth-Smith walked the jury through a file (PTX-441) showing the requests sent by a user's browser to Yahoo's search servers; she pointed out where the "B cookie" was transmitted; and she made clear that if Yahoo's servers "were going to try to provide search history," they "would use the value of the B cookie." *Id.* at 1719:4-1721:20; *see also id.* at 1732:5-1734:8 (using a "high level diagram" of Yahoo search

architecture to show that Yahoo's search servers "need to use cookies…to extract results" from "the database that contains the user's search history results") *id*. at 1734:9-1737:4 ("keystroke session" and "backspace rewrite" use "cookies as a key" to store user input).

- For ***My Yahoo***, Steve Carlson explained how a user could make personalized "customizations" for various "modules" within the product, which then stores them "in a very large database called the UDB, or user database," so that the customizations can be retrieved the next time the user visits his or her My Yahoo page. Ex. 3, Trial Tr. Vol. 9 at 1767:5-1768:25. Carlson also described the central role that Yahoo's "Y cookie" and "T cookie" play in that process. *Id*. at 1769:1-1770:25 ("So the Y and T cookie, it – I think I mentioned it identifies you specifically, your user I.D., and so My Yahoo! needs that information if we want to retrieve your customizations that you've made to My Yahoo!"). He noted that "if a user disables the Y and T cookies," they cannot "see the customizations they previously made to the My Yahoo! page." *Id*. at 1771:1-7; *id*. at 1774:7-15.

- For ***Mail***, Rattan Hudda told the jury that cookies are used to fetch a user's data—like the user's personalized inbox—when the user logs into his or her Mail account: "'Get my emails'…that request includes cookies going from Yahoo! user's machine to the Yahoo! servers." Ex. 3, Trial Tr. Vol. 9 at 1812:5-1813:18; *id*. at 1815:10-21. Hudda also explained that information stored in Mail's cookies was used both to authenticate a user through a user I.D. (Droplets' theory of "peripheral use") **as well as** to determine **where** a user's Mail data was stored: "[O]nce we validate the cookie…we want to kind of open the cookie and check where is the user's data on the Yahoo! site….we open the cookie and see where the user's data is on these YTS [Yahoo Traffic Server] machines." *Id*. at 1816:9-25; *see also id*. at 1817:1-1818:11 ("So these computer[s] again open the cookie. Once they open the cookie, they know exactly where the user's data is."); *id*. at 1813:2-18 ("It also checks where the user's data is because Yahoo! has thousands and thousands of machines. So it [Mail] has to know where the user's data is."). Information stored in Mail cookies also tells Yahoo's Mail servers **where** to send back the user email data requested: "So Yahoo! Mail machines won't serve an user request if the cookie is not a valid cookie…we don't know where to send the request and what information to serve without looking at [the] cookie. Because that information is inside the cookie. So without looking at the cookie, we cannot send back any data to the user's machine." Ex. 10, Trial Tr. Vol. 10

at 1878:16-23; *id.* at 1876:11-16 ("Yahoo! Mail requests cookie before any request we can send it back to user's computer."). Hudda made clear that Mail will not return any data without cookies: "Yahoo! Mail doesn't allow or want to [re]turn you any data back if there is not really [a] cookie." Ex. 3, Trial Tr. Vol. 9 at 1818:17-21; Ex. 10, Trial Tr. Vol. 10 at 1886:23-1887:1 ("Yahoo! Mail won't work if the user has blocked their cookies.")

Yahoo engineers also addressed the remaining accused cookied product—Maps—as well as the particular "Scoreboard" module within My Yahoo that Droplets had singled out as part of its infringement theory. Here, the engineers explained that Maps and the My Yahoo Scoreboard did not store any user information or state in the first instance (and therefore could not **restore** those states). For instance, Maps engineer Pavan Ratnakar explained the technological, under-the-hood implementation of "panning" and "zooming" functionality in Maps; these are the particular functionalities Droplets accused of infringement. Ex. 3, Trial Tr. Vol. 9 at 1800:2-1804:25 (explaining the flow of HTTP requests and responses for panning and zooming). Against this background, Ratnakar made clear that when a user pans or zooms in the product "we are not storing the user's state at any point in time." *Id.* at 1805:23-1806:8. He also explained how Maps presented the user with the same information *without* restoring state: "Every time when you would load the maps, we would use their IP address to resolve the location and to show you the bounding box for the user's location using the IP address." *Id.* at 1806:1-25. Similarly, My Yahoo engineer Steve Carlson described the Scoreboard module as not storing any user information (so there would be no state to later restore): "We don't keep any log or history of what a user has clicked on within the module." Ex. 3 Trial Tr. Vol. 9 at 1776:14-22; *id.* at 1176:23-1777:20 (explaining that My Yahoo does not "have any sense of the past tab selection gestures that the user had in the Scoreboard module").

The jury was entitled to credit this first-hand, percipient-witness testimony about the operation of the accused products, particularly after Droplets chose not to cross any of these witnesses about the merits of their testimony. Ex. 10, Trial Tr. Vol. 10 at 1887:21-1889:5 (Hudda cross); Ex. 3, Trial Tr. Vol. 9 at 1807:14-1808:6 (Ratnakar cross); Ex. 3, Trial Tr. Vol. 9 at 1780:7-1781:19 (Carlson cross); Ex. 3, Trial Tr. Vol. 9 at 1751:10-1752:23 (Forth-Smith cross). Indeed, Droplets' counsel even vouched for these engineers' credibility in his closing argument: "So we didn't cross-examine them

because we don't think they're lying and they're not bad people." Ex. 4, Trial Tr. Vol. 13 at 2493:7-8. "There was really nothing wrong with what they said." *Id*. at 2582:14-2584:11

Furthermore, once this Yahoo engineer testimony finished, Yahoo's technical expert, Dr. Michael Shamos, took the stand and explained—with reference to both the engineers' testimony and the cross-examination of Droplets' infringement expert (discussed below)—why the operation of the Search History, Mail, Maps, and My Yahoo products, as recounted by the engineers, did not meet the "interactive link" limitation and therefore did not infringe. For Search History, My Yahoo, and Mail, this was because the products used cookies "to restore previous operating states"—triggering the negative limitation that did not permit such "use" for infringement to arise. For example:

- For ***Search History***, Shamos, relying in part on Forth-Smith's testimony explained that the only way Yahoo search has of remembering a user's past search queries—*i.e.*, the "search history"— is through cookies: Yahoo search "has no way of remembering what you did in the past because HTTP is stateless. The only way it remembers it is through the cookies." Ex. 10, Trial Tr. Vol. 10 at 1972:24-1973:5. Yahoo search "couldn't bring back your previous search history because that would be stored using the Y and T cookies." *Id*. at 1969:1-24; *id*. at 1972:19-23 (the "only way that Yahoo has of knowing anything about what the user previously did is through cookies"). To get the search history, Yahoo "pulls the user identification out of the cookie and uses that as an index into a database to get your particular information." *Id*. at 1971:14-19.

- For ***My Yahoo***, Shamos observed that "the only way state is restored is through cookies when you're logged in." *Id*. at 1947:7-11; *id*. at 1944:21-1945:1 ("any state that's restored in My Yahoo! is restored through cookies"). Recapping Carlson's testimony, Shamos recounted that there are "a variety of modifications that you can make to My Yahoo!"—"you can add different modules"—but "Yahoo! has to store that. Otherwise, when you come back to My Yahoo!, you wouldn't be [able] to see the page the way you liked it." *Id*. at 1945:13-1946:3. Cookies were the way My Yahoo achieved this user-state storage and restoration: "So he [Carlson] said that it stored modifications on the server and it did so using cookies." *Id*.

- For ***Mail***, Shamos explained that "any state restoration is based on cookies." *Id*. at 1940:18-1941:6. Relying on Hudda's testimony *inter alia*, Shamos observed that "if you don't have

Y and T cookies, then Mail doesn't work…you can't go anywhere." *Id.* at 1941:16-1942:1; *see also id.* at 1943:2-1944:2 (agreeing that "through the use of cookies…Yahoo! can keep track of what user is on Yahoo! Mail, determine what information was last shown to them, and present the Mail applications that accurately reflect the state of that last visit.").

Turning to **Maps** and the My Yahoo Scoreboard, Dr. Shamos explained that these products did not meet the "interactive link" for a separate reason: For the functionalities that Droplets accused, they did not store user state at all and thus did not meet the "restoring a particular user's previous operating states" construction. His testimony about the accused "zoom" functionality in Maps is illustrative.

> Q. So if the user decides to zoom in three levels and then quits the application and comes back, is there any memory or history of where that user was when they left off?
>
> A. None.
>
> Q. And what would that mean in terms of whether or not this could infringe the patent?
>
> A. It can't because there's no restoration of state. If there's no restoration of state, there – there can't be infringement.
>
> Q. Okay. Is the fact that the user can go do it themselves again twice, is that – is that what this patent covers?
>
> A. No. As I say, there's no memory on the servers of what the user did. The user's doing the same many times, and if he does the same thing many times, he'll get the same result, but not because the server remembered anything.

*Id.* at 1954:3-17; *see also id.* at 1953:10-1954:1 ("And so if you move one way and you move back the other way, if you come back to your original position, yes, you'll see the same map, but that's not because the HERE servers remembered anything…The HERE servers have no memory whatsoever of what you've done. They get new requests all the time for pieces of map.").

Dr. Shamos made a similar point about the My Yahoo Scoreboard module, which had various tabs the user could select to toggle between views. My Yahoo had no memory of the Scoreboard tab the user selected or whether it was the first or second time the user selected it. *Id.* at 1949:5-13 ("Q. Does the Yahoo! server have any memory of the fact that this is the second time the user hit the 'Today' tab? A. No. Mr. Carlson testified that the servers do not maintain any record of the links that were clicked by the user. The server doesn't remember any of that."). By selecting a tab a second

time, a Scoreboard user is not fetching from memory his or her saved previous state; the user is creating that tab view anew a second time. *Id*. at 1949:14-18 ("Q. So does the user just keep having to do it themselves? A. Yes. Q. In light of that, does that infringe the patent? A. No."); *id*. at 1949:25-1950:8 ("It's the same thing as going to an ordinary website and clicking on different links. And if you click on the same link many times, you keep seeing the same thing. But not because the server remembered that."). Again, as with the Yahoo engineers, the jury was entitled to believe and accept Shamos' detailed, thorough testimony.

In the end, Droplets' real problem at trial was not the claim construction, but the fact that it chose a high-risk strategy that it ultimately could not pull off, because of two conceptual flaws—oversimplification and a false binary. The oversimplification was Droplets' contention that the **only** uses of cookies that the Yahoo engineers described were as places to store user IDs for authentication purposes. The false binary was Droplets' implicit premise that **if** a Yahoo cookie stored a user ID, it could not **also** use that cookie for other purposes, like looking up and storing user data from a Yahoo database. Both conceptual flaws were fully in evidence in Droplets' closing argument and in the testimony of its expert Dr. Schmidt.[21]

The jury of course did not have to believe Droplets' **characterization** of what the Yahoo engineers said about cookies in Yahoo products. They heard the testimony for themselves and—as summarized above—the cookies in Yahoo's accused products served purposes beyond merely storing user IDs for authentication purposes. The information in the cookies was also used to locate user data on Mail servers and to locate where that data would be sent, as one example. In Search History, the cookie values were used as a "key" to pull data from search databases and were similarly used in My

---

[21] *E.g.*, Ex. 4, Trial Tr. Vol. 13 at 2492:19-2493:21 (Droplets' closing: "Nothing that [the Yahoo engineers] said has anything to do with our theory of the case. What they all testified to is that cookies are used to get a user I.D."); *id*. at 2494:19-2495:11; *id*. at 2582:14-2584:11 ("There's nothing in the patent or in the Court's construction that says you can't use a cookie to get a user I.D."); *id*. at 2584:17-25 ("They're being used here just to the user I.D."); Ex. 8, Trial Tr. Vol. 5 at 984:25-985:9 (Dr. Schmidt: "The products only use the cookie, if they use it at all, peripherally in order to authenticate the user."); *id*. at 1077:20-1078:9 ("And that's a peripheral use of a cookie in order to be able to authenticate or identify a particular user"); Ex. 5, Trial Tr. Vol. 11 at 2184:21-2188:1 (Dr. Schmidt on rebuttal: "we saw many examples of how Yahoo!'s products applied cookies in order to be able to do things like authenticate a user or be able to keep track of a user's identity, which is not the same thing as using cookies to restore previous operating state."); *id*. at 2187:10-2188:1.

Yahoo to store and retrieve user "customizations" from the user database. All these further uses support a conclusion that cookies were used "to restore previous operating states."

The jury also did not have to credit any of Dr. Schmidt's testimony. With respect to cookie use, Dr. Schmidt did **not** challenge the Yahoo engineers on their descriptions of the technical operation of the products. Instead, he relied on strained analogies about "Post-it notes" (Ex. 5, Trial Tr. Vol. 11 at 2199:12-23) and airport "security checkpoints" (*id*. at 2200:4-2201:18) the jury could rightly disregard as playful but irrelevant. Moreover, Dr. Schmidt was crossed with his own prior expert-report statements, in which he discussed the Yahoo products' use of cookies to save and restore state information—not merely to house a user ID for authentication purposes.[22] In the end, ample evidence regarding cookie use supported the jury's determination of noninfringement. Droplets' motion for "a new trial on the cookied products" (Mot. at 30) should be denied.

## C. Droplets' alternate argument about "modifications" is irrelevant

In the last five pages of its motion, Droplets also argues that the Court improperly construed "previous operating state" to mean in particular "modifications made to the application by the user." Mot. at 36-40. Droplets presents this argument in the alternative, in the event that "Yahoo…contends that the cookie error was harmless because the jury could have found that the cookied products also failed to meet the 'modifications limitation.'" *Id*. at 36. The Court need not address this argument.

Yahoo does not claim that Droplets' new alleged "peripheral use" error is harmless because

---

[22] For **Mail**, he admitted that "Yahoo! stores information regarding the state of the user's mail services" and "associates that state with the user's HTTP request using cookies" ("although it could probably be said more artfully and accurately"). Ex. 20, Trial Tr. Vol. 6 at 1174:20-1175:1. Schmidt also agreed with the virtually identical statement in his earlier expert report that "Yahoo! stores information regarding the state of the user's mail services, including Calendar, Contacts, and Notes, and associates that state with a user's HTTP request using the Y and T cookies," as well as the further explanation that "In this way, Yahoo! can keep track of what user is on Yahoo! Mail, determine what information was last shown to them, and present the mail applications that accurately reflect the state of that last visit." *Id*. at 1177:11-1178:8; Ex. 21, Schmidt Expert Report, at ¶ 90.

For **My Yahoo**, Schmidt on cross agreed with his statement from his expert report that "Yahoo uses the user's Unique Identifier ('UID'),and cookies to save what the user's previous presentation looked like (what modules the user has added to their My Yahoo and their chosen theme) and redisplay those same modules with the same themes." Ex. 22, Exhibit F to Schmidt Expert Report, at ¶ 150; Ex. 20, Trial Tr. Vol. 6 at 1186:17-1187:4.

For **Search History**, Schmidt agreed with the statement in his report that, in Search History, "Yahoo! stores the B cookie to 'be aware of the user' to know 'when a user makes a request for search suggestions' and 'send any relevant past searches as additional search suggestions.'" Ex. 20, Trial Tr. Vol. 6 at 1197:24-1198:22; Ex. 21, Schmidt Expert Report, at ¶ 80.

the jury may have found those products to be missing "modifications." Rather, as explained above,

Yahoo argues that Droplets **waived** its "peripheral use" construction and argument. *See* Section IV.A

*infra*. If anything, Droplets' additional "peripheral use" language would be cumulative and

unnecessary. *E.g.*, *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim

construction "is not an obligatory exercise in redundancy"). The import of the "interactive link"

construction the jury heard is that **any** use of a cookie—"peripheral" or not—that does not involve

state restoration will expose the defendant to infringement liability. Indeed, that is the very point that

Droplets pressed frequently, loudly, and vigorously at trial, in closing and through Schmidt's

testimony. *See supra* note 21. That Droplets ultimately could not convince the jury on this point is not

a failure of the claim construction, but a consequence of Droplets' attempt to elide the reality of how

the cookied products operate.[23] Droplets' new trial motion should be denied.

## V.    CONCLUSION

For the reasons set forth above, this Court should (1) deny Droplets' motion for attorneys'

fees; (2) deny Droplets' motion for a new trial; and (3) award prejudgment interest at the 52-week T-

bill rate, compounded annually, but only for the windows between December 12, 2012 through April

12, 2016 and from November 1, 2018 through judgment.


Dated: July 1, 2022                                Respectfully submitted,


                                                   /s/ *Meghan C. Killian*
                                                   George D. Niespolo
                                                   (SBN: 72107)
                                                   Meghan C. Killian
                                                   (SBN: 310195)
                                                   Duane Morris LLP
                                                   Spear Tower
                                                   One Market Plaza, Suite 2200

---

[23] Droplets also should be careful what it wishes for. Despite attempting to limit its requested relief to "a new trial on the cookied products" only (Mot. at 40), if the "interactive link" construction were altered to eliminate the reference to "modifications made to the application by the user," that change would also impact the jury's verdict of infringement on Search Suggest—because the "interactive link" limitation is present in both asserted claims sent to the jury. There is no principled way to limit a new trial to only Mail, Maps, My Yahoo, and Search History, without also retrying liability on Search Suggest.

San Francisco, CA 94105
415.957.3000 (phone)
415.957.3001 (fax)
GDNiespolo@duanemorris.com
MCKillian@DuaneMorris.com

Kevin P. Anderson
(admitted *pro hac vice*)
Duane Morris LLP
505 9th Street, N.W., Suite 1000
Washington D.C. 20004-2166
202.776.7800 (phone)
202.776.7801 (fax)
KPAnderson@duanemorris.com

Aleksander Goranin
(admitted *pro hac vice*)
Duane Morris LLP
30 South 17th Street
Philadelphia PA 19103-4196
215.979.1000 (phone)
215.979.1020 (fax)
Agoranin@duanemorris.com

Woody Jameson
Matt C. Gaudet
Alice Snedeker
(admitted *pro hac vice*)
Duane Morris LLP
1075 Peachtree Street NE, Suite 2000
Atlanta GA 30309-3929
404.253.6900 (phone)
404.253.6901 (fax)
WJameson@duanemorris.com
MCGaudet@duanemorris.com
AESnedeker@duanemorris.com

Holly Engelmann
(admitted *pro hac vice*)
Duane Morris LLP
100 Crescent Court, Suite 1200
Dallas, TX 75201
214.257.7226 (phone)
214.292.9454 (fax)
HEngelmann@duanemorris.com

Jennifer H. Doan
(admitted *pro hac vice*)

Texas Bar No. 08809050
Joshua R. Thane
(admitted *pro hac vice*)
Texas Bar No. 24060713
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
903.255-1000 (phone)
903.255-0800 (fax)
jdoan@haltomdoan.com
jthane@haltomdoan.com

Hieu Hong Phan
(SBN 218216)
Yahoo Inc.
1193 & 1199 Coleman Avenue
598 Champions Drive
San Jose, California 95110
408.349.3300 (phone)
hphan@yahooinc.com

*Attorneys for Defendant Yahoo, Inc. and Intervenors-Plaintiffs Oath Holdings, Inc. and Oath, Inc.*

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of **YAHOO'S OPPOSITION TO DROPLETS, INC.'S OMNIBUS POST-TRIAL MOTION** was served by ECF on all counsel of record on July 1, 2022.

/s/ Meghan C. Killian
Meghan C. Killian